# EXHIBIT A





# IPP

*IPP / Income Producing Properties*

IPP are high performing properties in growing markets with great potential due to the high occupancy rate and demand for rentals, the increase in property prices and the low property taxes.

The ABC Capital team analyzes the potential of each property in detail. Once acquired and stabilized, we proceed to the complete remodeling and lease to then offer them to our clients.

In this way, each property is prepared, individually or in groups, as IPP.

The administration of the properties includes maintenance, sending income for rent and reports to our clients offering a comprehensive solution for foreign investors.



*We have designed a process that allows us to develop a high performance product.*

# A process that ensures your

# peace of mind and continuity of return.

**1.** SEARCH AND PURCHASE

We do an extensive search and analysis to define the best available properties and acquire them with great benefits.

**2.** REHABILITATION PROGRAM

A detailed and full remodeling process, completed by professionals. This process includes: structural adjustments/improvements, electrical and plumbing systems, drywall, kitchen and more.

**3.** LEASE PROGRAM

Once the property is remodeled, we proceed to lease it, ensuring returns above 9% per year.

**4.** PROPERTY ADMINISTRATION

We take care of the administration including the following:
– Receive the rent
– Pay expenses
– Monitor repairs
– Send a monthly account statement

**5.** PROPERTY SALE

At this point, the property enters our system, is listed in our sales inventory and offered to investors as a stable option for their portfolio.

# IPP PROPERTIES

To date, more than 5,000 properties have been acquired, refurbished and sold. These are some examples of the IPP properties that we have recently sold. To find out the available inventory, contact our sales department.



## BALTIMORE / 1708 MONTEREY

| Closing Costs: | | $4,500 |
|---|---|---|
| Estimated Annual Return: | | $11,284 |
| **Sale Price:** | | **$84,500** |

| | Monthly | Annual |
|---|---|---|
| Estimated Rent: | $1,200 | $14,400 |
| Property Management (10%): | $120 | $1,440 |
| Estimated Taxes: | $75 | $896 |
| Property Insurance: | $65 | $780 |
| **NOI:** | **$940** | **$11,284** |
| **CAP:** | | **12.7%** |

## PHILADELPHIA / 5713 HARMER

| Closing Costs: | | $3,500 |
|---|---|---|



| | Monthly | Annual |
|---|---|---|
| Estimated Annual Return: | | $9,938 |
| Sale Price: | | $90,000 |
| Estimated Rent: | $1,050 | $12,600 |
| Property Management (10%): | $105 | $1,260 |
| Estimated Taxes: | $52 | $622 |
| Property Insurance: | $65 | $780 |
| NOI: | $940 | $11,284 |
| CAP: | | 10.6% |

# Invest in IPP today

At ABC Capital we are ready to help you at every step.

**CONTACT US**

Home
Product
Market
Company

**Contact:**
contact@abccapitalmiami.com
(305) 395-7100



Contact

© 2019 ABC Capital Miami. All rights reserved.

# EXHIBIT B

HOME    HOW DOES IT WORK    CURRENT INVENTORY    ABOUT PHILADELPHIA    ABOUT ABC CAPITAL

## HOW DOES IT WORK

Home › How Does It Work

# PASSIVE INCOME FROM REAL ESTATE

ABC Capital RE, LTD offers a totally passive way to hold Real Estate. No physical or administrative involvement is required from our clients. By working with ABC, you retain legal control though your own entity or in your personal name but we handle the rest of your affairs if you wish. Everything regarding your property is cared for by ABC Capital RE, LTD.



## HOW DOES IT WORK



**1. Choose your income property** – ABC researches and locates the best rental properties to compliment our investor's needs and portfolio. Our clients just need to select a property from our stock. Normal range for our properties is from $25,000 to $50,000.

**2. We renovate it for you** – The ABC Capital RE, LTD team will renovate your property in a maximum of 120 days. Our team has renovated and developed over 1,000 properties. You will receive a finished product with no effort on your part. The normal cost of our renovations range from $35,000 to $100,000. The cost of renovation is guaranteed by ABC Capital RE, LTD.

**3. Start receiving your rental income** – You will receive your first monthly payment never later than 121 days after your purchase and every 30 days thereafter via electronic funds transfers. First year rent income is guaranteed and starting the second year you may be able to get rent insurance if you so choose. Return on Investments are 14%+ yearly, in addition to property appreciation.

# HIGHLIGHTS

**Home Warranty** – We fully renovate the properties, including a new roof with a 15-year warranty, but clients also receive a 1-year home warranty (from June 2016, it will only be 6 months) that covers your property for all damages and repairs needed within the first year of your purchase. No maintenance expenses during the first year!

**Rent Protect** – ABC Capital ensures that your monthly payment is delivered to you without fail. Yes, a guarantee that payments are made to you for the first year after purchase. You may choose to pay for that insurance (if available ) in the 2nd and succeeding years

**Electronic Monthly Payments** – Every month, your Return On Investment is sent to you via electronic funds transfer. Just provide us with the proper wiring instructions and your payments are sent automatically.

Our Renovations | ABC Capital RE



HOME    HOW DOES IT WORK    CURRENT INVENTORY    ABOUT PHILADELPHIA    ABOUT ABC CAPITAL

# ABOUT ABC CAPITAL

Home  ›  About ABC Capital

ABC Capital RE, LTD is a one-stop shop for overseas and US real estate clients. We locate, renovate, and manage properties for hands off international/national clients.  You do not have the risk of buying securities but instead your real estate properties remain in your own separate legal entity. ABC has presented our unique value proposition all over the world including cities and countries such as London, Singapore, Tel Aviv, Monaco, and New York. Our rental properties are cash-flow producing in the Philadelphia residential markets.

ABC Capital RE, LTD was created in the heart of the worldwide recession as more clients needed to generate stable cash flow income that they could rely on. Clients no longer wanted to speculate in property. Philadelphia was the perfect location for this type of venture. Philadelphia's low vacancy rate combined with some of the lowest property taxes in USA create a powerful combination of reliable strong cash flow.

ABC has learned that our clients want a smooth and quiet venture. ABC's model to completely renovate and warranty every house it sells is the model of the passive property venture industry.

In 5 years ABC has sold over 900+ properties to clients in 22 countries. ABC employees over 30 full-time employees in its Philadelphia office doing property management and administration. In addition, ABC has over 450 contractors working exclusively for ABC in all of its renovations. ABC is renovating 120+ houses at a time and selling 30-40 houses per month. ABC paid over 5 million dollars in rents to its clients in 2015. In addition, ABC was the largest cash buyer of residential property in the city of Philadelphia each of the last 3 years.

The ABC Capital RE, LTD staff and affiliates has over 30-years combined property venture experience with over 3,000 property transactions serviced in the last 16 years. Our expertise is in venture selections, construction, and property-management. ABC Capital RE, LTD has been #1 cash buyer in Philadelphia for number of transactions of residential properties during 2013 through 2016.

Our administrative offices and warehouse are located at 1218-1224 N. Marshall Street, with 5000 SF internal space and 18,000 SF exterior space.

# EXHIBIT C

Weisberg Law, P.C.

**L.Anthony DiJiacomo <adijiacomo@weisberglawoffices.com>**

## Fwd: NO SE MUEVA DE SU CASA - Reuniones Privadas !!!! -Detroit- Baltimore- Philadelphia - y mucho mas!!!

**javierrossi24031975@gmail.com** <javierrossi24031975@gmail.com>                Mon, Oct 24, 2022 at 12:17 PM
To: "L. Anthony DiJiacomo" <adijiacomo@weisberglawoffices.com>

Dr. Javier Luis Rossi

Inicio del mensaje reenviado:

**De:** Jorge Kupferman <jorge@miamiliferealty.com>
**Fecha:** 22 de julio de 2020, 07:22:36 ART
**Para:** javierrossi24031975@gmail.com
**Asunto: NO SE MUEVA DE SU CASA - Reuniones Privadas !!!! -Detroit- Baltimore- Philadelphia - y mucho mas!!!**
**Responder-Para:** jorge@miamiliferealty.com





**GRAN REVALORIZACIÓN**













jorge kupferman, 2320 Hollywood Blvd, Hollywood, FL 33020

SafeUnsubscribe™ javierrossi24031975@gmail.com

Forward email | Update Profile | About our service provider

Sent by jorge@miamiliferealty.com powered by

Try email marketing for free today!

Weisberg Law, P.C.                                        **L.Anthony DiJiacomo <adijiacomo@weisberglawoffices.com>**

---

## Fwd: Miami - Detroit - Baltimore - Philadelphia , RENTA EN DOLARES hasta el 14% anual!!
1 message

---

**javierrossi24031975@gmail.com** <javierrossi24031975@gmail.com>                  Mon, Oct 24, 2022 at 12:19 PM
To: "L. Anthony DiJiacomo" <adijiacomo@weisberglawoffices.com>

Dr. Javier Luis Rossi

Inicio del mensaje reenviado:

> **De:** Jorge Kupferman <jorge@miamiliferealty.com>
> **Fecha:** 28 de abril de 2020, 06:24:38 ART
> **Para:** javierrossi24031975@gmail.com
> **Asunto: Miami - Detroit - Baltimore - Philadelphia , RENTA EN DOLARES hasta el 14% anual!!**
> **Responder-Para:** jorge@miamiliferealty.com











jorge kupferman, 2320 Hollywood Blvd, Hollywood, FL 33020

SafeUnsubscribe™ javierrossi24031975@gmail.com

Forward email | Update Profile | About our service provider

Sent by jorge@miamiliferealty.com in collaboration with

Try email marketing for free today!

# EXHIBIT D

Weisberg Law, P.C.

**L.Anthony DiJiacomo <adijiacomo@weisberglawoffices.com>**

---

## Fwd: Webinar Gratuito - Miercoles 15 "Baltimore/Filadelfia , Renta ASEGURADA - DETROIT, Gran Revalorizacion " inversion desde u$s 50.000 - . REGISTRESE!!!

1 message

---

**javierrossi24031975@gmail.com** <javierrossi24031975@gmail.com>                   Mon, Oct 24, 2022 at 12:17 PM
To: "L. Anthony DiJiacomo" <adijiacomo@weisberglawoffices.com>

Dr. Javier Luis Rossi

Inicio del mensaje reenviado:

>
> **De:** INVIERTA EN USA - Webinar Gratuito <jorge@miamiliferealty.com>
> **Fecha:** 12 de julio de 2020, 07:43:52 ART
> **Para:** javierrossi24031975@gmail.com
> **Asunto: Webinar Gratuito - Miercoles 15 "Baltimore/Filadelfia , Renta ASEGURADA - DETROIT, Gran Revalorizacion " inversion desde u$s 50.000 - . REGISTRESE!!!**
> **Responder-Para:** jorge@miamiliferealty.com





jorge kupferman, 2320 Hollywood Blvd, Hollywood, FL 33020

10/31/22, 10:01 AM

Case 3:23-cv-00260-MSQ Document 1-4 Filed 01/20/23 Page 22 of 194
Weisberg Law; $0.2$ bd - MLS Web Document - Mireless IE Galindro, Placidia - Page ASE CUR - DETROIT, Gran R...

SafeUnsubscribe™ javierrossi24031975@gmail.com

Forward email | Update Profile | About our service provider

Sent by jorge@miamiliferealty.com in collaboration with



Try email marketing for free today!

Weisberg Law, P.C.

**L.Anthony DiJiacomo <adijiacomo@weisberglawoffices.com>**

## Fwd: Seminarios Marzo, ROSARIO, CORDOBA, CHILE, BS AS " INVIERTA EN USA ," Como , donde y por que, con rentabilidades de hasta 14% en Dolares"

1 message

**javierrossi24031975@gmail.com** <javierrossi24031975@gmail.com>　　　Mon, Oct 24, 2022 at 12:21 PM
To: "L. Anthony DiJiacomo" <adijiacomo@weisberglawoffices.com>

Dr. Javier Luis Rossi

Inicio del mensaje reenviado:

**De:** Jorge Kupferman <jorge@miamiliferealty.com>
**Fecha:** 3 de marzo de 2020, 06:30:37 ART
**Para:** javierrossi24031975@gmail.com
**Asunto: Seminarios Marzo, ROSARIO, CORDOBA, CHILE, BS AS " INVIERTA EN USA ," Como , donde y por que, con rentabilidades de hasta 14% en Dolares"**
**Responder-Para:** jorge@miamiliferealty.com



| | | | |
|---|---|---|---|
| **17**<br>MARZO | **ARGENTINA** | Av. Corrientes 919 | SOLICITAR INSCRIPCIÓN |
| **19**<br>MARZO | **CÓRDOBA**<br>ARGENTINA | HOLIDAY INN CORDOBA<br>Fray Luis Beltran Y Cardenosa,<br>5008 B Poeta Lugones - CC Libertad | SOLICITAR INSCRIPCIÓN |
| **24**<br>MARZO | **SANTIAGO**<br>CHILE | HOTEL PLAZA EL BOSQUE NUEVA<br>LAS CONDES<br>Av. Manquehue Norte 656, Las Condes | SOLICITAR INSCRIPCIÓN |
| **26**<br>MARZO | **BUENOS AIRES**<br>ARGENTINA | HOTEL HOWARD JOHNSON<br>Florida 944, Buenos Aires | SOLICITAR INSCRIPCIÓN |

**De 9:00 a 13:00 hs.**

INSCRIPCIÓN GRATUITA · CUPOS LIMITADOS

**Por inscripciones, mandar mail a: jorge@miamiliferealty.com**

## Además presentaremos:







VER MÁS      VER MÁS      VER MÁS      VER MÁS      VER MÁS

**Y MUCHAS OTRAS OPORTUNIDADES!**



Jorge Kupferman, **Lic. Real Estate Broker**
Cell: **786-306-7308**
email: **jorge@miamiliferealty.com**





Dirección: 2320 Hollywood Blvd, Hollywood, FL 33020
Oficina: (786) 464-8804 - Celular: (786) 306-7308
www.MiamiLifeRealty.com
info@miamiliferealty.com



jorge kupferman, 2320 Hollywood Blvd, Hollywood, FL 33020

SafeUnsubscribe™ javierrossi24031975@gmail.com

Forward email | Update Profile | About our service provider

Sent by jorge@miamiliferealty.com in collaboration with



Try email marketing for free today!

# EXHIBIT E

# REAL ESTATE CONTRACT OF SALE

THIS CONTRACT OF SALE dated May 18, 2020 between **CREAR ESTETICA LLC** (called "Buyer"), and **ABC CAPITAL BALTIMORE, LLC** (called "Seller").

1. The Property.  Seller sells to Buyer, and Buyer purchases from Seller the real property located in Baltimore City, Maryland, and known as **558 S Bentalou St, Baltimore, MD 21223.**

2. Purchase Price.  The purchase price for the Property is **Forty Four Thousand** ($44,000.00) **Dollars**. The balance of the purchase price shall be paid at Settlement.

3. Time and Place of Settlement.  Unless the parties agree otherwise in writing, settlement shall take place on or before___June 5, 2020_____, at the offices of **Dulaney** (TITLE CO).

4. Financing Contingency. There are no financing contingencies for this transaction.

5. Title to the Property.  At settlement, upon payment as above provided of the unpaid purchase money, a deed for the property containing covenants of special warranty and further assurance shall be executed at Buyer's expense by Seller, which shall convey the property to Buyer.  The title conveyed to Buyer shall be good and merchantable, free of liens and encumbrances except use, occupancy and similar restrictions of public record which are generally applicable to properties in the immediate neighborhood or subdivision in which the property is located, easements which may be observed by an inspection of the property, and such utility and other easements as do not materially adversely affect the fair market value of the property.

6. Possession.   The Buyer shall be given possession of the property at settlement. The following work will be completed on the property within __90__ days of closing (see addendum B). (NO ADDENDUM)

7. Settlement Adjustments. Water charges, and community association charges, if any, shall be adjusted and apportioned as of the date of settlement.  All taxes, general or special, and all other public or governmental charges or assessments against the property which are or may be payable on an annual basis (including Metropolitan District or other benefit charges, assessments, liens or encumbrances for sewer, water, drainage, or other public improvements completed or commenced on or prior to the date hereof or subsequent thereto), are to be adjusted and apportioned as of the date of settlement and are

to be assumed and paid thereafter by Buyer, whether assessments have been levied or not as of the date of settlement except as otherwise required by law.  The cost of all recordation and transfer taxes required by law will be paid by the buyer. The cost of the title search and title insurance premiums shall be paid by Buyer.

7a. If Seller has identified in writing that the Property is subject to a lease, possession is to be delivered by deed, existing keys and assignment of existing leases for the Property, together with security deposits and interest, if any, at day and time of settlement. Seller will not enter into any new leases, nor extend existing leases, for the Property without the written consent of Buyer. Buyer will acknowledge existing lease(s) by initialing the lease(s) at the execution of this Agreement, unless otherwise stated in this Agreement.

8.  Risk of Loss.  The property shall be held at the risk of Seller until settlement hereunder.  Upon the written request of Buyer, Seller shall immediately have all insurance policies on the property endorsed to protect all parties hereto, as their interest may appear, and shall continue the insurance in force during the life of this Contract.

9.  Buyer's Default.  If Buyer defaults in Buyer's obligation to purchase the property, Seller shall have the right, at Seller's election, to retain all deposits paid hereunder as liquidated damages and not as a penalty, and upon such election the parties shall be released from all further liability hereunder at law and in equity.

10. Real Estate Commission.  Seller warrants to Buyer that it has not used the services of a real estate broker or agent in connection with this transaction. Seller agrees to defend, indemnify and hold the buyer harmless for any claim for real estate commissions arising by reason of Seller's breach of this warranty. The provisions of this paragraph shall survive settlement and the delivery of the deed to the property or the termination of this Contract.

11. Notice to Buyer Required by the Maryland Homeowners Association Act.  Attached as Addenda to this Contract are both the Notice and the Disclosure required by §11B-106 of the Real Property Article of the Annotated Code of Maryland.

12. Electronic Delivery.  The parties agree that this Contract offer shall be deemed validly executed and delivered by a party if a party executes this Contract and delivers a copy of the executed Contract to the other party by telefax, telecopier transmittal or e-mail.

13. Ground Rent.  If the property is subject to ground rent and the ground rent is not timely paid, the owner of the reversionary interest may bring an action of ejectment against the leasehold owner pursuant to Section 8-402.2 of the Real Property Article, Annotated Code of Maryland (as amended).

14. Miscellaneous Provisions.

(a) NOTICE TO BUYER: BUYER HAS THE RIGHT TO SELECT BUYER'S OWN TITLE INSURANCE COMPANY, TITLE LAWYER, SETTLEMENT COMPANY, ESCROW COMPANY, MORTGAGE LENDER, OR FINANCIAL INSTITUTION AS DEFINED IN THE FINANCIAL INSTITUTIONS ARTICLE, ANNOTATED CODE OF MARYLAND.

(b) This Contract contains the final and entire agreement between the parties and neither they nor their agents shall be bound by any terms, conditions or representations not herein written.

(c) Time is of the essence of this Contract.

(d) The liability of any party to this Contract shall be both joint and several.

(e) This Contract is binding on the parties and their personal representatives and assigns.

**THE FOLLOWING ADDENDUMS ARE ATTACHED TO AND MADE PART OF THIS AGREEMENT:**

Signed by the hand of the parties.

WITNESS/ATTEST:

*Javier Luis Rossi*

_____          05/24/2020
                                                  01:21 AM GMT
                                                  _____ (SEAL)
                              Buyer                        Date


_____          _____ (SEAL)
                              Seller                       Date

**MARYLAND RESIDENTIAL PROPERTY DISCLAIMER STATEMENT**

Property Address: **558 S Bentalou St, Baltimore, MD 21223,**

The undersigned Seller of the Property described in this Contract makes no representations or warranties as to the condition of the real property or any improvements thereon, and Buyer will be receiving the property "AS IS", with all defects which may exist except as otherwise provided in this Contract.  Buyer acknowledges having carefully examined this Statement and further acknowledges that he has been informed of his rights and obligations under Section 10-702 of the Maryland Real Property Article.

IN WITNESS WHEREOF, each party hereto has executed and ensealed this Sale or caused it to be executed and ensealed on its behalf by its duly authorized representatives, the day and year first above written.

WITNESS/ATTEST:

_Javier Luis Rossi_
_____     05/24/2020
                                          01:21 AM GMT
                                          _____ (SEAL)
              Buyer                                Date

_____     _____ (SEAL)
              Seller                               Date

**Addendum to Agreement of Sale- Exhibit A**

**BUYER**: CREAR ESTETICA LLC

**SELLER**: ABC CAPITAL—BALTIMORE LLC

**WARRANTOR**: ABC CAPITAL—BALTIMORE LLC

**PROPERTY ADDRESS**: 558 S Bentalou St, Baltimore, MD 21223,

1. Property is warrantied for 24 months. Client will have NO maintenance at all for 24 months.
2. Roof is warrantied for 12 years added by a 3rd party roofing contractor.
3. Rents will be abated until identification number is provided.
4. Buyer acknowledges the tenant will have the right of first refusal to buy the property.
5. Rents are guaranteed by a third-party insurance company named the Guarantors and/or Rent Protect Membership for $1150 per month for 2 years. You are welcome to request your policy at any time.
6. ABC does not pay rent during construction delay from the city in the excess of 30 Days.
7. ABC has the rights to mitigate rent.
8. The client is responsible for all utilities at the property during construction. If ABC pays, they will be billed to the owner first billing rental statement.
9. Buyer will pay 10% for Property Management for Year One.
10. If ABC facilitates the purchase of a rental assurance policy for the client after year one, it will be at the cost of the client.
11. The Client will pay one month's rent for tenant placement during year one and all subsequent tenant placements.
12. Client indemnifies ABC of any claims regarding 3rd party products and services.
13. Client acknowledges they read and understand this contract. If they do not speak English, they have translated the documents and waive all claims against ABC for translation misunderstanding.
14. If Client or ABC terminates the property management agreement, all warranties provided by ABC and its affiliates are NULL and void.
15. If the buyer does not close on time at no fault of title not being clear, then buyer will pay $2000.00 USD penalty per week if closing is not done on time of closing.
16. If the client takes any type of warrantor offered by ABC. They acknowledge the expenses related to those warranties can be larger or smaller than the cost the warranties are offered.

*Javier Luis Rossi*   05/24/2020
01:21 AM GMT
_____
Buyer

_____
Seller

**AUTHORIZATION FOR TAXATION PETITION FOR REVIEW and/or NEW OWNER APPEAL OF REAL PROPERTY**

**Address: 558 S Bentalou St, Baltimore, MD 21223,**

I/We,  CREAR ESTETICA LLC  , Owner(s) of the above noted property, do hereby authorize ABC Management- Baltimore, LLC to file a Petition For Review and/or New Owner Appeal of Real Property on our behalf.

 

05/24/2020
01:21 AM GMT

# ABC Management – Baltimore, LLC

**100 INTERNATIONAL DRIVE**
**Baltimore, MD**

---

# Property Management Contract

This Agreement is entered by and between ABC Management – Baltimore, LLC, hereinafter called "**AGENT**," and   CREAR ESTETICA LLC, hereinafter called "**OWNER**."

**WITNESSETH** that, in order to induce the AGENT to enter into this agreement, OWNER hereby Represents and Warrants to AGENT that it is the OWNER of all the properties listed in Exhibit A (hereinafter "premises") as updated from time to time, that the premises have necessary Fire and Extended Coverage and Liability Insurance current, lead certificates if required, that the premises meet all required building and use codes, AND that the premises is registered both with the Municipality and with Maryland Department of Environment as required:

In consideration of these representations, warrants and the fees to be paid, AGENT agrees to act as management AGENT with respect to the property listed in Exhibit A, to use due diligence in the management of said premises upon the terms herein provided, and agrees to furnish the services of AGENT for the renting, leasing, operating and managing of said premises subject to and in accordance with the terms and provisions set forth below.

**I. AGENT'S COMPENSATION:**

    A. OWNER shall pay a monthly management fee shall and be charged as follows:
        For each premises or unit managed by AGENT, **ten percent (10%)** of the collected monthly rent, but not less than $50.00 for rented units, payable on the first day of each month.  If Owner waives any rent amount due Agent shall be entitled to the management fee as if the amount was collected.  The minimum amount is due even if the rent is collected at a later date.

    B. OWNER shall pay any late charge: judicial fine, penalty, or multiple damage; or interest collected from the tenant to the AGENT as an additional fee, as described in **Paragraph IV.B.**

C. OWNER shall grant the AGENT the right to Lease the premises, and shall pay to the AGENT a leasing fee of one hundred percent (100%) of the first month's rent if the premises is leased during the effective period of this Agreement.

**II. LEASING:**

A. OWNER hereby authorizes AGENT to rent the premises for a minimum term of one year.

B. All utility charges, as appropriate, shall be paid by the tenant during tenant's occupancy. Water charges shall be paid by OWNER directly to Municipality and, where appropriate, shall be promptly presented by OWNER to AGENT for reimbursement from Tenant.

C. AGENT shall collect a security deposit from all tenants as directed by OWNER. The security deposit shall be maintained in the escrow account of OWNER.

**III. DISBURSEMENTS**: AGENT shall pay, OUT OF OWNER'S FUNDS AVAILABLE, the following as they shall accrue and in the order here set out:

A. AGENT's compensation, as set forth in Paragraph I.

B. Such advertising and utility bills (including gas, electric, and water), necessary repairs and/or charges to maintain the property, and cleaning charges as shall accrue or be necessary to preserve the property during periods of vacancy or occupancy, or to put the property in a rentable condition after vacated; or expenses to regain possession and/or to attempt to collect delinquent rent subject to the provisions set forth below; or necessary professional fees; or governmental assessments.

C. Proceeds to OWNER. Tenancy revenues, refunds, adjustments, or other funds due OWNER shall be sent to the address provided by the OWNER on or before by the 15TH of the following month that the rent is collected (45 Days after the rent is due). If OWNER's account is negative AGENT may invoice that amount to OWNER.  OWNER agrees to pay such invoice within 10 business days.  If any of the invoice amount is outstanding for more than 3 days following said period of 10 business days such amount is subject to 5% interest penalty per month accrued on a daily basis.

D. **IT IS EXPRESSLY AGREED THAT NOTHING HEREIN CONTAINED SHALL BE CONSTRUED AS REQUIRING AGENT TO ADVANCE ANY OF ITS OWN MONIES FOR ANY PURPOSE WHATSOEVER**.

**IV. GENERAL PROVISIONS:**



**A. GRANT OF POWER:** Subject to the limitations set out herein, OWNER grants AGENT full power and authority to lease, let, rent and demise the premises, or any part thereof, in its own name as AGENT for OWNER. In order to effectuate same, AGENT may enter into such written contracts and/or leases as AGENT deems necessary, in its own name as AGENT for OWNER. Agent has the right to approve the rental amount for the initial lease and OWNER has the right to approve the rental amount for any subsequent new lease or renewal. AGENT may collect and receive all rents arising as a result of AGENT's management of the premises. AGENT may use such means as are ordinary and customary in collecting or attempting to collect any delinquent accounts. AGENT may, with OWNER approval evict any tenant who violates any term of the lease. OWNER hereby assigns to AGENT any and all delinquent rents which may accrue from any tenant for the purpose of crediting such rents to OWNER's operating account for required disbursement.

**B. COLLECTION OF RENT**

1. AGENT shall use such means as are ordinary and customary to collect or attempt to collect any rent from any tenant of the premises. In the event that legal action is necessary to obtain judgment for possession of the premises, delinquent rent, or damages upon other causes of action, AGENT is authorized to employ attorneys, to sue in its own name as AGENT for OWNER, and to expend the sum of up to six hundred dollars ($600.00) per premises or unit for each monthly billing cycle from OWNER's account for such purposes without OWNER's prior permission. If the legal expense will exceed this amount, the AGENT will obtain prior OWNER permission to proceed.  Additionally, AGENT will, when requested by OWNER, instigate action, legal or otherwise, for the collection of rents which is beyond the discretion heretofore allowed to AGENT, provided such action is considered reasonable by the AGENT.

2. **AGENT SHALL NOT BE HELD MONETARILY RESPONSIBLE FOR ITS INABILITY TO COLLECT RENTS. AGENT SHALL NOT BE HELD RESPONSIBLE FOR ANY EXPENSES INCURRED FOR LEGAL ACTION INVOLVED IN THE COLLECTION OF RENTS AND/OR THE EVICTION OF ANY TENANT AND/OR DAMAGES INCURRED TO THE PROPERTY**. All such expenses shall be paid by OWNER, reimbursable in the event AGENT is able to collect the rents, legal fees, or damages from the tenant.

3. If a late charge, judicial fine, penalty, or multiple damage, or interest is collected from the tenant, it shall be considered income to AGENT for its additional effort and time.

**C. MAINTENANCE**

1. AGENT shall have full authority to perform or to cause to be performed such maintenance of the property as is reasonable and necessary for the safety of the tenants and the preservation of the property at OWNER's expense.

2. AGENT may, at his sole discretion, install fire/smoke detectors, carbon monoxide detectors, and/or fire extinguishers on the property at OWNER's expense.

3. In the event maintenance, repairs, or construction are required to be performed to the property in excess of $_____500_____, AGENT will obtain prior OWNER permission to proceed.

**D. DISCRETIONARY AUTHORITY:**

1. OWNER expressly grants AGENT full power and authority to contract and pay for all repairs and cleaning costs, not exceeding the amount stipulated in paragraph IV.C.3. above, which in its discretion it deems necessary or advisable to maintain; or put the premises in a rentable condition; or to repair the same in the event of damage or destruction to the premises due to fire, windstorm, hail, flood, riot, civil commotion, tenant abuse, or other causes resulting in damage to the premises, all at OWNER's expense. Should the estimate or contemplated cost exceed funds on hand, OWNER shall promptly remit, upon AGENT's request, the necessary balance.

2. In an emergency, OWNER authorizes AGENT's expenditure in excess of funds on hand and above the amount stipulated in paragraph IV.C.3. above, without prior authorization. OWNER shall thereafter promptly remit, upon AGENT's request, the necessary balance.

3. Failure of OWNER to remit balances described in this subparagraph shall result in AGENT's reimbursement therefore from subsequent revenues ordinarily accruing and payable to OWNER.

**E. INSURANCE COVERAGE:** OWNER is obligated, at OWNER's expense, to keep the necessary Fire and Extended Coverage and Liability Insurance current and renewed. AGENT shall be shown as an additional insured under the liability section only.

**F. LIABILITY OF AGENT:** It is agreed that AGENT shall use reasonable and ordinary care in all acts assigned for performance by this Agreement. When any act is required of the AGENT, it shall be done in the ordinary course of AGENT's business.

1. Other than in cases of bad faith, fraud or willfull misconduct by AGENT or any of its representatives, OWNER shall save and hold AGENT harmless and indemnify AGENT from any and all claims, charges, debts, demands and lawsuits, which may arise in connection with the management of the premises, and from any liability from injuries suffered by any person entering or about the premises, including any property manager or other employee.

2. Other than in cases of bad faith, fraud or willfull misconduct by AGENT or any of its representatives, AGENT shall not be personally liable for any act it may do or omit to do hereunder as AGENT.

3. AGENT is hereby expressly authorized to comply with and obey any and all process, orders, judgment or decree, it receives of any court; where AGENT obeys or complies with any such process, order, judgment or decree, it shall not be liable to OWNER or any person, firm, or corporation by reason of such compliance, notwithstanding subsequent reversal or modification.

4. AGENT is hereby expressly authorized to comply with any laws, whether now in existence or hereinafter enacted, and whether federal, state, or local, relating to fair housing, rent control, discrimination, and health and welfare. AGENT is expressly authorized to comply with the rule or order of any governmental agency, insofar as such order in any manner affects the management of the premises or any duties of the AGENT hereunder.

**G. ACCOUNTING FOR FUNDS:**

1. AGENT shall furnish OWNER a monthly accounting statement showing the receipts and expenditures with respect to the premises, plus OWNER's monthly proceeds.

2. AGENT shall furnish a final accounting upon the termination of this agreement within forty-five (45) days from the date of a written request of management termination, except as modified by this agreement.

**H. SECURITY AND DAMAGE DEPOSITS**

1. All security and damage deposits shall be accounted to owners account and maintained by OWNER. OWNER shall return to the tenant any legally required amounts when the tenant vacates the premises, consistent with Maryland law.

2. AGENT shall properly account for sums retained for the purpose of off-setting OWNER's expenses for unpaid rent, utilities, cleaning charges, or repairs.

3. In the event litigation shall occur concerning security deposits, AGENT may defend same in its own name as AGENT for OWNER, at OWNER's expense.

4. Should AGENT and OWNER disagree on the amount of security deposit to be refunded to the tenant, AGENT shall have no further obligation or liability whatsoever concerning the security deposit to any person or entity; and OWNER shall hold AGENT harmless and indemnify AGENT therefrom.

5. Should this Agreement initiate while an existing tenant's security deposit is in OWNERS possession, AGENT shall be given a full accounting of said deposit. AGENT shall have no obligation or liability whatsoever concerning the security deposit to any person or entity; the OWNER shall hold AGENT harmless and indemnify AGENT therefrom.

**I. ADDRESS OF OWNER:** OWNER expressly agrees, within twenty (20) days of change, to advise AGENT, in writing, of any change of address. Any notice or accounting statement or other document required or desired to be given by AGENT to OWNER may be given by mailing to the address noted hereon, or the most recent address of OWNER

shown in the records of the AGENT; and notice so mailed shall be as effectual as if served upon such party in person at the time of depositing such notice in the mail.

**J. TERMINATION:** This agreement may be terminated by either party upon sixty (60) day's written notice. If so terminated, OWNER shall retake possession of the premises, subject to the rights of any tenant rightfully in possession. Other than an amount equal to any outstanding AGENT or third-party obligations then remaining, OWNER's proceeds shall be distributed by AGENT thirty (30) days after termination.  Each relevant portion of the proceeds not distributed at such time shall be distributed by AGENT to OWNER immediately following the satisfaction of the corresponding obligation.

**K. DEFICIT ACCOUNT:** In the event of AGENT's termination, should there be any outstanding and unpaid obligations, debts, or charges due AGENT, any amounts on account or received by AGENT on account or otherwise due OWNER shall be applied first to satisfy those obligations and then disbursed to OWNER. OWNER waives all protest and defenses against AGENT for such lawful disbursements. AGENT's lien rights against the subject property shall not be waived by this provision.

**L. PARTIAL WAIVE OR ACQUIESCENCE NO BAR:** AGENT's or OWNER's waiver, forbearance, or
acquiescence of any of its rights or remedies, in whole or in part, shall not serve to waive, bar, or
compromise any contemporaneous or subsequent right or remedy.

**M. ATTORNEY FEES AND COSTS:** The unsuccessful party in litigation to enforce the terms and conditions of this Agreement shall pay the reasonable attorney fees and costs of the successful party.

**N. WHOLE AGREEMENT:** This writing, as amended in writing from time to time, embodies the entire agreement between the parties and is not based upon any other representation whatsoever, expressed or implied, except as herein contained. The Agreement cannot be modified except in writing and agreed to by the parties.

**V. EFFECTIVE DATE:** Management by AGENT shall be effective as of date executed herein**.** This agreement shall automatically be renewed for additional one year periods from the end date stated as its ending date unless written notice of its non-renewal is given in accordance with IV-J above.

**VII. ITEMS OF MUTUAL AGREEMENT:**
1. OWNER ( ) does / ( ) does not authorize AGENT to have the furnace HVAC system serviced twice each year;
2. OWNER ( ) does / ( ) does not authorize AGENT to have the sprinkler system drained in the winter and re-pressurized in the Spring of each year;

3. Pets ( ) shall - ( ) shall not be allowed, and/or limited as follows:_____.  A pet deposit of $_____ shall be collected of which $_____ shall be considered non-refundable.

4. OWNER ( ) does / ( ) does not permit smoking.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands this _____ day of _____.

AGENT / ABC Management – Baltimore, LLC

By: _____

Authorized Signature

_____

Printed Name

By:_____

Name:

Title: Managing Member

OWNER:_____*Javier Luis Rossi*___ 05/24/2020 01:21 AM GMT_____

Social Security No. or Federal I.D. No. _____

OWNER:_____

Social Security No. or Federal I.D. No. _____

## Attachment A
## Premises

<u>Name of Property</u>            <u>Address of Property</u>

558 S Bentalou St, Baltimore, MD 21223, USA

**WITNESSETH** that, in order to induce the AGENT to enter into this agreement, OWNER hereby Represents and Warrants to AGENT that he/she/they is/are the OWNER(s) of all the properties listed in Exhibit A (hereinafter "premises") as updated from time to time, that the premises have necessary Fire and Extended Coverage and Liability Insurance current, lead certificates if required, that the premises meet all required building and use codes, AND that the premises is registered both with the Municipality and with Maryland Department of Environment as required.

 

05/24/2020
01:21 AM GMT

# EXHIBIT F

$40,000.00

558 S Bentalou St, Baltimore, Maryland 21223
DATE

## PROMISSORY NOTE

FOR VALUE RECEIVED, the undersigned, Crear Estetica, LLC, (the "Borrower") promises to pay to the order of Wall Street Wealth Management, LLC or any subsequent holder of this Note (the "Lender"), during Lender's regular business hours at Lender's offices at 1714 Memphis St, Suite C-8, Philadelphia, PA 19125, or at such other place as Lender may from time to time designate to Borrower in writing, the sum of Forty Thousand DOLLARS ($40,000.00) (the "Loan"), together with interest on the unpaid principal balance outstanding from time to time at the rate or rates hereafter specified and any and all other sums which may be owing to Lender by Borrower pursuant to this Note. Payments of all sums due under this Note shall be paid in lawful money of the United States of America which shall be legal tender in payment of all debts and dues. The following additional terms shall apply to this Note.

1.    Interest. The principal amount outstanding from time to time hereunder shall bear interest at a fixed rate of NINE PERCENT (9%) per annum. Interest shall be calculated on the basis of a year of three hundred sixty (360) days applied to the actual days on which there exists an unpaid balance under this Note.

2.    Repayment.

(a) Commencing on July 1, 2020, and continuing on the first day of each month thereafter, Borrower shall make payments of interest at the rate provided above in the monthly amount of $300.00; provided, however, that unless sooner paid, the entire amount of the unpaid principal amount, together with all accrued and unpaid interest thereon and all other sums due under this Note that remain unpaid shall be repaid within FIVE YEARS which is the final and absolute due date of this Note (the "Note Maturity Date").

(b) The Borrower acknowledges and agrees that the payments of interest during the term of this Note are insufficient to pay the entire principal amount by the Maturity Date, and therefore, unless sooner paid, this Note contemplates a balloon payment of principal on the Maturity Date.

3.    Default Interest Rate. Upon an Event of Default (hereinafter defined), Lender may, in Lender's sole discretion, raise the rate of interest accruing on the unpaid principal balance to fifteen percent (15%) per annum, independent of whether Lender elects to accelerate the unpaid principal balance as a result of such default. Such default interest rate shall continue, in Lender's sole discretion, until all defaults are cured.

4.    Repayment Extension. If any payment of principal or interest shall be due on a Saturday, Sunday or any other day on which banking institutions in the State of Maryland are required or permitted to be closed, such payment shall be made on the next succeeding business day and such extension of time shall be included in computing interest under this Note.

5.    Late Payment Charge. Borrower shall pay a late payment charge of five percent (5%) of the amount then due if any payment due under this Note is not received by Lender

353503.1
7/18/2006

Scanned with CamScanner

within five (5) days after its due date.  The late payment charge shall be payable to Lender on demand.  A similar late charge may be imposed for each successive 30-day period during which all or any portion of such payment remains delinquent.  Such late charge shall be in addition to, and not in lieu of, any other right or remedy Lender may have, including the right to receive principal and interest and to reimbursement of costs and expenses.

      6.   Application of Payments.  All payments made under this Note may, in Lender's sole discretion, be applied first to late payment charges or other sums owed to Lender, next to accrued and unpaid interest, and the balance to the repayment of principal, or in such other order or proportion as Lender, in its sole discretion, may elect from time to time.

      7.   Prepayment.  This Note may be prepaid in whole or in part at any time without premium or penalty, provided, however, that each such payment shall be accompanied by payment of all unpaid penalties and premiums, if any, which are due plus all accrued and unpaid interest due as of the date of such prepayment.

      8.   Events of Default; Acceleration.  The following shall each constitute an "Event of Default" under this Note: (a) a default by Borrower to make any payment of any sum under this Note within five (5) days after such payment is first due and payable; or (b) a failure to timely comply with any other obligation set forth in this Note or (c) an event of default in any other document delivered in connection with the securing and funding of this Note (collectively, the "Loan Documents").  The terms, covenants, conditions, provisions, stipulations, and agreements contained in the Loan Documents are hereby made a part hereof to the same extent and with the same effect as if fully set forth herein.  Upon the occurrence of an Event of Default, Lender, in Lender's sole discretion and without notice or demand, may declare the entire unpaid principal balance of this Note, together with all accrued interest and all other sums due under this Note to be immediately due and payable and may exercise any and all rights and remedies available to Lender hereunder, under applicable law and under any of the Loan Documents.  This Note is given pursuant to the aforesaid Loan Documents, and reference is hereby made to the Loan Documents for further and additional rights of Lender to declare the entire unpaid principal balance plus all accrued interest and all other sums due under this Note to be immediately due and payable.  Any failure by Lender to exercise this right of acceleration shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

      9.   Expenses of Collection.  Borrower agrees to pay to Lender and reimburse Lender upon demand for any and all losses, costs and expenses, including all reasonable attorney's fees and court costs, if any, incurred by Lender in connection with the enforcement or collection of this Note, whether or not any action has been commenced by Lender to enforce or collect this Note.

      10.   Security.  This Note is secured by a Deed of Trust, Assignment of Rents and Security Agreement of even date herewith (the "Deed of Trust"), from Borrower, as grantor, to the trustees named therein, for the benefit of Lender.  The Deed of Trust encumbers the real property and improvements thereon, more fully described in the Deed of Trust.

      11.   Confession of Judgment.  Upon the occurrence of any Event of Default as provided hereinabove, Borrower authorizes any attorney admitted to practice before any court of record in the United States to appear on behalf of Borrower in any court having jurisdiction in one

- 2 –

Scanned with CamScanner

or more proceedings, or before any clerk thereof or prothonotary or other court official, and to CONFESS JUDGMENT AGAINST BORROWER, WITHOUT PRIOR NOTICE OR OPPORTUNITY OF BORROWER FOR PRIOR HEARING, in favor of the holder of this Note for the full amount due on this Note (including principal, accrued interest and any and all other sums due under this Note that remain unpaid) plus court costs, expenses and attorneys fees of fifteen percent (15%) of the total amount then due hereunder. Notwithstanding the amount of any such judgment, Lender agrees by accepting this Note not to enforce a judgment for legal fees against Borrower in an amount in excess of the fees and expenses actually charged to Lender for services rendered by, and for actual expenses incurred by, its counsel in connection with such confession of judgment and the collection of all amounts owed by Borrower to Lender. Borrower waives the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon Borrower any right or privilege of exemption, summons and other process, all errors and rights of appeal, homestead rights, stay of execution or stay of supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment. The authority and power to appear for and enter judgment against Borrower shall not be exhausted by one or more exercises thereof, or by any imperfect exercise thereof, and shall not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions, from time to time, in the same or different jurisdictions, as often as the holder shall deem necessary or advisable, for all of which this Note shall be sufficient authority.

12.   Interest Rate After Judgment. If judgment is entered against Borrower on this Note, the amount of the judgment entered (which may include principal, interest, fees, and costs) shall bear interest at the higher: (a) the above described default interest rate, or (b) the legal rate of interest then applicable to judgments in the jurisdiction in which the judgment was entered, to be determined on the date of the entry of the judgment, until the judgment is paid in full.

13.   Certain Waivers By Borrower. Borrower waives demand, presentment, notice of dishonor, protest, protest and demand, notice of protest, and notice of non-payment of this Note. Lender, without compromising, impairing, modifying, diminishing, or in any way releasing or discharging Borrower from Borrower's obligations hereunder and without notifying or obtaining the prior approval of Borrower at any time or from time to time, may: (a) grant extensions of time for payment or performance by Borrower or any other party to the Loan Documents; (b) release, substitute, exchange, impair, surrender, dispose of, or add any collateral which is security for this Note; (c) release in whole or in part Borrower or any other party to the Loan Documents; or (d) modify, change, renew, extend, or amend, in any respect, Lender's agreements with Borrower or any document, instrument, or writing, embodying or reflecting the same.

14.   Commercial Loan.   Borrower acknowledges and warrants that the debt evidenced by this Note is a "commercial loan" within the meaning of Title 12 of the Commercial Law Article of the Annotated Code of Maryland (2000 Rep. Vol.).

15.   Non-Waiver By Lender. The rights and remedies of Lender under this Note and under the Loan Documents shall be cumulative and concurrent and may be pursued singularly, successively or together at the sole discretion of Lender, and may be exercised as often as occasion therefor shall occur, and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of the same or any other right or remedy. By accepting full or partial payment after the due date of any amount of principal or of interest on this Note, Lender

– 3 –

Scanned with CamScanner

shall not be deemed to have waived the right either to require prompt payment when due and payable of all other amounts of principal or of interest on this Note or to exercise any remedies available to it in order to collect all such other amounts due and payable under this Note.

No delay in the exercise of or failure to exercise, any right, remedy, or power accruing upon any default or failure of Borrower in the performance of any obligation under this Note shall impair any such right, remedy or power or shall be construed to be a waiver thereof, but any such right, remedy, or power may be exercised from time to time and as often as may be deemed by Lender expedient. If Borrower should default in the performance of any obligation under this Note, and such default should thereafter be waived by Lender, such waiver shall be limited to the particular default so waived.

16.   Evidence of Indebtedness.  This Note is given and accepted as evidence of indebtedness only, and not in payment or satisfaction of any indebtedness or obligation. The books and records of Lender will be sufficient evidence of advances made and payments received hereunder, except in the case of manifest error.

17.   Time of the Essence.  Time is of the essence under this Note.

18.   Estoppel Certificate.  Borrower agrees to furnish to the holder of this Note at any time and from time to time within fifteen (15) days after a written request from the holder of this Note, a written Estoppel Certificate duly executed and acknowledged setting forth the amount then due under this Note and whether any claim, offset or defense then exists under this Note.

19.   Notices.  Any notice or demand required or permitted by or in connection with this Note shall be given by either service of process or by certified mail or receipted overnight delivery service addressed to the Borrower at its principal place of business . Notice by certified mail shall be deemed received on the third day after the date sent and notice by overnight delivery shall be deemed received on the day following the date sent. Notwithstanding anything to the contrary, all notices and demands for payment from Lender actually received in writing by Borrower shall be considered to be effective upon the receipt thereof by Borrower regardless of the procedure or method utilized to accomplish delivery thereof to Borrower. Notice to any one person constituting Borrower shall constitute notice to all such persons.

20.   Choice of Law; Consent to Venue and Jurisdiction.  This Note shall be governed, construed and interpreted strictly in accordance with the laws of the State of Maryland. Borrower consents to the jurisdiction and venue the courts of Maryland and to the jurisdiction and venue of the United States District Court for the District of Maryland in any action or judicial proceeding brought to enforce, construe or interpret this Note. Borrower agrees to stipulate in any future proceeding that this Note is to be considered for all purposes to have been executed and delivered within the geographical boundaries of the State of Maryland, even if it was, in fact, executed and delivered elsewhere.

21.   Points.  Lender is requiring that Borrower pay, in addition to Lender's out of pocket costs of closing this transaction, a loan fee equal to ten (10) percent of the loan amount. Said loan fee is being paid at funding of the Loan. (If the values in this paragraph are left blank then the values equal zero (0).)

- 4 -

22.  <u>Actions Against Lender</u>.  Any action brought by Borrower against Lender which is based, directly or indirectly or in whole or in part, on this Note or any matter in or related to this Note or any of the Loan Documents, including but not limited to the making of the loan or the administration or collection thereof, shall be brought only in the courts of the State of Maryland.  Borrower may not file a counterclaim against Lender in a suit brought by Lender against Borrower in a state other than the State of Maryland unless, under the rules of procedure of the court in which Lender brought the action, the counterclaim is mandatory and will be considered waived unless filed as a counterclaim in the action instituted by Lender.  All costs and expenses, including all attorneys fees, incurred by Lender in successfully defending any such action or counterclaim brought by Borrower against Lender shall be paid by Borrower to Lender.

23.  <u>Waiver of Jury Trial</u>.  Borrower agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by Borrower or Lender or any successor or assign of Borrower or Lender on or with respect to this Note or any of the Loan Documents or which in any way relates, directly or indirectly, to the obligations of Borrower to Lender under this Note or any of the Loan Documents, or the dealings of the parties with respect thereto, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY.  BORROWER HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY in any such suit, action, or proceeding.  Borrower acknowledges and agrees that this waiver is knowingly, intelligently, and voluntarily made by Borrower, that this provision is a specific and material aspect of the agreement between the parties and that Lender would not enter into the transaction with Borrower if this provision were not part of their agreement.  Borrower acknowledges that neither Lender nor any person acting on behalf of Lender has made any misrepresentations of fact to induce this waiver of trial by jury.  Borrower further acknowledges that Borrower has been represented (or has had the opportunity to be represented) in the signing of this Note and in the making of this waiver by independent legal counsel selected of Borrower's own free will and that Borrower has had the opportunity to discuss this waiver with counsel.

24.  <u>Miscellaneous</u>.  Neither this Note nor any term hereof may be terminated, amended, supplemented, waived, released or modified orally, but only by an instrument in writing signed by the party against which the enforcement of the termination, amendment, supplement, waiver, release, or modification is sought.  The Lender may, without notice to or consent of the Borrower, sell, assign, pledge or transfer this Note or sell, assign, transfer or grant participations in all or any part of the obligations evidenced by this Note to others at any time and from time to time, and the Lender may divulge to any potential assignee, transferee or participant all information, reports, financial statements and documents obtained in connection with this Note and any other Loan Documents or otherwise.  No amendment, modification, waiver, or release of this Note shall be established by conduct, custom, or course of dealing.  Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders.  The headings used in this Note are for convenience only and are not to be interpreted as a part of this Note.  This Note and the Loan Documents constitute the entire agreement between the parties with respect to their subject matter and supercede all prior letters, representations or agreements, oral or written, with respect thereto.

25.            IN WITNESS WHEREOF, Borrower has executed this Note specifically intending this Note to constitute an instrument under seal.

- 5 –

*Signature on next page*



- 6 –

**Scanned with CamScanner**

*Signature page to _____DATE_____ Promissory Note*

WITNESS/ATTEST:                    BORROWER

_____            By: _____ (SEAL)

                                   Its: _____

STATE OF _____, CITY/COUNTY OF _____, **TO WIT:**

       I HEREBY CERTIFY, that on this __ TH day of _____, before me, the undersigned, a Notary Public of the aforesaid State, personally appeared _____, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within Note, and, being authorized so to do, acknowledged that he executed the same as authorized person on behalf of _____ for the purposes therein contained.

       IN WITNESS MY Hand and Notarial Seal.

                           _____

                           NOTARY PUBLIC

My Commission Expires: _____

- 7 -

Scanned with CamScanner

# REAL ESTATE MORTGAGE

Securing the real property known as: **558 S Bentalou St, Baltimore, MD 21223**

## DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT (the "**Instrument**") is dated as of the_____ day of_____, 20__ by **Crear Estetica, LLC** a _____ limited liability company, as grantor (together with successors and assigns, "**Grantor**"), for the benefit of <u>Wall Street Wealth Management, LLC</u>, as beneficiary ("**Lender**").

Grantor, in consideration of the Indebtedness, and the trust created by this Instrument, irrevocably grants, conveys and assigns to Trustee, in trust, with power of sale, the Mortgaged Property described in Exhibit A attached to this Instrument, and authorizes Trustee to sell the Mortgaged Property upon default by any lawful means, as provided in this Instrument, and assents to the passage of a decree for the sale of the Mortgaged Property; provided, however, that prior to the occurrence of an Event of Default, Grantor shall be entitled to possession of the Mortgaged Property.

TO SECURE TO LENDER the repayment of the Indebtedness evidenced by the Note (the "**Note**") payable to Lender, dated as of the date of this Instrument, in the principal amount of **Forty Thousand DOLLARS ($40,000.00)**, executed by Grantor (also sometimes referred to herein as the "**Borrower**"), and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in the Loan Documents.

Grantor represents and warrants that Grantor is lawfully seized of the Mortgaged Property and has the right, power and authority to grant, convey and assign the Mortgaged Property, and that Mortgaged Property is unencumbered. Grantor covenants that Grantor will warrant and defend specially the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Instrument and insuring Lender's interest in the Mortgaged Property.

**Covenants.** Grantor and Lender covenant and agree as follows:

1.    **DEFINITIONS.** The following terms, when used in this Instrument (including when used in the above recitals), shall have the following meanings:

(a)    "**Borrower**" means all persons or entities identified as "Borrower" in the first page of this Instrument, together with their successors and assigns. If Borrower and Grantor are the same person, sentences in this instrument which refer to Borrower and to Grantor shall be read as referring to that one person.

(b)    **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(c)    **"Event of Default"** means the occurrence of any event listed in Section 18.

(d)    **"Fixtures"** means all property which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

(e)    **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

(f)    **"Grantor"** means all persons or entities identified as "Grantor" in the first paragraph of this Instrument, together with their successors and assigns.

(g)    **"Guaranty"** means the Guaranty, if any, executed on even date herewith in connection with the making of the Note, and all schedules, riders, allonges and addenda, as such Guaranty may be amended from time to time.

(h)    **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(i)    **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials and apply to Grantor or to the Mortgaged Property. Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, *et seq.*, and their state analogs.

2

Scanned with CamScanner

(j)   **"Improvements"** means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(k)   **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under, the Note, the Guaranty, this Instrument or any other Loan Document, including late charges, default interest, and advances as provided in Section 8 or elsewhere including this Instrument to protect the security of this Instrument.

(l)   **"Key Principal"** means the natural person(s) or entity identified as such or Exhibit B attached to this Instrument, and any person or entity who becomes a Key Principal after the date of this Instrument and is identified as such in an amendment or supplement to this Instrument.

(m)   **"Land"** means the land described in Exhibit A.

(n)   **"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Grantor is a cooperative housing corporation), and all modifications, extensions or renewals.

(o)   **"Lender"** means the entity identified as "Lender" in the first paragraph of this Instrument and its successors and assigns, or any subsequent holder of the Note.

(p)   **"Loan Documents"** means the Note, the Guaranty, this Instrument, all guaranties, all indemnity agreements, O&M Programs, and any other documents now or in the future executed by Borrower, Grantor, Key Principal, any guarantor or any other person in connection with the loan evidenced by the Note, as such documents may be amended from time to time.

(q)   **"Loan Servicer"** means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, the Guaranty, this Instrument and any other Loan Document, and otherwise to service the loan evidenced by the Note for the benefit of Lender. Unless Grantor receives notice to the contrary, the Loan Servicer is the entity identified as "Lender" in the first paragraph of this Instrument.

(r)   **"Mortgaged Property"** means all of Grantor's present and future right, title and interest in and to all of the following:

  (1)   the Land;

  (2)   the Improvements;

  (3)   the Fixtures;

  (4)   the Personalty;

  (5)   all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the

3

Scanned with CamScanner

Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6) all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Grantor obtained the insurance pursuant to Lender's requirement;

(7) all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8) all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Grantor now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9) all proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds;

(10) all Rents and Leases;

(11) all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the loan secured by this Instrument and, if Grantor is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12) all tenant security deposits which have not been forfeited by any tenant under any Lease; and

(13) all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property.

(s) **"Note"** means the Note described on page 1 of this Instrument.

(t) **"O&M Program"** is defined in Section 14(a).

(u) **"Personalty"** means all equipment, inventory, general intangibles which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, including furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the



4

Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

(v)   "**Property Jurisdiction**" is defined in Section 26(a).

(w)   "**Rents**" means all rents, revenues and other income of the Land or the Improvements, whether now due, past due, or to become due, and deposits forfeited by tenants.

(x)   "**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

(y)   "**Transfer**" means (A) a sale, assignment, transfer or other disposition (whether voluntary, involuntary or by operation of law); (B) the granting, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law); (C) the issuance or other creation of an ownership interest in a legal entity, including a partnership interest, interest in a limited liability company or corporate stock; (D) the withdrawal, retirement, removal or involuntary resignation of a partner in a partnership or a member or manager in a limited liability company; or (E) the merger, dissolution, liquidation, or consolidation of a legal entity. "Transfer" does not include (i) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under this Instrument or (ii) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the United States Bankruptcy Code. For purposes of defining the term "Transfer," the term "partnership" shall mean a general partnership, a limited partnership, a joint venture and a limited liability partnership, and the term "partner" shall mean a general partner, a limited partner and a joint venturer.

**2.     UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.** This Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash and non-cash proceeds thereof (collectively, "**UCC Collateral**"), and Grantor hereby grants to Lender a security interest in the UCC Collateral. Grantor hereby authorizes Lender to file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest and Grantor agrees, if Lender so requests, to execute and deliver to Lender such financing statements, continuation statements and amendments. Grantor shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require. Without the prior written consent of Lender, Grantor shall not create or permit to exist any other lien or security interest in any of the UCC Collateral. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture.

**3.     ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

5

(a)     As part of the consideration for the Indebtedness, Grantor absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Grantor to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Grantor. Promptly upon request by Lender, Grantor agrees to execute and deliver such further assignments as Lender may from time to time require. Grantor and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the "Mortgaged Property," as that term is defined in Section 1(r). However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under applicable law, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of the Grantor that in this circumstance this Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Instrument.

(b)     After the occurrence of an Event of Default, Grantor authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender, and Grantor shall, upon Grantor's receipt of any Rents from any sources, pay the total amount of such receipts to the Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Grantor a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Loan Documents and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums, tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Grantor free and clear of, and released from, Lender's rights with respect to Rents under this Instrument. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Grantor's license to collect Rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Grantor shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Grantor hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender, no tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Grantor any amounts which are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Grantor shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c)     Grantor represents and warrants to Lender that Grantor has not executed any prior assignment of Rents (other than an assignment of Rents securing indebtedness that will be paid off and discharged with the proceeds of the loan evidenced by the Note), that Grantor has not performed, and Grantor covenants and agrees that it will not perform, any acts and has not executed, and shall not execute, any instrument which would prevent Lender from exercising its rights under this Section 3, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents. Grantor shall not collect or accept payment of any Rents more than two months prior to the due dates of such Rents.

(d)     If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Grantor and even in the absence of waste, enter upon

6

and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to this Section 3, protecting the Mortgaged Property or the security of this Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable. Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Grantor's solvency and without the necessity of giving prior notice (oral or written) to Borrower or Grantor, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Grantor, by its execution of this Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property. Immediately upon appointment of a receiver or immediately upon the Lender's entering upon and taking possession and control of the Mortgaged Property, Grantor shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents. In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and Grantor and their representatives from the Mortgaged Property. Grantor acknowledges and agrees that the exercise by Lender of any of the rights conferred under this Section 3 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

(e)     If Lender enters the Mortgaged Property, Lender shall be liable to account only to Grantor and only for those Rents actually received. Lender shall not be liable to Borrower, Grantor, anyone claiming under or through Grantor or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under this Section 3, and Grantor hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)     If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 8.

(g)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Instrument.

(h)     Grantor shall, promptly upon Lender's request, deliver to Lender an executed copy of each Lease then in effect. All Leases for residential dwelling units shall be on forms approved by Lender, shall be for initial terms of at least six months and not more than two years, and shall not include options to purchase. If customary in the applicable market, residential Leases with terms of less than six months may be permitted with Lender's prior written consent.

(i)     Grantor shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

7

**4.    PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS.** Upon default by Borrower under the Note, Grantor shall pay the Indebtedness when due in accordance with the terms of the Note and the other Loan Documents and shall perform, observe and comply with all other provisions of the Note and the other Loan Documents.

**5.    APPLICATION OF PAYMENTS.** If at any time Lender receives, from Borrower, Grantor or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Neither Lender's acceptance of an amount which is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Grantor's obligations under this Instrument and the Note shall remain unchanged.

**6.    COMPLIANCE WITH LAWS.** Grantor shall comply with all laws, ordinances, regulations and requirements of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements and covenants pertaining to health and safety, construction of improvements on the Mortgaged Property, zoning and land use, and Leases. Grantor also shall comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits. Grantor shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 6. Grantor shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property. Grantor represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

**7.    USE OF PROPERTY.** Unless required by applicable law, Grantor shall not (a) except for any change in use approved by Lender, allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Instrument was executed, (b) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property, or (c) establish any condominium or cooperative regime with respect to the Mortgaged Property.

**8.    PROTECTION OF LENDER'S SECURITY.**

(a)    If Grantor fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Grantor and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 15, and (4) payment of amounts which Grantor has failed to pay under Sections 11 and 13.

(b)    Any amounts disbursed by Lender under this Section 8, or under any other provision of this Instrument that treats such disbursement as being made under this Section 8, shall be added to,

8

and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the **"Default Rate"**, as defined in the Note.

(c)  Nothing in this Section 8 shall require Lender to incur any expense or take any action.

**9.  INSPECTION.** Lender, its agents, representatives, and designees may make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during normal business hours, or at any other reasonable time.

## 10.  BOOKS AND RECORDS; FINANCIAL REPORTING.

(a)  Grantor shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property. The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)  If requested by Lender, Grantor shall furnish to Lender all of the following:

(1)  within 120 days after the end of each fiscal year of Grantor, a statement of income and expenses for Grantor's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Grantor relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Grantor relating to the Mortgaged Property as of the end of that fiscal year;

(2)  within 120 days after the end of each fiscal year of Grantor, and at any other time upon Lender's request, a rent schedule for the Mortgaged Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3)  within 120 days after the end of each fiscal year of Grantor, and at any other time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4)  within 120 days after the end of each fiscal year of Grantor, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Grantor and the interest held by each, if Grantor is a corporation, all officers and directors of Grantor, and if Grantor is a limited liability company, all managers who are not members;

(5)  upon Lender's request, a monthly property management report for the Mortgaged Property, showing the number of inquiries made and rental applications

9

received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender; and

(6)     upon Lender's request, a balance sheet, a statement of income and expenses for Grantor and a statement of changes in financial position of Grantor for Grantor's most recent fiscal year; and

(7)     if required by Lender, a statement of income and expense for the Mortgaged Property for the prior month or quarter.

(c)     Each of the statements, schedules and reports required by Section 10(b) shall be certified to be complete and accurate by an individual having authority to bind Grantor, and shall be in such form and contain such detail as Lender may reasonably require. Lender also may require that any statements, schedules or reports be audited at Grantor's expense by independent certified public accountants acceptable to Lender.

(d)     If Grantor fails to provide in a timely manner the statements, schedules and reports required by Section 10(b), Lender shall have the right to have Grantor's books and records audited, at Grantor's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness as provided in Section 8.

(e)     If an Event of Default has occurred and is continuing, Grantor shall deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation.

(f)     Grantor authorizes Lender to obtain a credit report on Grantor at any time.

(g)     If an Event of Default has occurred and Lender has not previously required Grantor to furnish a quarterly statement of income and expense for the Mortgaged Property, Lender may require Grantor to furnish such a statement within 45 days after the end of each fiscal quarter of Grantor following such Event of Default.

## 11.   TAXES; OPERATING EXPENSES.

(a)     Subject to the provisions of Section 11(c) and Section 11(d), Grantor shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)     Subject to the provisions of Section 11(c), Grantor shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)     Grantor, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Grantor notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Grantor deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Grantor furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which



10

Scanned with CamScanner

may include the delivery to Lender of the reserves established by Grantor to pay the contested Imposition.

**12.    LIENS; ENCUMBRANCES.** Grantor acknowledges that, to the extent provided in Section 17, the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance (a **"Lien"**) on the Mortgaged Property (other than the lien of this Instrument) or on certain ownership interests in Grantor, whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Instrument, is a **"Transfer"** which constitutes an Event of Default.

**13.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.** Grantor (1) shall not commit waste or permit impairment or deterioration of the Mortgaged Property, (2) shall not abandon the Mortgaged Property, (3) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (4) shall keep the Mortgaged Property in good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, and (5) shall give notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument. Grantor shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Personalty.

**14.    ENVIRONMENTAL HAZARDS.**

(a)    Except for matters covered by a written program of operations and maintenance approved in writing by Lender (an **"O&M Program"**) or matters described in Section 14(b), Grantor shall not cause or permit any of the following:

(1)    the presence, use, generation, release, treatment, processing, storage (including storage in above ground and underground storage tanks), handling, or disposal of any Hazardous Materials on or under the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property;

(2)    the transportation of any Hazardous Materials to, from, or across the Mortgaged Property;

(3)    any occurrence or condition on the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(4)    any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Grantor that is adjacent to the Mortgaged Property.

The matters described in clauses (1) through (4) above are referred to collectively in this Section 14 as **"Prohibited Activities or Conditions"**.

(b)    Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) pre-packaged supplies, cleaning materials and petroleum products

11

customarily used in the operation and maintenance of comparable commercial properties, and (2) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(c)     Grantor shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions.

(d)     Grantor represents and warrants to Lender that, except as previously disclosed by Grantor to Lender in writing:

    (1)     Grantor has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

    (2)     to the best of Grantor's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

    (3)     except to the extent previously disclosed by Grantor to Lender in writing, the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Grantor's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past. If there is an underground storage tank located on the Property which has been previously disclosed by Grantor to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

    (4)     Grantor has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials. Without limiting the generality of the foregoing, Grantor has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

    (5)     no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with the terms of any Environmental Permit;

    (6)     there are no actions, suits, claims or proceedings pending or, to the best of Grantor's knowledge after reasonable and diligent inquiry, threatened that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

    (7)     Grantor has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property.



12

Scanned with CamScanner

The representations and warranties in this Section 14 shall be continuing representations and warranties that shall be deemed to be made by Grantor throughout the term of the loan evidenced by the Note, until the Indebtedness has been paid in full.

(e)     Grantor shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)     Grantor's discovery of any Prohibited Activity or Condition;

(2)     Grantor's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property; and

(3)     any representation or warranty in this Section 14 becomes untrue after the date of this Agreement.

Any such notice given by Grantor shall not relieve Grantor of, or result in a waiver of, any obligation under this Instrument, the Note, or any other Loan Document.

(f)     Grantor shall pay promptly the costs of any environmental inspections, tests or audits ("**Environmental Inspections**") required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any Transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) which Grantor fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 8. The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to Grantor or any other party such results or any other information obtained by Lender in connection with its Environmental Inspections. Lender hereby reserves the right, and Grantor hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property. Grantor consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections. Grantor acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale. Grantor agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Grantor hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(g)     If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("**Remedial Work**") is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials Law, Grantor shall, by the earlier of (1) the applicable deadline required by Hazardous Materials Law or (2)



13

Scanned with CamScanner

30 days after notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law. If Grantor fails to begin or a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Grantor shall reimburse Lender on demand for the cost of doing so. Any reimbursement due from Grantor to Lender shall become part of the Indebtedness as provided in Section 8.

(h)     Grantor shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(i)     Grantor shall indemnify, hold harmless and defend (i) Lender, (ii) any prior owner or holder of the Note, (iii) the Loan Servicer, (iv) any prior Loan Servicer, (v) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (vi) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, the "**Indemnitees**") from and against all proceedings, claims, damages, judgments, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(1)     any breach of any representation or warranty of Grantor in this Section 14;

(2)     any failure by Grantor to perform any of its obligations under this Section 14;

(3)     the existence or alleged existence of any Prohibited Activity or Condition;

(4)     the presence or alleged presence of Hazardous Materials on or under the Mortgaged Property or any property of Grantor that is adjacent to the Mortgaged Property; and

(5)     the actual or alleged violation of any Hazardous Materials Law.

(j)     Counsel selected by Grantor to defend Indemnitees shall be subject to the approval of those Indemnitees. However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at the Grantor's expense.

(k)     Grantor shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (a "**Claim**"), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(l)     The provisions of this Section 14 shall be in addition to any and all other obligations and liabilities that Grantor may have under applicable law or under other Loan Documents. If Grantor consists of more than one person or entity, the obligation of those persons or entities to indemnify the Indemnitees under this Section 14 shall be joint and several. The obligation of Grantor to indemnify the Indemnitees under this Section 14 shall survive any repayment or discharge of the Indebtedness,

14

any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Instrument.

## 15.   PROPERTY AND LIABILITY INSURANCE.

(a)     Grantor shall keep the Improvements insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, and business income coverage. Lender's insurance requirements may change from time to time throughout the term of the Indebtedness. If any of the Improvements is located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, and if flood insurance is available in that area, Grantor shall insure such Improvements against loss by flood.

(b)     All policies of property damage insurance shall include a non-contributing, non-reporting mortgage and loss payee clause in favor of, and in a form approved by, Lender. Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 15(a). Grantor shall promptly deliver to Lender a copy of all renewal and other notices received by Grantor with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Grantor shall deliver to Lender the original (or a duplicate original) of a renewal policy in form satisfactory to Lender.

(c)     Grantor shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require.

(d)     Grantor shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Instrument requires Grantor to maintain.

(e)     In the event of loss, Grantor shall give immediate written notice to the insurance carrier and to Lender. Grantor hereby authorizes and appoints Lender as attorney-in-fact for Grantor to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds.  This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 19 shall require Lender to incur any expense or take any action. Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Grantor for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender (the "**Restoration**"), or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar commercial properties.

(f)     Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating

15

to the Mortgaged Property; (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty; and (5) upon Lender's request, Grantor provides Lender evidence of the availability during and after the Restoration of the insurance required to be maintained by Grantor pursuant to this Section 15.

(g)     If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, Lender shall automatically succeed to all rights of Grantor in and to any insurance policies and unearned insurance premiums and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

### 16.     CONDEMNATION.

(a)     Grantor shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect (a **"Condemnation"**). Grantor shall appear in and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by Lender in writing. Grantor authorizes and appoints Lender as attorney-in-fact for Grantor to commence, appear in and prosecute, in Lender's or Grantor's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 16 shall require Lender to incur any expense or take any action. Grantor hereby transfers and assigns to Lender all right, title and interest of Grantor in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b)     Lender may apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to the restoration or repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Grantor. Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness shall not extend or postpone the due date of any monthly installments referred to in the Note or Guaranty, Section 4 of this Instrument, or change the amount of such installments. Grantor agrees to execute such further evidence of assignment of any awards or proceeds as Lender may require.

### 17.     TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN GRANTOR.

(a)     The occurrence of any of the following events shall constitute an Event of Default under this Instrument:

> (1)     a Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property;

> (2)     a Transfer of a Controlling Interest in Grantor;

> (3)     a Transfer of a Controlling Interest in any entity which owns, directly or indirectly through one or more intermediate entities, a Controlling Interest in Grantor;

16

(4)     a Transfer of all or any part of a Key Principal's ownership interests in Grantor, or in any other entity which owns, directly or indirectly through one or more intermediate entities, other than a transfer of an interest that is (i) insignificant, (ii) non-governing interest and (iii) does not effectively shift control of the Grantor;

(5)     if Key Principal is an entity, (A) a Transfer of a Controlling Interest in Key Principal, or (B) a Transfer of a Controlling Interest in any entity which owns, directly or indirectly through one or more intermediate entities, a Controlling Interest in Key Principal;

(6)     if Grantor or Key Principal is a trust, the termination or revocation of such trust; and

(7)     a conversion of Grantor from one type of legal entity into another type of legal entity, whether or not there is a Transfer.

Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default in order to exercise any of its remedies with respect to an Event of Default under this Section 17.

(b)     The occurrence of any of the following events shall not constitute an Event of Default under this Instrument, notwithstanding any provision of Section 17(a) to the contrary:

(1)     a Transfer to which Lender has consented;

(2)     a Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person;

(3)     the grant of a leasehold interest in all or any portion of the Improvements not containing an option to purchase for a term of three years or less (including renewals) if the Improvements are residential, and for a term of ten years (five years if to an affiliate of Grantor) or less (including renewals) if the Improvements are not residential;

(4)     a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality, which are free of liens, encumbrances and security interests other than those created by the Loan Documents or consented to by Lender;

(5)     the grant of an easement, if before the grant Lender determines that the easement will not materially affect the operation or value of the Mortgaged Property or Lender's interest in the Mortgaged Property, and Grantor pays to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's or Grantor's request; and

(6)     the creation of a tax lien or a mechanic's, materialman's or judgment lien against the Mortgaged Property which is bonded off, released of record or otherwise remedied to Lender's satisfaction within 30 days of the date of creation.

17

Scanned with CamScanner

(c)    For purposes of this Section, the following terms shall have the meanings set forth below:

(1)    **"Initial Owners"** means, with respect to Grantor or any other entity, the persons or entities who on the date of the Note own in the aggregate 100% of the ownership interests in Grantor or that entity.

(2)    A Transfer of a **"Controlling Interest"** shall mean, with respect to any entity, the following:

(i)    if such entity is a general partnership or a joint venture, a Transfer of any general partnership interest or joint venture interest which would cause the Initial Owners to own less than 51% of all general partnership or joint venture interests in such entity;

(ii)    if such entity is a limited partnership, a Transfer of any general partnership interest;

(iii)    if such entity is a limited liability company or a limited liability partnership, a Transfer of any membership or other ownership interest which would cause the Initial Owners to own less than 51% of all membership or other ownership interests in such entity;

(iv)    if such entity is a corporation (other than a Publicly-Held Corporation) with only one class of voting stock, a Transfer of any voting stock which would cause the Initial Owners to own less than 51% of voting stock in such corporation;

(v)    if such entity is a corporation (other than a Publicly-Held Corporation) with more than one class of voting stock, a Transfer of any voting stock which would cause the Initial Owners to own less than a sufficient number of shares of voting stock having the power to elect the majority of directors of such corporation;

(vi)    if such entity is a trust, the removal, appointment or substitution of a trustee of such trust other than (A) in the case of a land trust, or (B) if the trustee of such trust after such removal, appointment or substitution is a trustee identified in the trust agreement approved by Lender

(vii)    for any entity, a change in the terms of the governing agreement(s) which has the practical effect of shifting control of the entity from either of the Key Principals.

(3)    **"Publicly-Held Corporation"** shall mean a corporation the outstanding voting stock of which is registered under Section 12(b) or 12(g) of the Securities and Exchange Act of 1934, as amended.

18.    **EVENTS OF DEFAULT.** The occurrence of any one or more of the following shall constitute an Event of Default under this Instrument:

18

Scanned with CamScanner

    (a)    any failure by Borrower or Grantor to pay or deposit when due any amount required by the Note, the Guaranty, this Instrument or any other Loan Document;

    (b)    any failure by Grantor to maintain the insurance coverage required by Section 15;

    (c)    fraud or material misrepresentation or material omission by Grantor or any of its officers, directors, trustees, general partners or managers, Key Principal or any guarantor in connection with (A) the application for or creation of the Indebtedness, (B) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (C) any request for Lender's consent to any proposed action;

    (d)    any Event of Default under Section 17;

    (e)    the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property;

    (f)    any failure by Grantor to perform any of its obligations under this Instrument (other than those specified in Sections 18(a) through (e)), as and when required, which continues for a period of 30 days after notice of such failure by Lender to Grantor, but no such notice or grace period shall apply in the case of any such failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Instrument, result in harm to Lender, impairment of the Note or this Instrument or any other security given under any other Loan Documents;

    (g)    any failure by Borrower or Grantor to perform any of its obligations as and when required under any Loan Document other than this Instrument which continues beyond the applicable cure period, if any, specified in that Loan Document; and

    (h)    any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable.

    **19.**    **REMEDIES CUMULATIVE.** Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

    **20.**    **FORBEARANCE.**

    (a)    Lender may (but shall not be obligated to) agree with Grantor, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, any guarantor or other third party obligor, to take any of the following actions: extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Instrument, the Guaranty, the Note, or any other Loan Document; release anyone liable for the payment of any amounts under this Instrument, the Guaranty, the Note, or any other Loan Document; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Instrument, the Guaranty, the Note, or any other Loan Document.

19

(b)      Any forbearance by Lender in exercising any right or remedy under the Guaranty, the Note, this Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any awards or proceeds under Sections 19 and 20 shall not operate to cure or waive any Event of Default.

21.    **LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower or Grantor is interpreted so that any charge provided for in any Loan Document, whether considered separately or together with other charges levied in connection with any other Loan Document, violates that law, and Borrower or Grantor is entitled to the benefit of that law, that charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower or Grantor has been violated, all Indebtedness which constitutes interest, as well as all other charges levied in connection with the Indebtedness which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

22.    **WAIVER OF STATUTE OF LIMITATIONS.** Grantor hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce the Note or any Loan Document.

23.    **WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Grantor and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

24.    **FURTHER ASSURANCES.** Grantor shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Note.

25.    **ESTOPPEL CERTIFICATE.** Within 10 days after a request from Lender, Grantor shall deliver to Lender a written statement, signed and acknowledged by Grantor, certifying to Lender or any person designated by Lender, as of the date of such statement, (i) that the Loan Documents are

20

unmodified and in full force and effect  (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications); (ii) the unpaid principal balance of the Note and the Guaranty; (iii) the date to which interest under the Note and Guaranty has been paid; (iv) that neither Grantor nor Borrower is in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Instrument, the Note, or any of the other Loan Documents (or, if the Grantor is in default, describing such default in reasonable detail); (v) whether or not there are then existing any setoffs or defenses known to Grantor against the enforcement of any right or remedy of Lender under the Loan Documents; and (vi) any additional facts requested by Lender.

### 26.   GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.

(a)    To the extent required by Maryland law, this Instrument shall be governed by the laws of the jurisdiction in which the Land is located (the **"Property Jurisdiction"**), but shall otherwise be governed, together with the Guaranty and all other Loan Documents, by the laws of the State of Maryland.

(b)    Except to the extent required exercise foreclosure and related rights with respect to the Land and other collateral located outside of Maryland, Grantor agrees that any controversy arising under or in relation to the Guaranty, this Instrument, or any other Loan Document shall be litigated exclusively in Maryland. The state and federal courts and authorities with jurisdiction in Maryland shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Guaranty, this Instrument, any security for the Indebtedness, or any other Loan Document. Grantor irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

### 27.   NOTICE.

(a)    All notices, demands and other communications (**"notice"**) under or concerning this Instrument shall be in writing. Each notice shall be addressed to the intended recipient at its address set forth in this Instrument, and shall be deemed given on the earliest to occur of (1) the date when the notice is received by the addressee; (2) the first Business Day after the notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested.  As used in this Section 27, the term "Business Day" means any day other than a Saturday, a Sunday or any other day on which financial institutions in Maryland are authorized to be closed.

(b)    Any party to this Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 27.  Each party agrees that it will not refuse or reject delivery of any notice given in accordance with this Section 27, that it will acknowledge, in writing, the receipt of any notice upon request by the other party and that any notice rejected or refused by it shall be deemed for purposes of this Section 27 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

### 28.   SALE OF NOTE; CHANGE IN SERVICER. The Note or a partial interest in the Note (together with the Guaranty, this Instrument and the other Loan Documents) may be sold one or more times without prior notice to Borrower or Grantor. A sale may result in a change of the Loan

21

Scanned with CamScanner

Servicer. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given notice of the change.

**29.     SUCCESSORS AND ASSIGNS BOUND.** This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and assigns of Lender and Grantor. However, a Transfer not permitted by Section 17 shall be an Event of Default.

**30.     JOINT AND SEVERAL LIABILITY.** If more than one person or entity signs this Instrument as Grantor, the obligations of such persons and entities shall be joint and several.

**31.     RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.**

(a)     The relationship between Lender and Grantor shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Grantor.

(b)     No creditor of any party to this Instrument and no other person (except Borrower) shall be a third party beneficiary of this Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (1) any arrangement (a "**Servicing Arrangement**") between the Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Grantor for the payment of the Indebtedness under the Guaranty, (2) Grantor shall not be a third party beneficiary of any Servicing Arrangement, and (3) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness under the Note or guaranteed by the Guaranty.

**32.     SEVERABILITY; AMENDMENTS.** The invalidity or unenforceability of any provision of this Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect. This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**33.     CONSTRUCTION.** The captions and headings of the sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument. Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument. All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument. Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Agreement includes the plural and use of the plural includes the singular. As used in this Instrument, the term "including" means "including, but not limited to."

**34.     LOAN SERVICING.** All actions regarding the servicing of the loan evidenced by the Note, including the collection of payments, the giving and receipt of notice, inspections of the Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such notice from Lender shall govern.

22

**35.    DISCLOSURE OF INFORMATION.** Lender may furnish information regarding Grantor or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of commercial mortgage loans. Grantor irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including any right of privacy.

**36.    SUBROGATION.** If, and to the extent that, the proceeds of the loan evidenced by the Note are used to pay, satisfy or discharge any obligation of Grantor for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a **"Prior Lien"**), such loan proceeds shall be deemed to have been advanced by Lender at Grantor's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

**37.    ACCELERATION; REMEDIES.** At any time during the existence of an Event of Default, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by Maryland law or provided in this Instrument or in any other Loan Document. Grantor acknowledges that the power of sale granted in this Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports.

If Lender invokes the power of sale, Lender shall mail or cause Trustee to mail written notice of sale to Grantor in the manner prescribed by Maryland law. Trustee shall give notice of sale and shall sell the Mortgaged Property according to Maryland law. Trustee may sell the Mortgaged Property at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone sale of all or any part of the Mortgaged Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Mortgaged Property at any sale.

Trustee shall deliver to the purchaser at the sale, within a reasonable time after the sale, a deed conveying the Mortgaged Property so sold without any express or implied covenant or warranty. The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements made in those recitals. Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including Trustee's fees, attorneys' fees and costs of title evidence; (b) to the Indebtedness in such order as Lender, in Lender's discretion, directs; and (c) the excess, if any, to the person or persons legally entitled to the excess.

Grantor hereby assents to the passage of a decree for the sale of the Mortgaged Property pursuant to Lender's exercise of its rights under this Section.

**38.    RELEASE.** Upon payment of the Indebtedness, Lender or Trustee shall release this Instrument. Grantor shall pay Lender's or Trustee's reasonable costs incurred in releasing this Instrument.

**39.    SUBSTITUTE TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee by an instrument recorded in the city or county in which this Instrument is recorded. Without conveyance of the Mortgaged Property, the successor trustee shall

23

succeed to all the title, power and duties conferred upon the Trustee in this Instrument and by applicable law.

40.    **WAIVER OF TRIAL BY JURY.** GRANTOR AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS GUARANTOR AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

Balance of page left blank

24

Scanned with CamScanner

**IN WITNESS WHEREOF,** Grantor has signed and delivered this Instrument under seal or has caused this Instrument to be signed and delivered by its duly authorized representative under seal.

WTINESS/ATTEST

Crear Estetica, LLC (BORROWER)

_____ (SEAL)

By: _Javier Rossi_

Its: _____

STATE OF_____ COUNTY/CITY OF_____ TO WIT:

I HEREBY CERTIFY, that on this\_\_\_\_day of_____, 20\_\_ before me, the undersigned, a Notary Public of the aforesaid State, personally appeared _____, and that he is known to me (or satisfactorily proven) to be the _____ whose name is subscribed to authorized person of _____ the within instrument, and, being authorized so to do, acknowledged that he executed the same on behalf of _____ for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ NOTARY PUBLIC

My Commission Expires: _____

The undersigned, an attorney duly admitted to practice before the Maryland Court of Appeals, hereby certifies that this instrument has been prepared by or under the supervision of the undersigned.

25

**Scanned with CamScanner**

**EXHIBIT A** 

26

**Scanned with CamScanner**

Lender's Licensure Exemption Affidavit

I hereby certify pursuant to Annotated Code of Maryland, Real Property Article, Section 3-104.1, that Wall Street Wealth Management, LLC is exempt from the licensure requirements of Financial Institutions Code Title 11, Subtitles 5 and 6.

Lender
**Wall Street Wealth Management, LLC**

_____
By:

27

Scanned with CamScanner

# EXHIBIT G

# A. Settlement Statement (HUD-1)

OMB Approval No. 2502-0265

## B. Type of Loan

| | |
|---|---|
| 1. ☐ FHA  2. ☐ RHS  3. ☐ Conv. Unins. | 6. File Number: M20-8201-TG-B |
| 4. ☐ VA  5. ☐ Conv. Ins. | 7. Loan Number: 0000 |
| | 8. Mortgage Insurance Case Number: |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agents are shown. Items marked "(p.o.c)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: Crear Estetica, LLC 1714 Memphis St, Suite C-8, Philadelphia 19125 | E. Name & Address of Seller: KANNO INVESTMENTS, LLC 1714 Memphis St, Suite C-8, Philadelphia 19125 | F. Name & Address of Lender: Wall Street Wealth Management, LLC |
|---|---|---|
| G. Property Location: 558 South Bentalou Street Baltimore, MD 21223 | H. Settlement Agent: Masters Title & Escrow 10411 Motor City Drive #690, Bethesda, MD 20817 | I. Settlement Date: 05/26/2020 Disbursement Date: 05/26/2020 |
| | Place of Settlement: 10411 Motor City Drive #690, Bethesda, MD 20817 | TitleExpress |

## J. Summary of Borrower's Transaction

| | | |
|---|---|---|
| **100.** | **Gross Amount Due from Borrower** | |
| 101. | Contract sales price | 44,000.00 |
| 102. | Personal property | |
| 103. | Settlement charges to borrower (line 1400) | 48,816.97 |
| 104. | | |
| 105. | | |
| | Adjustments for items paid by seller in advance | |
| 106. | City/town taxes 05/26/2020 to 06/30/2020 | 58.03 |
| 107. | County taxes to | |
| 108. | Assessments to | |
| 109. | | |
| 110. | | |
| 111. | | |
| 112. | | |
| **120.** | **Gross Amount Due from Borrower** | **92,875.00** |
| **200.** | **Amounts Paid by or in Behalf of Borrower** | |
| 201. | Deposit or earnest money | |
| 202. | Principal amount of new loan(s) | 40,000.00 |
| 203. | Existing loan(s) taken subject to | |
| 204. | | |
| 205. | | |
| 206. | | |
| 207. | | |
| 208. | | |
| 209. | | |
| | Adjustments for items unpaid by seller | |
| 210. | City/town taxes to | |
| 211. | County taxes to | |
| 212. | Assessments to | |
| 213. | | |
| 214. | | |
| 215. | | |
| 216. | | |
| 217. | | |
| 218. | | |
| 219. | | |
| **220.** | **Total Paid by/for Borrower** | **40,000.00** |
| **300.** | **Cash at Settlement from/to Borrower** | |
| 301. | Gross amount due from borrower (line 120) | 92,875.00 |
| 302. | Less amounts paid by/for borrower (line 220) | 40,000.00 |
| **303.** | **Cash ☒ From ☐ To Borrower** | **52,875.00** |

## K. Summary of Seller's Transaction

| | | |
|---|---|---|
| **400.** | **Gross Amount Due to Seller** | |
| 401. | Contract sales price | 44,000.00 |
| 402. | Personal property | |
| 403. | | |
| 404. | Credit to Seller | 14,695.15 |
| 405. | | |
| | Adjustments for items paid by seller in advance | |
| 406. | City/town taxes 05/26/2020 to 06/30/2020 | 58.03 |
| 407. | County taxes to | |
| 408. | Assessments to | |
| 409. | | |
| 410. | | |
| 411. | | |
| 412. | | |
| **420.** | **Gross Amount Due to Seller** | **58,753.18** |
| **500.** | **Reductions In Amount Due to Seller** | |
| 501. | Excess deposit (see instructions) | |
| 502. | Settlement charges to seller (line 1400) | 23,553.18 |
| 503. | Existing loan(s) taken subject to | |
| 504. | Payoff of first mortgage loan | |
| 505. | Payoff of second mortgage loan | |
| 506. | | |
| 507. | | |
| 508. | | |
| 509. | | |
| | Adjustments for items unpaid by seller | |
| 510. | City/town taxes to | |
| 511. | County taxes to | |
| 512. | Assessments to | |
| 513. | | |
| 514. | | |
| 515. | | |
| 516. | | |
| 517. | | |
| 518. | | |
| 519. | | |
| **520.** | **Total Reduction Amount Due Seller** | **23,553.18** |
| **600.** | **Cash at Settlement to/from Seller** | |
| 601. | Gross amount due to seller (line 420) | 58,753.18 |
| 602. | Less reductions in amount due seller (line 520) | 23,553.18 |
| **603.** | **Cash ☒ To ☐ From Seller** | **35,200.00** |

The Public Reporting Burden for this collection of information is estimated at 35 minutes per response for collecting, reviewing, and reporting the data. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. No confidentiality is assured; this disclosure is mandatory. This is designed to provide the parties to a RESPA covered transaction with information during the settlement process.

*JLR*

HUD-1

**L. Settlement Charges**

| | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| **700.** | **Total Real Estate Broker Fees** | $4,150.00 | | |
| | Division of commission (line 700) as follows: | | | |
| 701. | $0.00 | to | | |
| 702. | $4,150.00 | to   ABC Capital Miami | | |
| 703. | Commission paid at settlement | | | 4,150.00 |
| **800.** | **Items Payable in Connection with Loan** | | | |
| 801. | Our origination charge  (Includes Origination Point 0.000% or $0.00) | $                              (from GFE #1) | | |
| 802. | Your credit or charge (points) for the specific interest rate chosen | $                              (from GFE #2) | | |
| 803. | Your adjusted origination charges | (from GFE A) | | |
| 804. | Processing Fee | to ABC Capital Miami | 499.00 | |
| 805. | Homeowners Insurance and Fees | to Stateside APM | 880.00 | |
| 806. | Renovations - Utilities | to | | |
| 807. | MD - Registration | to | | |
| 808. | MD - Lead Cert | to                            (from GFE #3) | | |
| 809. | Processing Fee | to Miami Life Realty, LLC | 495.00 | |
| 810. | Lender Points | to Wall Street Wealth Managment, LLC | 4,000.00 | |
| **900.** | **Items Required by Lender to be Paid in Advance** | | | |
| 901. | Daily interest charges from | from 05/26/2020 to 06/01/2020 @ $0.00/day            (from GFE #10) | | |
| 902. | Mortgage insurance premium | months to                   (from GFE #3) | | |
| 903. | Homeowner's insurance | months to                   (from GFE #11) | | |
| 904. | | months to                   (from GFE #11) | | |
| **1000.** | **Reserves Deposited with Lender** | | | |
| 1001. | Initial deposit for your escrow account | (from GFE #9) | | |
| 1002. | Homeowner's insurance | months @ $            /month | | |
| 1003. | Mortgage insurance | months @ $            /month | | |
| 1004. | Property taxes | months @ $     49.17/month  $ | | |
| 1005. | | months @ $            /month | | |
| 1006. | Assessments | months @ $      0.00/month  $ | | |
| 1007. | Aggregate Adjustment | $ | | |
| **1100.** | **Title Charges** | | | |
| 1101. | Title services and lender's title insurance | $                              (from GFE #4) | 205.00 | |
| 1102. | Settlement or closing fee | to                          $ | | |
| 1103. | Owner's title insurance - First American Title Insurance Company | $                              (from GFE #5) | 398.40 | |
| 1104. | Lender's title insurance - First American Title Insurance Company | $175.00 | | |
| 1105. | Lender's title policy limit $40,000.00  Lender's Policy | | | |
| 1106. | Owner's title policy limit $83,000.00  Owner's Policy | | | |
| 1107. | Agent's portion of the total title insurance premium | $458.72 | | |
| | to Masters Title & Escrow | | | |
| 1108. | Underwriter's portion of the total title insurance premium | $114.68 | | |
| | to First American Title Insurance Company | | | |
| 1109. | Settlement Fee | to Masters Title & Escrow | 450.00 | |
| 1110. | Title Abstract | to Masters Title & Escrow | 260.00 | |
| 1111. | Document Preparation | to Masters Title & Escrow | 185.00 | |
| 1112. | Attorney Fee | to Masters Title & Escrow | 395.00 | |
| 1113. | Lien Certification | to Masters Title & Escrow | 120.00 | |
| 1114. | Wire/Courier Fee | to Masters Title & Escrow | 70.00 | |
| 1115. | Closing Prot Ltr | to First American Title    $30.00 Insurance Company | | |
| **1200.** | **Government Recording and Transfer Charges** | | | |
| 1201. | Government recording charges | $                              (from GFE #7) | 175.00 | |
| 1202. | Deed $60.00 | Mortgage $115.00          Release $ | | |
| 1203. | Transfer taxes | $                              (from GFE #8) | 1,320.00 | |
| 1204. | State Recordation Tax | Deed $440.00              Mortgage $ | | |
| 1205. | State Transfer Tax | Deed $220.00              Mortgage $ | | |
| 1206. | City Transfer Tax | Deed $660.00              Mortgage $ | | |
| **1300.** | **Additional Settlement Charges** | | | |
| 1301. | Required services that you can shop for | (from GFE #6) | | |
| 1302. | Violation/Water Escrow | to Seller Escrow | | 350.00 |
| 1303. | Water Bill | to Director of Finance | | 753.18 |
| 1304. | Referral Fee | to Miami Life Realty, LLC | | 4,980.00 |
| 1305. | Property Taxes | to Director of Finance               $669.12 P.O.C.(S*) | | |
| 1306. | Reimbursement of Maintenance Fee | to ABC Management - Baltimore, LLC   $4,000.00 P.O.C.(B*) | 35,000.00 | |
| 1307. | Violation/Water Escrow | to Escrow | 300.00 | |
| 1308. | Renovation Fee | to USA Rebuilders, LLC | | 3,320.00 |
| 1309. | Per Agreement | to ABC Capital RE, LLC | | 10,000.00 |
| 1310. | Closing Fee | to ABC Capital-Baltimore, LLC | 4,064.57 | |
| **1400.** | **Total Settlement Charges      (enter on lines 103, Section J and 502, Section K)** | | 48,816.97 | 23,553.18 |

*Paid outside of closing by (B)orrower, (S)eller, (L)ender, (I)nvestor, Bro(K)er. **Credit by lender shown on page 1. ***Credit by seller shown on page 1.

*JLR*

**Signature Page**

## HUD CERTIFICATION OF BUYER AND SELLER

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

**Buyers**

CREAR ESTETICA, LLC

*Javier Luis Rossi*          06/12/2020
                              05:14 PM GMT

,

**Sellers**

KANNO INVESTMENTS, LLC

,

**Settlement Agent**

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

*[signature]*                              5/26/20

SETTLEMENT AGENT                           DATE

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT, FOR DETAILS SEE TITLE 18: U.S. CODE SECTION 1001 AND SECTION 1010.

**Signature Page**

## HUD CERTIFICATION OF BUYER AND SELLER

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

**Buyers**

CREAR ESTETICA, LLC

_____

'

**Sellers**

KANNO INVESTMENTS, LLC

_____

'

**Settlement Agent**

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

_____          5/26/20
SETTLEMENT AGENT                                 DATE

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE TITLE 18: U.S. CODE SECTION 1001 AND SECTION 1010.

# EXHIBIT H

## REAL ESTATE CONTRACT OF SALE

THIS CONTRACT OF SALE dated May 20, 2020 between **CREAR ESTETICA LLC** (called "Buyer"), and **ABC CAPITAL BALTIMORE, LLC** (called "Seller").

1. The Property.  Seller sells to Buyer, and Buyer purchases from Seller the real property located in Baltimore City, Maryland, and known as **1802 Hope St, Baltimore, MD 21202.**

2. Purchase Price.  The purchase price for the Property is **Thirty One Thousand Five Hundred** ($31,500.00) **Dollars**. The balance of the purchase price shall be paid at Settlement.

3. Time and Place of Settlement.  Unless the parties agree otherwise in writing, settlement shall take place on or before___June 5, 2020_____, at the offices of  **Masters** (TITLE CO).

4. Financing Contingency. There are no financing contingencies for this transaction.

5. Title to the Property.  At settlement, upon payment as above provided of the unpaid purchase money, a deed for the property containing covenants of special warranty and further assurance shall be executed at Buyer's expense by Seller, which shall convey the property to Buyer.  The title conveyed to Buyer shall be good and merchantable, free of liens and encumbrances except use, occupancy and similar restrictions of public record which are generally applicable to properties in the immediate neighborhood or subdivision in which the property is located, easements which may be observed by an inspection of the property, and such utility and other easements as do not materially adversely affect the fair market value of the property.

6. Possession.   The Buyer shall be given possession of the property at settlement. The following work will be completed on the property within __90__ days of closing (see addendum B). (NO ADDENDUM)

7. Settlement Adjustments. Water charges, and community association charges, if any, shall be adjusted and apportioned as of the date of settlement.  All taxes, general or special, and all other public or governmental charges or assessments against the property which are or may be payable on an annual basis (including Metropolitan District or other benefit charges, assessments, liens or encumbrances for sewer, water, drainage, or other public improvements completed or commenced on or prior to the date hereof or subsequent thereto), are to be adjusted and apportioned as of the date of settlement and are

to be assumed and paid thereafter by Buyer, whether assessments have been levied or not as of the date of settlement except as otherwise required by law. The cost of all recordation and transfer taxes required by law will be paid by the buyer. The cost of the title search and title insurance premiums shall be paid by Buyer.

7a. If Seller has identified in writing that the Property is subject to a lease, possession is to be delivered by deed, existing keys and assignment of existing leases for the Property, together with security deposits and interest, if any, at day and time of settlement. Seller will not enter into any new leases, nor extend existing leases, for the Property without the written consent of Buyer. Buyer will acknowledge existing lease(s) by initialing the lease(s) at the execution of this Agreement, unless otherwise stated in this Agreement.

8. Risk of Loss. The property shall be held at the risk of Seller until settlement hereunder. Upon the written request of Buyer, Seller shall immediately have all insurance policies on the property endorsed to protect all parties hereto, as their interest may appear, and shall continue the insurance in force during the life of this Contract.

9. Buyer's Default. If Buyer defaults in Buyer's obligation to purchase the property, Seller shall have the right, at Seller's election, to retain all deposits paid hereunder as liquidated damages and not as a penalty, and upon such election the parties shall be released from all further liability hereunder at law and in equity.

10. Real Estate Commission. Seller warrants to Buyer that it has not used the services of a real estate broker or agent in connection with this transaction. Seller agrees to defend, indemnify and hold the buyer harmless for any claim for real estate commissions arising by reason of Seller's breach of this warranty. The provisions of this paragraph shall survive settlement and the delivery of the deed to the property or the termination of this Contract.

11. Notice to Buyer Required by the Maryland Homeowners Association Act. Attached as Addenda to this Contract are both the Notice and the Disclosure required by §11B-106 of the Real Property Article of the Annotated Code of Maryland.

12. Electronic Delivery. The parties agree that this Contract offer shall be deemed validly executed and delivered by a party if a party executes this Contract and delivers a copy of the executed Contract to the other party by telefax, telecopier transmittal or e-mail.

13. Ground Rent. If the property is subject to ground rent and the ground rent is not timely paid, the owner of the reversionary interest may bring an action of ejectment against the leasehold owner pursuant to Section 8-402.2 of the Real Property Article, Annotated Code of Maryland (as amended).

14. Miscellaneous Provisions.
(a) NOTICE TO BUYER: BUYER HAS THE RIGHT TO SELECT BUYER'S OWN TITLE INSURANCE COMPANY, TITLE LAWYER, SETTLEMENT COMPANY, ESCROW COMPANY, MORTGAGE LENDER, OR FINANCIAL INSTITUTION AS DEFINED IN THE FINANCIAL INSTITUTIONS ARTICLE, ANNOTATED CODE OF MARYLAND.

(b) This Contract contains the final and entire agreement between the parties and neither they nor their agents shall be bound by any terms, conditions or representations not herein written.

(c) Time is of the essence of this Contract.

(d) The liability of any party to this Contract shall be both joint and several.

(e) This Contract is binding on the parties and their personal representatives and assigns.

**THE FOLLOWING ADDENDUMS ARE ATTACHED TO AND MADE PART OF THIS AGREEMENT:**

Signed by the hand of the parties.

WITNESS/ATTEST:

_Javier Luis Rossi_____     05/24/2020 01:21 AM GMT _____ (SEAL)

                    Buyer                                 Date

_____     _____ (SEAL)

                    Seller                                Date

**MARYLAND RESIDENTIAL PROPERTY DISCLAIMER STATEMENT**

Property Address: **1802 Hope St, Baltimore, MD 21202,**

The undersigned Seller of the Property described in this Contract makes no representations or warranties as to the condition of the real property or any improvements thereon, and Buyer will be receiving the property "AS IS", with all defects which may exist except as otherwise provided in this Contract.  Buyer acknowledges having carefully examined this Statement and further acknowledges that he has been informed of his rights and obligations under Section 10-702 of the Maryland Real Property Article.

IN WITNESS WHEREOF, each party hereto has executed and ensealed this Sale or caused it to be executed and ensealed on its behalf by its duly authorized representatives, the day and year first above written.

WITNESS/ATTEST:

_Javier Luis Rossi_

_____        05/24/2020
                                            01:21 AM GMT
                                            _____ (SEAL)
                  Buyer                          Date

_____        _____ (SEAL)
                  Seller                         Date

**Addendum to Agreement of Sale- Exhibit A**

**BUYER**: CREAR ESTETICA LLC

**SELLER**: ABC CAPITAL—BALTIMORE LLC

**WARRANTOR**: ABC CAPITAL—BALTIMORE LLC

**PROPERTY ADDRESS**: 1802 Hope St, Baltimore, MD 21202,

1. Property is warrantied for 24 months. Client will have NO maintenance at all for 24 months.
2. Roof is warrantied for 12 years added by a 3rd party roofing contractor.
3. Rents will be abated until identification number is provided.
4. Buyer acknowledges the tenant will have the right of first refusal to buy the property.
5. Rents are guaranteed by a third-party insurance company named the Guarantors and/or Rent Protect Membership for $950 per month for 2 years. You are welcome to request your policy at any time.
6. ABC does not pay rent during construction delay from the city in the excess of 30 Days.
7. ABC has the rights to mitigate rent.
8. The client is responsible for all utilities at the property during construction. If ABC pays, they will be billed to the owner first billing rental statement.
9. Buyer will pay 10% for Property Management for Year One.
10. If ABC facilitates the purchase of a rental assurance policy for the client after year one, it will be at the cost of the client.
11. The Client will pay one month's rent for tenant placement during year one and all subsequent tenant placements.
12. Client indemnifies ABC of any claims regarding 3rd party products and services.
13. Client acknowledges they read and understand this contract. If they do not speak English, they have translated the documents and waive all claims against ABC for translation misunderstanding.
14. If Client or ABC terminates the property management agreement, all warranties provided by ABC and its affiliates are NULL and void.
15. If the buyer does not close on time at no fault of title not being clear, then buyer will pay $2000.00 USD penalty per week if closing is not done on time of closing.
16. If the client takes any type of warrantor offered by ABC. They acknowledge the expenses related to those warranties can be larger or smaller than the cost the warranties are offered.

_Javier Luis Rossi_   05/24/2020
                      01:21 AM GMT
_____
Buyer


_____
Seller

**AUTHORIZATION FOR TAXATION PETITION FOR REVIEW and/or NEW OWNER APPEAL OF REAL PROPERTY**

**Address: 1802 Hope St, Baltimore, MD 21202,**

I/We, _ CREAR ESTETICA LLC _, Owner(s) of the above noted property, do hereby authorize ABC Management- Baltimore, LLC to file a Petition For Review and/or New Owner Appeal of Real Property on our behalf.

 05/24/2020
01:21 AM GMT

# ABC Management – Baltimore, LLC

**100 INTERNATIONAL DRIVE**
**Baltimore, MD**

---

# Property Management Contract

This Agreement is entered by and between ABC Management – Baltimore, LLC, hereinafter called "**AGENT**," and   CREAR ESTETICA LLC, hereinafter called "**OWNER**."

**WITNESSETH** that, in order to induce the AGENT to enter into this agreement, OWNER hereby Represents and Warrants to AGENT that it is the OWNER of all the properties listed in Exhibit A (hereinafter "premises") as updated from time to time, that the premises have necessary Fire and Extended Coverage and Liability Insurance current, lead certificates if required, that the premises meet all required building and use codes, AND that the premises is registered both with the Municipality and with Maryland Department of Environment as required:

In consideration of these representations, warrants and the fees to be paid, AGENT agrees to act as management AGENT with respect to the property listed in Exhibit A, to use due diligence in the management of said premises upon the terms herein provided, and agrees to furnish the services of AGENT for the renting, leasing, operating and managing of said premises subject to and in accordance with the terms and provisions set forth below.

**I. AGENT'S COMPENSATION:**

A. OWNER shall pay a monthly management fee shall and be charged as follows:
For each premises or unit managed by AGENT, **ten percent (10%)** of the collected monthly rent, but not less than $50.00 for rented units, payable on the first day of each month.  If Owner waives any rent amount due Agent shall be entitled to the management fee as if the amount was collected.  The minimum amount is due even if the rent is collected at a later date.

B. OWNER shall pay any late charge: judicial fine, penalty, or multiple damage; or interest collected from the tenant to the AGENT as an additional fee, as described in **Paragraph IV.B.**

C. OWNER shall grant the AGENT the right to Lease the premises, and shall pay to the AGENT a leasing fee of one hundred percent (100%) of the first month's rent if the premises is leased during the effective period of this Agreement.

## II. LEASING:

A. OWNER hereby authorizes AGENT to rent the premises for a minimum term of one year.

B. All utility charges, as appropriate, shall be paid by the tenant during tenant's occupancy. Water charges shall be paid by OWNER directly to Municipality and, where appropriate, shall be promptly presented by OWNER to AGENT for reimbursement from Tenant.

C. AGENT shall collect a security deposit from all tenants as directed by OWNER. The security deposit shall be maintained in the escrow account of OWNER.

## III. DISBURSEMENTS: AGENT shall pay, OUT OF OWNER'S FUNDS AVAILABLE, the following as they shall accrue and in the order here set out:

A. AGENT's compensation, as set forth in Paragraph I.

B. Such advertising and utility bills (including gas, electric, and water), necessary repairs and/or charges to maintain the property, and cleaning charges as shall accrue or be necessary to preserve the property during periods of vacancy or occupancy, or to put the property in a rentable condition after vacated; or expenses to regain possession and/or to attempt to collect delinquent rent subject to the provisions set forth below; or necessary professional fees; or governmental assessments.

C. Proceeds to OWNER. Tenancy revenues, refunds, adjustments, or other funds due OWNER shall be sent to the address provided by the OWNER on or before by the 15TH of the following month that the rent is collected (45 Days after the rent is due). If OWNER's account is negative AGENT may invoice that amount to OWNER.  OWNER agrees to pay such invoice within 10 business days.  If any of the invoice amount is outstanding for more than 3 days following said period of 10 business days such amount is subject to 5% interest penalty per month accrued on a daily basis.

D. **IT IS EXPRESSLY AGREED THAT NOTHING HEREIN CONTAINED SHALL BE CONSTRUED AS REQUIRING AGENT TO ADVANCE ANY OF ITS OWN MONIES FOR ANY PURPOSE WHATSOEVER**.

## IV. GENERAL PROVISIONS:



**A. GRANT OF POWER:** Subject to the limitations set out herein, OWNER grants AGENT full power and authority to lease, let, rent and demise the premises, or any part thereof, in its own name as AGENT for OWNER. In order to effectuate same, AGENT may enter into such written contracts and/or leases as AGENT deems necessary, in its own name as AGENT for OWNER. Agent has the right to approve the rental amount for the initial lease and OWNER has the right to approve the rental amount for any subsequent new lease or renewal. AGENT may collect and receive all rents arising as a result of AGENT's management of the premises. AGENT may use such means as are ordinary and customary in collecting or attempting to collect any delinquent accounts. AGENT may, with OWNER approval evict any tenant who violates any term of the lease. OWNER hereby assigns to AGENT any and all delinquent rents which may accrue from any tenant for the purpose of crediting such rents to OWNER's operating account for required disbursement.

**B. COLLECTION OF RENT**

1. AGENT shall use such means as are ordinary and customary to collect or attempt to collect any rent from any tenant of the premises. In the event that legal action is necessary to obtain judgment for possession of the premises, delinquent rent, or damages upon other causes of action, AGENT is authorized to employ attorneys, to sue in its own name as AGENT for OWNER, and to expend the sum of up to six hundred dollars ($600.00) per premises or unit for each monthly billing cycle from OWNER's account for such purposes without OWNER's prior permission. If the legal expense will exceed this amount, the AGENT will obtain prior OWNER permission to proceed.  Additionally, AGENT will, when requested by OWNER, instigate action, legal or otherwise, for the collection of rents which is beyond the discretion heretofore allowed to AGENT, provided such action is considered reasonable by the AGENT.

2. **AGENT SHALL NOT BE HELD MONETARILY RESPONSIBLE FOR ITS INABILITY TO COLLECT RENTS. AGENT SHALL NOT BE HELD RESPONSIBLE FOR ANY EXPENSES INCURRED FOR LEGAL ACTION INVOLVED IN THE COLLECTION OF RENTS AND/OR THE EVICTION OF ANY TENANT AND/OR DAMAGES INCURRED TO THE PROPERTY**. All such expenses shall be paid by OWNER, reimbursable in the event AGENT is able to collect the rents, legal fees, or damages from the tenant.

3. If a late charge, judicial fine, penalty, or multiple damage, or interest is collected from the tenant, it shall be considered income to AGENT for its additional effort and time.

**C. MAINTENANCE**

1. AGENT shall have full authority to perform or to cause to be performed such maintenance of the property as is reasonable and necessary for the safety of the tenants and the preservation of the property at OWNER's expense.

2. AGENT may, at his sole discretion, install fire/smoke detectors, carbon monoxide detectors, and/or fire extinguishers on the property at OWNER's expense.

3. In the event maintenance, repairs, or construction are required to be performed to the property in excess of $_____500_____, AGENT will obtain prior OWNER permission to proceed.

**D. DISCRETIONARY AUTHORITY:**

1. OWNER expressly grants AGENT full power and authority to contract and pay for all repairs and cleaning costs, not exceeding the amount stipulated in paragraph IV.C.3. above, which in its discretion it deems necessary or advisable to maintain; or put the premises in a rentable condition; or to repair the same in the event of damage or destruction to the premises due to fire, windstorm, hail, flood, riot, civil commotion, tenant abuse, or other causes resulting in damage to the premises, all at OWNER's expense. Should the estimate or contemplated cost exceed funds on hand, OWNER shall promptly remit, upon AGENT's request, the necessary balance.

2. In an emergency, OWNER authorizes AGENT's expenditure in excess of funds on hand and above the amount stipulated in paragraph IV.C.3. above, without prior authorization. OWNER shall thereafter promptly remit, upon AGENT's request, the necessary balance.

3. Failure of OWNER to remit balances described in this subparagraph shall result in AGENT's reimbursement therefore from subsequent revenues ordinarily accruing and payable to OWNER.

**E. INSURANCE COVERAGE:** OWNER is obligated, at OWNER's expense, to keep the necessary Fire and Extended Coverage and Liability Insurance current and renewed. AGENT shall be shown as an additional insured under the liability section only.

**F. LIABILITY OF AGENT:** It is agreed that AGENT shall use reasonable and ordinary care in all acts assigned for performance by this Agreement. When any act is required of the AGENT, it shall be done in the ordinary course of AGENT's business.

1. Other than in cases of bad faith, fraud or willfull misconduct by AGENT or any of its representatives, OWNER shall save and hold AGENT harmless and indemnify AGENT from any and all claims, charges, debts, demands and lawsuits, which may arise in connection with the management of the premises, and from any liability from injuries suffered by any person entering or about the premises, including any property manager or other employee.

2. Other than in cases of bad faith, fraud or willfull misconduct by AGENT or any of its representatives, AGENT shall not be personally liable for any act it may do or omit to do hereunder as AGENT.

3. AGENT is hereby expressly authorized to comply with and obey any and all process, orders, judgment or decree, it receives of any court; where AGENT obeys or complies with any such process, order, judgment or decree, it shall not be liable to OWNER or any person, firm, or corporation by reason of such compliance, notwithstanding subsequent reversal or modification.

4. AGENT is hereby expressly authorized to comply with any laws, whether now in existence or hereinafter enacted, and whether federal, state, or local, relating to fair housing, rent control, discrimination, and health and welfare. AGENT is expressly authorized to comply with the rule or order of any governmental agency, insofar as such order in any manner affects the management of the premises or any duties of the AGENT hereunder.

**G. ACCOUNTING FOR FUNDS:**

1. AGENT shall furnish OWNER a monthly accounting statement showing the receipts and expenditures with respect to the premises, plus OWNER's monthly proceeds.

2. AGENT shall furnish a final accounting upon the termination of this agreement within forty-five (45) days from the date of a written request of management termination, except as modified by this agreement.

**H. SECURITY AND DAMAGE DEPOSITS**

1. All security and damage deposits shall be accounted to owners account and maintained by OWNER. OWNER shall return to the tenant any legally required amounts when the tenant vacates the premises, consistent with Maryland law.

2. AGENT shall properly account for sums retained for the purpose of off-setting OWNER's expenses for unpaid rent, utilities, cleaning charges, or repairs.

3. In the event litigation shall occur concerning security deposits, AGENT may defend same in its own name as AGENT for OWNER, at OWNER's expense.

4. Should AGENT and OWNER disagree on the amount of security deposit to be refunded to the tenant, AGENT shall have no further obligation or liability whatsoever concerning the security deposit to any person or entity; and OWNER shall hold AGENT harmless and indemnify AGENT therefrom.

5. Should this Agreement initiate while an existing tenant's security deposit is in OWNERS possession, AGENT shall be given a full accounting of said deposit. AGENT shall have no obligation or liability whatsoever concerning the security deposit to any person or entity; the OWNER shall hold AGENT harmless and indemnify AGENT therefrom.

**I. ADDRESS OF OWNER:** OWNER expressly agrees, within twenty (20) days of change, to advise AGENT, in writing, of any change of address. Any notice or accounting statement or other document required or desired to be given by AGENT to OWNER may be given by mailing to the address noted hereon, or the most recent address of OWNER

JL
R

shown in the records of the AGENT; and notice so mailed shall be as effectual as if served upon such party in person at the time of depositing such notice in the mail.

**J. TERMINATION:** This agreement may be terminated by either party upon sixty (60) day's written notice. If so terminated, OWNER shall retake possession of the premises, subject to the rights of any tenant rightfully in possession. Other than an amount equal to any outstanding AGENT or third-party obligations then remaining, OWNER's proceeds shall be distributed by AGENT thirty (30) days after termination.  Each relevant portion of the proceeds not distributed at such time shall be distributed by AGENT to OWNER immediately following the satisfaction of the corresponding obligation.

**K. DEFICIT ACCOUNT:** In the event of AGENT's termination, should there be any outstanding and unpaid obligations, debts, or charges due AGENT, any amounts on account or received by AGENT on account or otherwise due OWNER shall be applied first to satisfy those obligations and then disbursed to OWNER. OWNER waives all protest and defenses against AGENT for such lawful disbursements. AGENT's lien rights against the subject property shall not be waived by this provision.

**L. PARTIAL WAIVE OR ACQUIESCENCE NO BAR:** AGENT's or OWNER's waiver, forbearance, or acquiescence of any of its rights or remedies, in whole or in part, shall not serve to waive, bar, or compromise any contemporaneous or subsequent right or remedy.

**M. ATTORNEY FEES AND COSTS:** The unsuccessful party in litigation to enforce the terms and conditions of this Agreement shall pay the reasonable attorney fees and costs of the successful party.

**N. WHOLE AGREEMENT:** This writing, as amended in writing from time to time, embodies the entire agreement between the parties and is not based upon any other representation whatsoever, expressed or implied, except as herein contained. The Agreement cannot be modified except in writing and agreed to by the parties.

**V. EFFECTIVE DATE:** Management by AGENT shall be effective as of date executed herein**.** This agreement shall automatically be renewed for additional one year periods from the end date stated as its ending date unless written notice of its non-renewal is given in accordance with IV-J above.

**VII. ITEMS OF MUTUAL AGREEMENT:**
1. OWNER ( ) does / ( ) does not authorize AGENT to have the furnace HVAC system serviced twice each year;
2. OWNER ( ) does / ( ) does not authorize AGENT to have the sprinkler system drained in the winter and re-pressurized in the Spring of each year;

3. Pets ( ) shall - ( ) shall not be allowed, and/or limited as
follows:_____.  A pet
deposit of $_____ shall be collected of which $_____ shall be considered
non-refundable.
4. OWNER ( ) does / ( ) does not permit smoking.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands this _____ day of
_____.

AGENT / ABC Management – Baltimore, LLC
By: _____
Authorized Signature
_____
Printed Name

By:_____
Name:
Title: Managing Member

OWNER:_____ *Javier Luis Rossi* _____ 05/24/2020 01:21 AM GMT _____
Social Security No. or Federal I.D. No. _____
OWNER:_____
Social Security No. or Federal I.D. No. _____

## Attachment A
## Premises

<u>Name of Property</u>          <u>Address of Property</u>

1802 Hope St, Baltimore, MD 21202, USA

**WITNESSETH** that, in order to induce the AGENT to enter into this agreement, OWNER hereby Represents and Warrants to AGENT that he/she/they is/are the OWNER(s) of all the properties listed in Exhibit A (hereinafter "premises") as updated from time to time, that the premises have necessary Fire and Extended Coverage and Liability Insurance current, lead certificates if required, that the premises meet all required building and use codes, AND that the premises is registered both with the Municipality and with Maryland Department of Environment as required.

 

05/24/2020
01:21 AM GMT

# EXHIBIT I

$34,500.00                                          1802 Hope St, Baltimore, Maryland 21202
                                                                                    DATE

## PROMISSORY NOTE

FOR VALUE RECEIVED, the undersigned, Crear Estetica, LLC, (the "Borrower") promises to pay to the order of Wall Street Wealth Management, LLC or any subsequent holder of this Note (the "Lender"), during Lender's regular business hours at Lender's offices at 1714 Memphis St, Suite C-8, Philadelphia, PA 19125, or at such other place as Lender may from time to time designate to Borrower in writing, the sum of Thirty Four Thousand Five Hundred DOLLARS  ($34,500.00) (the "Loan"), together with interest on the unpaid principal balance outstanding from time to time at the rate or rates hereafter specified and any and all other sums which may be owing to Lender by Borrower pursuant to this Note.  Payments of all sums due under this Note shall be paid in lawful money of the United States of America which shall be legal tender in payment of all debts and dues.  The following additional terms shall apply to this Note.

   1.   Interest.  The principal amount outstanding from time to time hereunder shall bear interest at a fixed rate of NINE PERCENT (9%) per annum.  Interest shall be calculated on the basis of a year of three hundred sixty (360) days applied to the actual days on which there exists an unpaid balance under this Note.

   2.   Repayment.

      (a) Commencing on July 1, 2020 and continuing on the first day of each month thereafter, Borrower shall make payments of interest at the rate provided above in the monthly amount of $258.75; provided, however, that unless sooner paid, the entire amount of the unpaid principal amount, together with all accrued and unpaid interest thereon and all other sums due under this Note that remain unpaid shall be repaid within FIVE YEARS which is the final and absolute due date of this Note (the "Note Maturity Date").

      (b) The Borrower acknowledges and agrees that the payments of interest during the term of this Note are insufficient to pay the entire principal amount by the Maturity Date, and therefore, unless sooner paid, this Note contemplates a balloon payment of principal on the Maturity Date.

   3.   Default Interest Rate.  Upon an Event of Default (hereinafter defined), Lender may, in Lender's sole discretion, raise the rate of interest accruing on the unpaid principal balance to fifteen percent (15%) per annum, independent of whether Lender elects to accelerate the unpaid principal balance as a result of such default.  Such default interest rate shall continue, in Lender's sole discretion, until all defaults are cured.

   4.   Repayment Extension.  If any payment of principal or interest shall be due on a Saturday, Sunday or any other day on which banking institutions in the State of Maryland are required or permitted to be closed, such payment shall be made on the next succeeding business day and such extension of time shall be included in computing interest under this Note.

353503.1
7/18/2006

5.   **Late Payment Charge.**  Borrower shall pay a late payment charge of five percent (5%) of the amount then due if any payment due under this Note is not received by Lender within five (5) days after its due date.  The late payment charge shall be payable to Lender on demand.  A similar late charge may be imposed for each successive 30-day period during which all or any portion of such payment remains delinquent.  Such late charge shall be in addition to, and not in lieu of, any other right or remedy Lender may have, including the right to receive principal and interest and to reimbursement of costs and expenses.

6.   **Application of Payments.**  All payments made under this Note may, in Lender's sole discretion, be applied first to late payment charges or other sums owed to Lender, next to accrued and unpaid interest, and the balance to the repayment of principal, or in such other order or proportion as Lender, in its sole discretion, may elect from time to time.

7.   **Prepayment.**  This Note may be prepaid in whole or in part at any time without premium or penalty, provided, however, that each such payment shall be accompanied by payment of all unpaid penalties and premiums, if any, which are due plus all accrued and unpaid interest due as of the date of such prepayment.

8.   **Events of Default; Acceleration.**  The following shall each constitute an "Event of Default" under this Note: (a) a default by Borrower to make any payment of any sum under this Note within five (5) days after such payment is first due and payable; or (b) a failure to timely comply with any other obligation set forth in this Note or (c) an event of default in any other document delivered in connection with the securing and funding of this Note (collectively, the "Loan Documents").  The terms, covenants, conditions, provisions, stipulations, and agreements contained in the Loan Documents are hereby made a part hereof to the same extent and with the same effect as if fully set forth herein.  Upon the occurrence of an Event of Default, Lender, in Lender's sole discretion and without notice or demand, may declare the entire unpaid principal balance of this Note, together with all accrued interest and all other sums due under this Note to be immediately due and payable and may exercise any and all rights and remedies available to Lender hereunder, under applicable law and under any of the Loan Documents.  This Note is given pursuant to the aforesaid Loan Documents, and reference is hereby made to the Loan Documents for further and additional rights of Lender to declare the entire unpaid principal balance plus all accrued interest and all other sums due under this Note to be immediately due and payable.  Any failure by Lender to exercise this right of acceleration shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

9.   **Expenses of Collection.**  Borrower agrees to pay to Lender and reimburse Lender upon demand for any and all losses, costs and expenses, including all reasonable attorney's fees and court costs, if any, incurred by Lender in connection with the enforcement or collection of this Note, whether or not any action has been commenced by Lender to enforce or collect this Note.

10.   **Security.**  This Note is secured by a Deed of Trust, Assignment of Rents and Security Agreement of even date herewith (the "Deed of Trust"), from Borrower, as grantor, to the trustees named therein, for the benefit of Lender.  The Deed of Trust encumbers the real property and improvements thereon, more fully described in the Deed of Trust.

– 2 –

Scanned with CamScanner

11.  <u>Confession of Judgment</u>.  Upon the occurrence of any Event of Default as provided hereinabove, Borrower authorizes any attorney admitted to practice before any court of record in the United States to appear on behalf of Borrower in any court having jurisdiction in one or more proceedings, or before any clerk thereof or prothonotary or other court official, and to CONFESS JUDGMENT AGAINST BORROWER, WITHOUT PRIOR NOTICE OR OPPORTUNITY OF BORROWER FOR PRIOR HEARING, in favor of the holder of this Note for the full amount due on this Note (including principal, accrued interest and any and all other sums due under this Note that remain unpaid) plus court costs, expenses and attorneys fees of fifteen percent (15%) of the total amount then due hereunder.  Notwithstanding the amount of any such judgment, Lender agrees by accepting this Note not to enforce a judgment for legal fees against Borrower in an amount in excess of the fees and expenses actually charged to Lender for services rendered by, and for actual expenses incurred by, its counsel in connection with such confession of judgment and the collection of all amounts owed by Borrower to Lender.  Borrower waives the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon Borrower any right or privilege of exemption, summons and other process, all errors and rights of appeal, homestead rights, stay of execution or stay of supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment.  The authority and power to appear for and enter judgment against Borrower shall not be exhausted by one or more exercises thereof, or by any imperfect exercise thereof, and shall not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions, from time to time, in the same or different jurisdictions, as often as the holder shall deem necessary or advisable, for all of which this Note shall be sufficient authority.

12.  <u>Interest Rate After Judgment</u>.  If judgment is entered against Borrower on this Note, the amount of the judgment entered (which may include principal, interest, fees, and costs) shall bear interest at the higher: (a) the above described default interest rate, or (b) the legal rate of interest then applicable to judgments in the jurisdiction in which the judgment was entered, to be determined on the date of the entry of the judgment, until the judgment is paid in full.

13.  <u>Certain Waivers By Borrower</u>.  Borrower waives demand, presentment, notice of dishonor, protest, protest and demand, notice of protest, and notice of non-payment of this Note.  Lender, without compromising, impairing, modifying, diminishing, or in any way releasing or discharging Borrower from Borrower's obligations hereunder and without notifying or obtaining the prior approval of Borrower at any time or from time to time, may:  (a) grant extensions of time for payment or performance by Borrower or any other party to the Loan Documents; (b) release, substitute, exchange, impair, surrender, dispose of, or add any collateral which is security for this Note; (c) release in whole or in part Borrower or any other party to the Loan Documents; or (d) modify, change, renew, extend, or amend, in any respect, Lender's agreements with Borrower or any document, instrument, or writing, embodying or reflecting the same.

14.  <u>Commercial Loan</u>.  Borrower acknowledges and warrants that the debt evidenced by this Note is a "commercial loan" within the meaning of Title 12 of the Commercial Law Article of the Annotated Code of Maryland (2000 Rep. Vol.).

15.  <u>Non-Waiver By Lender</u>.  The rights and remedies of Lender under this Note and under the Loan Documents shall be cumulative and concurrent and may be pursued singularly, successively or together at the sole discretion of Lender, and may be exercised as often as occasion

– 3 –



Scanned with CamScanner

therefor shall occur, and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of the same or any other right or remedy. By accepting full or partial payment after the due date of any amount of principal or of interest on this Note, Lender shall not be deemed to have waived the right either to require prompt payment when due and payable of all other amounts of principal or of interest on this Note or to exercise any remedies available to it in order to collect all such other amounts due and payable under this Note.

No delay in the exercise of or failure to exercise, any right, remedy, or power accruing upon any default or failure of Borrower in the performance of any obligation under this Note shall impair any such right, remedy or power or shall be construed to be a waiver thereof, but any such right, remedy, or power may be exercised from time to time and as often as may be deemed by Lender expedient. If Borrower should default in the performance of any obligation under this Note, and such default should thereafter be waived by Lender, such waiver shall be limited to the particular default so waived.

16.   Evidence of Indebtedness.  This Note is given and accepted as evidence of indebtedness only, and not in payment or satisfaction of any indebtedness or obligation. The books and records of Lender will be sufficient evidence of advances made and payments received hereunder, except in the case of manifest error.

17.   Time of the Essence.  Time is of the essence under this Note.

18.   Estoppel Certificate.  Borrower agrees to furnish to the holder of this Note at any time and from time to time within fifteen (15) days after a written request from the holder of this Note, a written Estoppel Certificate duly executed and acknowledged setting forth the amount then due under this Note and whether any claim, offset or defense then exists under this Note.

19.   Notices.  Any notice or demand required or permitted by or in connection with this Note shall be given by either service of process or by certified mail or receipted overnight delivery service addressed to the Borrower at its principal place of business . Notice by certified mail shall be deemed received on the third day after the date sent and notice by overnight delivery shall be deemed received on the day following the date sent. Notwithstanding anything to the contrary, all notices and demands for payment from Lender actually received in writing by Borrower shall be considered to be effective upon the receipt thereof by Borrower regardless of the procedure or method utilized to accomplish delivery thereof to Borrower. Notice to any one person constituting Borrower shall constitute notice to all such persons.

20.   Choice of Law; Consent to Venue and Jurisdiction.  This Note shall be governed, construed and interpreted strictly in accordance with the laws of the State of Maryland. Borrower consents to the jurisdiction and venue the courts of Maryland and to the jurisdiction and venue of the United States District Court for the District of Maryland in any action or judicial proceeding brought to enforce, construe or interpret this Note. Borrower agrees to stipulate in any future proceeding that this Note is to be considered for all purposes to have been executed and delivered within the geographical boundaries of the State of Maryland, even if it was, in fact, executed and delivered elsewhere.

21.   Points.  Lender is requiring that Borrower pay, in addition to Lender's out of pocket costs of closing this transaction, a loan fee equal to ten (10) percent of the loan amount.

- 4 –

Scanned with CamScanner

Said loan fee is being paid at funding of the Loan. (If the values in this paragraph are left blank then the values equal zero (0).)

22.   <u>Actions Against Lender</u>.   Any action brought by Borrower against Lender which is based, directly or indirectly or in whole or in part, on this Note or any matter in or related to this Note or any of the Loan Documents, including but not limited to the making of the loan or the administration or collection thereof, shall be brought only in the courts of the State of Maryland. Borrower may not file a counterclaim against Lender in a suit brought by Lender against Borrower in a state other than the State of Maryland unless, under the rules of procedure of the court in which Lender brought the action, the counterclaim is mandatory and will be considered waived unless filed as a counterclaim in the action instituted by Lender. All costs and expenses, including all attorneys fees, incurred by Lender in successfully defending any such action or counterclaim brought by Borrower against Lender shall be paid by Borrower to Lender.

23.   <u>Waiver of Jury Trial</u>.   Borrower agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by Borrower or Lender or any successor or assign of Borrower or Lender on or with respect to this Note or any of the Loan Documents or which in any way relates, directly or indirectly, to the obligations of Borrower to Lender under this Note or any of the Loan Documents, or the dealings of the parties with respect thereto, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY.   BORROWER HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY in any such suit, action, or proceeding. Borrower acknowledges and agrees that this waiver is knowingly, intelligently, and voluntarily made by Borrower, that this provision is a specific and material aspect of the agreement between the parties and that Lender would not enter into the transaction with Borrower if this provision were not part of their agreement. Borrower acknowledges that neither Lender nor any person acting on behalf of Lender has made any misrepresentations of fact to induce this waiver of trial by jury. Borrower further acknowledges that Borrower has been represented (or has had the opportunity to be represented) in the signing of this Note and in the making of this waiver by independent legal counsel selected of Borrower's own free will and that Borrower has had the opportunity to discuss this waiver with counsel.

24.   <u>Miscellaneous</u>.   Neither this Note nor any term hereof may be terminated, amended, supplemented, waived, released or modified orally, but only by an instrument in writing signed by the party against which the enforcement of the termination, amendment, supplement, waiver, release, or modification is sought. The Lender may, without notice to or consent of the Borrower, sell, assign, pledge or transfer this Note or sell, assign, transfer or grant participations in all or any part of the obligations evidenced by this Note to others at any time and from time to time, and the Lender may divulge to any potential assignee, transferee or participant all information, reports, financial statements and documents obtained in connection with this Note and any other Loan Documents or otherwise. No amendment, modification, waiver, or release of this Note shall be established by conduct, custom, or course of dealing. Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders. The headings used in this Note are for convenience only and are not to be interpreted as a part of this Note. This Note and the Loan Documents constitute the entire agreement between the parties with respect to their subject matter and supercede all prior letters, representations or agreements, oral or written, with respect thereto.

- 5 –

25.        IN WITNESS WHEREOF, Borrower has executed this Note specifically intending this Note to constitute an instrument under seal.

*Signature on next page*



- 6 –

**Scanned with CamScanner**

*Signature page to* _____DATE_____ *Promissory Note*

WITNESS/ATTEST: BORROWER

_____

By: *Javier Rossi* (SEAL)

Its: *Crear Estetica LLC*

STATE OF _____, CITY/COUNTY OF _____, TO WIT:

      I HEREBY CERTIFY, that on this __$^{TH}$ day of _____, before me, the undersigned, a Notary Public of the aforesaid State, personally appeared _____, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within Note, and, being authorized so to do, acknowledged that he executed the same as authorized person on behalf of _____ for the purposes therein contained.

     IN WITNESS MY Hand and Notarial Seal.

_____

NOTARY PUBLIC

My Commission Expires: _____

- 7 –

Scanned with CamScanner

# REAL ESTATE MORTGAGE

Securing the real property known as: **1802 Hope Street, Baltimore, MD 21202**

## DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT (the **"Instrument"**) is dated as of the_____ day of_____, 20__ by **Crear Estetica, LLC** a Florida limited liability company, as grantor (together with successors and assigns, **"Grantor"**), for the benefit of <u>Wall Street Wealth Management, LLC</u>, as beneficiary (**"Lender"**).

Grantor, in consideration of the Indebtedness, and the trust created by this Instrument, irrevocably grants, conveys and assigns to Trustee, in trust, with power of sale, the Mortgaged Property described in Exhibit A attached to this Instrument, and authorizes Trustee to sell the Mortgaged Property upon default by any lawful means, as provided in this Instrument, and assents to the passage of a decree for the sale of the Mortgaged Property; provided, however, that prior to the occurrence of an Event of Default, Grantor shall be entitled to possession of the Mortgaged Property.

TO SECURE TO LENDER the repayment of the Indebtedness evidenced by the Note (the **"Note"**) payable to Lender, dated as of the date of this Instrument, in the principal amount of **Thirty Four Thousand Five Hundred DOLLARS ($34,500.00)**, executed by Grantor (also sometimes referred to herein as the **"Borrower"**), and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in the Loan Documents.

Grantor represents and warrants that Grantor is lawfully seized of the Mortgaged Property and has the right, power and authority to grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered. Grantor covenants that Grantor will warrant and defend specially the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Instrument and insuring Lender's interest in the Mortgaged Property.

**Covenants.** Grantor and Lender covenant and agree as follows:

**1.    DEFINITIONS.** The following terms, when used in this Instrument (including when used in the above recitals), shall have the following meanings:

(a)    **"Borrower"** means all persons or entities identified as "Borrower" in the first page of this Instrument, together with their successors and assigns. If Borrower and Grantor are the same person, sentences in this instrument which refer to Borrower and to Grantor shall be read as referring to that one person.

(b)     **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(c)     **"Event of Default"** means the occurrence of any event listed in Section 18.

(d)     **"Fixtures"** means all property which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

(e)     **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

(f)     **"Grantor"** means all persons or entities identified as "Grantor" in the first paragraph of this Instrument, together with their successors and assigns.

(g)     **"Guaranty"** means the Guaranty, if any, executed on even date herewith in connection with the making of the Note, and all schedules, riders, allonges and addenda, as such Guaranty may be amended from time to time.

(h)     **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(i)     **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials and apply to Grantor or to the Mortgaged Property. Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, *et seq.*, and their state analogs.

2

(j)      **"Improvements"** means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(k)      **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under, the Note, the Guaranty, this Instrument or any other Loan Document, including late charges, default interest, and advances as provided in Section 8 or elsewhere including this Instrument to protect the security of this Instrument.

(l)      **"Key Principal"** means the natural person(s) or entity identified as such or Exhibit B attached to this Instrument, and any person or entity who becomes a Key Principal after the date of this Instrument and is identified as such in an amendment or supplement to this Instrument.

(m)      **"Land"** means the land described in Exhibit A.

(n)      **"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Grantor is a cooperative housing corporation), and all modifications, extensions or renewals.

(o)      **"Lender"** means the entity identified as "Lender" in the first paragraph of this Instrument and its successors and assigns, or any subsequent holder of the Note.

(p)      **"Loan Documents"** means the Note, the Guaranty, this Instrument, all guaranties, all indemnity agreements, O&M Programs, and any other documents now or in the future executed by Borrower, Grantor, Key Principal, any guarantor or any other person in connection with the loan evidenced by the Note, as such documents may be amended from time to time.

(q)      **"Loan Servicer"** means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, the Guaranty, this Instrument and any other Loan Document, and otherwise to service the loan evidenced by the Note for the benefit of Lender. Unless Grantor receives notice to the contrary, the Loan Servicer is the entity identified as "Lender" in the first paragraph of this Instrument.

(r)      **"Mortgaged Property"** means all of Grantor's present and future right, title and interest in and to all of the following:

    (1)      the Land;

    (2)      the Improvements;

    (3)      the Fixtures;

    (4)      the Personalty;

    (5)      all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the

3

Scanned with CamScanner

Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6)     all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Grantor obtained the insurance pursuant to Lender's requirement;

(7)     all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8)     all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Grantor now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9)     all proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds;

(10)    all Rents and Leases;

(11)    all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the loan secured by this Instrument and, if Grantor is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12)    all tenant security deposits which have not been forfeited by any tenant under any Lease; and

(13)    all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property.

(s)     **"Note"** means the Note described on page 1 of this Instrument.

(t)     **"O&M Program"** is defined in Section 14(a).

(u)     **"Personalty"** means all equipment, inventory, general intangibles which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, including furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the

4

Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

(v)      "**Property Jurisdiction**" is defined in Section 26(a).

(w)      "**Rents**" means all rents, revenues and other income of the Land or the Improvements, whether now due, past due, or to become due, and deposits forfeited by tenants.

(x)      "**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

(y)      "**Transfer**" means (A) a sale, assignment, transfer or other disposition (whether voluntary, involuntary or by operation of law); (B) the granting, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law); (C) the issuance or other creation of an ownership interest in a legal entity, including a partnership interest, interest in a limited liability company or corporate stock; (D) the withdrawal, retirement, removal or involuntary resignation of a partner in a partnership or a member or manager in a limited liability company; or (E) the merger, dissolution, liquidation, or consolidation of a legal entity. "Transfer" does not include (i) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under this Instrument or (ii) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the United States Bankruptcy Code. For purposes of defining the term "Transfer," the term "partnership" shall mean a general partnership, a limited partnership, a joint venture and a limited liability partnership, and the term "partner" shall mean a general partner, a limited partner and a joint venturer.

2.      **UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.** This Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash and non-cash proceeds thereof (collectively, "**UCC Collateral**"), and Grantor hereby grants to Lender a security interest in the UCC Collateral. Grantor hereby authorizes Lender to file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest and Grantor agrees, if Lender so requests, to execute and deliver to Lender such financing statements, continuation statements and amendments. Grantor shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require. Without the prior written consent of Lender, Grantor shall not create or permit to exist any other lien or security interest in any of the UCC Collateral. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture.

3.      **ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

5

(a)     As part of the consideration for the Indebtedness, Grantor absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Grantor to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Grantor. Promptly upon request by Lender, Grantor agrees to execute and deliver such further assignments as Lender may from time to time require. Grantor and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the "Mortgaged Property," as that term is defined in Section 1(r). However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under applicable law, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of the Grantor that in this circumstance this Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Instrument.

(b)     After the occurrence of an Event of Default, Grantor authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender, and Grantor shall, upon Grantor's receipt of any Rents from any sources, pay the total amount of such receipts to the Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Grantor a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Loan Documents and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums, tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Grantor free and clear of, and released from, Lender's rights with respect to Rents under this Instrument. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Grantor's license to collect Rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Grantor shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Grantor hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender, no tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Grantor any amounts which are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Grantor shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c)     Grantor represents and warrants to Lender that Grantor has not executed any prior assignment of Rents (other than an assignment of Rents securing indebtedness that will be paid off and discharged with the proceeds of the loan evidenced by the Note), that Grantor has not performed, and Grantor covenants and agrees that it will not perform, any acts and has not executed, and shall not execute, any instrument which would prevent Lender from exercising its rights under this Section 3, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents. Grantor shall not collect or accept payment of any Rents more than two months prior to the due dates of such Rents.

(d)     If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Grantor and even in the absence of waste, enter upon

6

and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to this Section 3, protecting the Mortgaged Property or the security of this Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable. Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Grantor's solvency and without the necessity of giving prior notice (oral or written) to Borrower or Grantor, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Grantor, by its execution of this Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property. Immediately upon appointment of a receiver or immediately upon the Lender's entering upon and taking possession and control of the Mortgaged Property, Grantor shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents. In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and Grantor and their representatives from the Mortgaged Property. Grantor acknowledges and agrees that the exercise by Lender of any of the rights conferred under this Section 3 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

(e)     If Lender enters the Mortgaged Property, Lender shall be liable to account only to Grantor and only for those Rents actually received. Lender shall not be liable to Borrower, Grantor, anyone claiming under or through Grantor or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under this Section 3, and Grantor hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)     If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 8.

(g)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Instrument.

(h)     Grantor shall, promptly upon Lender's request, deliver to Lender an executed copy of each Lease then in effect. All Leases for residential dwelling units shall be on forms approved by Lender, shall be for initial terms of at least six months and not more than two years, and shall not include options to purchase. If customary in the applicable market, residential Leases with terms of less than six months may be permitted with Lender's prior written consent.

(i)     Grantor shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

7

**4.    PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS.** Upon default by Borrower under the Note, Grantor shall pay the Indebtedness when due in accordance with the terms of the Note and the other Loan Documents and shall perform, observe and comply with all other provisions of the Note and the other Loan Documents.

**5.    APPLICATION OF PAYMENTS.** If at any time Lender receives, from Borrower, Grantor or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Neither Lender's acceptance of an amount which is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Grantor's obligations under this Instrument and the Note shall remain unchanged.

**6.    COMPLIANCE WITH LAWS.** Grantor shall comply with all laws, ordinances, regulations and requirements of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements and covenants pertaining to health and safety, construction of improvements on the Mortgaged Property, zoning and land use, and Leases. Grantor also shall comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits. Grantor shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 6. Grantor shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property. Grantor represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

**7.    USE OF PROPERTY.** Unless required by applicable law, Grantor shall not (a) except for any change in use approved by Lender, allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Instrument was executed, (b) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property, or (c) establish any condominium or cooperative regime with respect to the Mortgaged Property.

**8.    PROTECTION OF LENDER'S SECURITY.**

(a)    If Grantor fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Grantor and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 15, and (4) payment of amounts which Grantor has failed to pay under Sections 11 and 13.

(b)    Any amounts disbursed by Lender under this Section 8, or under any other provision of this Instrument that treats such disbursement as being made under this Section 8, shall be added to,

8

and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the **"Default Rate"**, as defined in the Note.

(c)     Nothing in this Section 8 shall require Lender to incur any expense or take any action.

**9.     INSPECTION.** Lender, its agents, representatives, and designees may make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during normal business hours, or at any other reasonable time.

**10.     BOOKS AND RECORDS; FINANCIAL REPORTING.**

(a)     Grantor shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property. The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)     If requested by Lender, Grantor shall furnish to Lender all of the following:

(1)     within 120 days after the end of each fiscal year of Grantor, a statement of income and expenses for Grantor's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Grantor relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Grantor relating to the Mortgaged Property as of the end of that fiscal year;

(2)     within 120 days after the end of each fiscal year of Grantor, and at any other time upon Lender's request, a rent schedule for the Mortgaged Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3)     within 120 days after the end of each fiscal year of Grantor, and at any other time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4)     within 120 days after the end of each fiscal year of Grantor, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Grantor and the interest held by each, if Grantor is a corporation, all officers and directors of Grantor, and if Grantor is a limited liability company, all managers who are not members;

(5)     upon Lender's request, a monthly property management report for the Mortgaged Property, showing the number of inquiries made and rental applications

9

received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender; and

(6)    upon Lender's request, a balance sheet, a statement of income and expenses for Grantor and a statement of changes in financial position of Grantor for Grantor's most recent fiscal year; and

(7)    if required by Lender, a statement of income and expense for the Mortgaged Property for the prior month or quarter.

(c)    Each of the statements, schedules and reports required by Section 10(b) shall be certified to be complete and accurate by an individual having authority to bind Grantor, and shall be in such form and contain such detail as Lender may reasonably require. Lender also may require that any statements, schedules or reports be audited at Grantor's expense by independent certified public accountants acceptable to Lender.

(d)    If Grantor fails to provide in a timely manner the statements, schedules and reports required by Section 10(b), Lender shall have the right to have Grantor's books and records audited, at Grantor's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness as provided in Section 8.

(e)    If an Event of Default has occurred and is continuing, Grantor shall deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation.

(f)    Grantor authorizes Lender to obtain a credit report on Grantor at any time.

(g)    If an Event of Default has occurred and Lender has not previously required Grantor to furnish a quarterly statement of income and expense for the Mortgaged Property, Lender may require Grantor to furnish such a statement within 45 days after the end of each fiscal quarter of Grantor following such Event of Default.

**11.    TAXES; OPERATING EXPENSES.**

(a)    Subject to the provisions of Section 11(c) and Section 11(d), Grantor shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)    Subject to the provisions of Section 11(c), Grantor shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)    Grantor, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Grantor notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Grantor deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Grantor furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which

10

Scanned with CamScanner

may include the delivery to Lender of the reserves established by Grantor to pay the contested Imposition.

**12.    LIENS; ENCUMBRANCES.** Grantor acknowledges that, to the extent provided in Section 17, the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance (a **"Lien"**) on the Mortgaged Property (other than the lien of this Instrument) or on certain ownership interests in Grantor, whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Instrument, is a **"Transfer"** which constitutes an Event of Default.

**13.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.** Grantor (1) shall not commit waste or permit impairment or deterioration of the Mortgaged Property, (2) shall not abandon the Mortgaged Property, (3) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (4) shall keep the Mortgaged Property in good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, and (5) shall give notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument. Grantor shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Personalty.

**14.    ENVIRONMENTAL HAZARDS.**

(a)     Except for matters covered by a written program of operations and maintenance approved in writing by Lender (an **"O&M Program"**) or matters described in Section 14(b), Grantor shall not cause or permit any of the following:

(1)     the presence, use, generation, release, treatment, processing, storage (including storage in above ground and underground storage tanks), handling, or disposal of any Hazardous Materials on or under the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property;

(2)     the transportation of any Hazardous Materials to, from, or across the Mortgaged Property;

(3)     any occurrence or condition on the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(4)     any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Grantor that is adjacent to the Mortgaged Property.

The matters described in clauses (1) through (4) above are referred to collectively in this Section 14 as **"Prohibited Activities or Conditions"**.

(b)     Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) pre-packaged supplies, cleaning materials and petroleum products

11

Scanned with CamScanner

customarily used in the operation and maintenance of comparable commercial properties, and (2) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(c)     Grantor shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions.

(d)     Grantor represents and warrants to Lender that, except as previously disclosed by Grantor to Lender in writing:

(1)     Grantor has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)     to the best of Grantor's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)     except to the extent previously disclosed by Grantor to Lender in writing, the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Grantor's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past. If there is an underground storage tank located on the Property which has been previously disclosed by Grantor to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)     Grantor has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials. Without limiting the generality of the foregoing, Grantor has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)     no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with the terms of any Environmental Permit;

(6)     there are no actions, suits, claims or proceedings pending or, to the best of Grantor's knowledge after reasonable and diligent inquiry, threatened that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7)     Grantor has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property.

12

Scanned with CamScanner

The representations and warranties in this Section 14 shall be continuing representations and warranties that shall be deemed to be made by Grantor throughout the term of the loan evidenced by the Note, until the Indebtedness has been paid in full.

(e)     Grantor shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)     Grantor's discovery of any Prohibited Activity or Condition;

(2)     Grantor's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property; and

(3)     any representation or warranty in this Section 14 becomes untrue after the date of this Agreement.

Any such notice given by Grantor shall not relieve Grantor of, or result in a waiver of, any obligation under this Instrument, the Note, or any other Loan Document.

(f)     Grantor shall pay promptly the costs of any environmental inspections, tests or audits ("**Environmental Inspections**") required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any Transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) which Grantor fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 8. The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to Grantor or any other party such results or any other information obtained by Lender in connection with its Environmental Inspections. Lender hereby reserves the right, and Grantor hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property. Grantor consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections. Grantor acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale. Grantor agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Grantor hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(g)     If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("**Remedial Work**") is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials Law, Grantor shall, by the earlier of (1) the applicable deadline required by Hazardous Materials Law or (2)

13

Scanned with CamScanner

30 days after notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law. If Grantor fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Grantor shall reimburse Lender on demand for the cost of doing  so. Any reimbursement due from Grantor to Lender shall become part of the Indebtedness as provided in Section 8.

(h)     Grantor shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(i)     Grantor shall indemnify, hold harmless and defend (i) Lender, (ii) any prior owner or holder of the Note, (iii) the Loan Servicer, (iv) any prior Loan Servicer, (v) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (vi) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, the "**Indemnitees**") from and against all proceedings, claims, damages, judgments, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(1)     any breach of any representation or warranty of Grantor in this Section 14;

(2)     any failure by Grantor to perform any of its obligations under this Section 14;

(3)     the existence or alleged existence of any Prohibited Activity or Condition;

(4)     the presence or alleged presence of Hazardous Materials on or under the Mortgaged Property or any property of Grantor that is adjacent to the Mortgaged Property; and

(5)     the actual or alleged violation of any Hazardous Materials Law.

(j)     Counsel selected by Grantor to defend Indemnitees shall be subject to the approval of those Indemnitees.  However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at the Grantor's expense.

(k)     Grantor shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (a "**Claim**"), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(l)     The provisions of this Section 14 shall be in addition to any and all other obligations and liabilities that Grantor may have under applicable law or under other Loan Documents. If Grantor consists of more than one person or entity, the obligation of those persons or entities to indemnify the Indemnitees under this Section 14 shall be joint and several. The obligation of Grantor to indemnify the Indemnitees under this Section 14 shall survive any repayment or discharge of the Indebtedness,

14

any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Instrument.

**15.    PROPERTY AND LIABILITY INSURANCE.**

(a)    Grantor shall keep the Improvements insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, and business income coverage. Lender's insurance requirements may change from time to time throughout the term of the Indebtedness. If any of the Improvements is located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, and if flood insurance is available in that area, Grantor shall insure such Improvements against loss by flood.

(b)    All policies of property damage insurance shall include a non-contributing, non-reporting mortgage and loss payee clause in favor of, and in a form approved by, Lender. Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 15(a). Grantor shall promptly deliver to Lender a copy of all renewal and other notices received by Grantor with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Grantor shall deliver to Lender the original (or a duplicate original) of a renewal policy in form satisfactory to Lender.

(c)    Grantor shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require.

(d)    Grantor shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Instrument requires Grantor to maintain.

(e)    In the event of loss, Grantor shall give immediate written notice to the insurance carrier and to Lender. Grantor hereby authorizes and appoints Lender as attorney-in-fact for Grantor to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 19 shall require Lender to incur any expense or take any action. Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Grantor for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender (the "**Restoration**"), or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar commercial properties.

(f)    Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating

15

Scanned with CamScanner

to the Mortgaged Property; (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty; and (5) upon Lender's request, Grantor provides Lender evidence of the availability during and after the Restoration of the insurance required to be maintained by Grantor pursuant to this Section 15.

(g)     If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, Lender shall automatically succeed to all rights of Grantor in and to any insurance policies and unearned insurance premiums and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

### 16.   CONDEMNATION.

(a)     Grantor shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect (a "**Condemnation**"). Grantor shall appear in and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by Lender in writing. Grantor authorizes and appoints Lender as attorney-in-fact for Grantor to commence, appear in and prosecute, in Lender's or Grantor's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 16 shall require Lender to incur any expense or take any action. Grantor hereby transfers and assigns to Lender all right, title and interest of Grantor in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b)     Lender may apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to the restoration or repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Grantor. Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness shall not extend or postpone the due date of any monthly installments referred to in the Note or Guaranty, Section 4 of this Instrument, or change the amount of such installments. Grantor agrees to execute such further evidence of assignment of any awards or proceeds as Lender may require.

### 17.   TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN GRANTOR.

(a)     The occurrence of any of the following events shall constitute an Event of Default under this Instrument:

(1)     a Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property;

(2)     a Transfer of a Controlling Interest in Grantor;

(3)     a Transfer of a Controlling Interest in any entity which owns, directly or indirectly through one or more intermediate entities, a Controlling Interest in Grantor;

16

Scanned with CamScanner

(4)    a Transfer of all or any part of a Key Principal's ownership interests in Grantor, or in any other entity which owns, directly or indirectly through one or more intermediate entities, other than a transfer of an interest that is (i) insignificant, (ii) non-governing interest and (iii) does not effectively shift control of the Grantor;

(5)    if Key Principal is an entity, (A) a Transfer of a Controlling Interest in Key Principal, or (B) a Transfer of a Controlling Interest in any entity which owns, directly or indirectly through one or more intermediate entities, a Controlling Interest in Key Principal;

(6)    if Grantor or Key Principal is a trust, the termination or revocation of such trust; and

(7)    a conversion of Grantor from one type of legal entity into another type of legal entity, whether or not there is a Transfer.

Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default in order to exercise any of its remedies with respect to an Event of Default under this Section 17.

(b)    The occurrence of any of the following events shall not constitute an Event of Default under this Instrument, notwithstanding any provision of Section 17(a) to the contrary:

(1)    a Transfer to which Lender has consented;

(2)    a Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person;

(3)    the grant of a leasehold interest in all or any portion of the Improvements not containing an option to purchase for a term of three years or less (including renewals) if the Improvements are residential, and for a term of ten years (five years if to an affiliate of Grantor) or less (including renewals) if the Improvements are not residential;

(4)    a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality, which are free of liens, encumbrances and security interests other than those created by the Loan Documents or consented to by Lender;

(5)    the grant of an easement, if before the grant Lender determines that the easement will not materially affect the operation or value of the Mortgaged Property or Lender's interest in the Mortgaged Property, and Grantor pays to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's or Grantor's request; and

(6)    the creation of a tax lien or a mechanic's, materialman's or judgment lien against the Mortgaged Property which is bonded off, released of record or otherwise remedied to Lender's satisfaction within 30 days of the date of creation.

17

Scanned with CamScanner

(c)    For purposes of this Section, the following terms shall have the meanings set forth below:

(1)    **"Initial Owners"** means, with respect to Grantor or any other entity, the persons or entities who on the date of the Note own in the aggregate 100% of the ownership interests in Grantor or that entity.

(2)    A Transfer of a **"Controlling Interest"** shall mean, with respect to any entity, the following:

(i)    if such entity is a general partnership or a joint venture, a Transfer of any general partnership interest or joint venture interest which would cause the Initial Owners to own less than 51% of all general partnership or joint venture interests in such entity;

(ii)    if such entity is a limited partnership, a Transfer of any general partnership interest;

(iii)    if such entity is a limited liability company or a limited liability partnership, a Transfer of any membership or other ownership interest which would cause the Initial Owners to own less than 51% of all membership or other ownership interests in such entity;

(iv)    if such entity is a corporation (other than a Publicly-Held Corporation) with only one class of voting stock, a Transfer of any voting stock which would cause the Initial Owners to own less than 51% of voting stock in such corporation;

(v)    if such entity is a corporation (other than a Publicly-Held Corporation) with more than one class of voting stock, a Transfer of any voting stock which would cause the Initial Owners to own less than a sufficient number of shares of voting stock having the power to elect the majority of directors of such corporation;

(vi)    if such entity is a trust, the removal, appointment or substitution of a trustee of such trust other than (A) in the case of a land trust, or (B) if the trustee of such trust after such removal, appointment or substitution is a trustee identified in the trust agreement approved by Lender

(vii)    for any entity, a change in the terms of the governing agreement(s) which has the practical effect of shifting control of the entity from either of the Key Principals.

(3)    **"Publicly-Held Corporation"** shall mean a corporation the outstanding voting stock of which is registered under Section 12(b) or 12(g) of the Securities and Exchange Act of 1934, as amended.

**18.    EVENTS OF DEFAULT.** The occurrence of any one or more of the following shall constitute an Event of Default under this Instrument:

18

Scanned with CamScanner

(a)     any failure by Borrower or Grantor to pay or deposit when due any amount required by the Note, the Guaranty, this Instrument or any other Loan Document;

(b)     any failure by Grantor to maintain the insurance coverage required by Section 15;

(c)     fraud or material misrepresentation or material omission by Grantor or any of its officers, directors, trustees, general partners or managers, Key Principal or any guarantor in connection with (A) the application for or creation of the Indebtedness, (B) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (C) any request for Lender's consent to any proposed action;

(d)     any Event of Default under Section 17;

(e)     the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property;

(f)     any failure by Grantor to perform any of its obligations under this Instrument (other than those specified in Sections 18(a) through (e)), as and when required, which continues for a period of 30 days after notice of such failure by Lender to Grantor, but no such notice or grace period shall apply in the case of any such failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Instrument, result in harm to Lender, impairment of the Note or this Instrument or any other security given under any other Loan Documents;

(g)     any failure by Borrower or Grantor to perform any of its obligations as and when required under any Loan Document other than this Instrument which continues beyond the applicable cure period, if any, specified in that Loan Document; and

(h)     any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable.

**19.     REMEDIES CUMULATIVE.** Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

**20.     FORBEARANCE.**

(a)     Lender may (but shall not be obligated to) agree with Grantor, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, any guarantor or other third party obligor, to take any of the following actions: extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Instrument, the Guaranty, the Note, or any other Loan Document; release anyone liable for the payment of any amounts under this Instrument, the Guaranty, the Note, or any other Loan Document; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Instrument, the Guaranty, the Note, or any other Loan Document.

19

(b)      Any forbearance by Lender in exercising any right or remedy under the Guaranty, the Note, this Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any awards or proceeds under Sections 19 and 20 shall not operate to cure or waive any Event of Default.

21.      **LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower or Grantor is interpreted so that any charge provided for in any Loan Document, whether considered separately or together with other charges levied in connection with any other Loan Document, violates that law, and Borrower or Grantor is entitled to the benefit of that law, that charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower or Grantor has been violated, all Indebtedness which constitutes interest, as well as all other charges levied in connection with the Indebtedness which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

22.      **WAIVER OF STATUTE OF LIMITATIONS.** Grantor hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce the Note or any Loan Document.

23.      **WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Grantor and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

24.      **FURTHER ASSURANCES.** Grantor shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Note.

25.      **ESTOPPEL CERTIFICATE.** Within 10 days after a request from Lender, Grantor shall deliver to Lender a written statement, signed and acknowledged by Grantor, certifying to Lender or any person designated by Lender, as of the date of such statement, (i) that the Loan Documents are

20

unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications); (ii) the unpaid principal balance of the Note and the Guaranty; (iii) the date to which interest under the Note and Guaranty has been paid; (iv) that neither Grantor nor Borrower is in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Instrument, the Note, or any of the other Loan Documents (or, if the Grantor is in default, describing such default in reasonable detail); (v) whether or not there are then existing any setoffs or defenses known to Grantor against the enforcement of any right or remedy of Lender under the Loan Documents; and (vi) any additional facts requested by Lender.

### 26.   GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.

(a)     To the extent required by Maryland law, this Instrument shall be governed by the laws of the jurisdiction in which the Land is located (the "**Property Jurisdiction**"), but shall otherwise be governed, together with the Guaranty and all other Loan Documents, by the laws of the State of Maryland.

(b)     Except to the extent required exercise foreclosure and related rights with respect to the Land and other collateral located outside of Maryland, Grantor agrees that any controversy arising under or in relation to the Guaranty, this Instrument, or any other Loan Document shall be litigated exclusively in Maryland. The state and federal courts and authorities with jurisdiction in Maryland shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Guaranty, this Instrument, any security for the Indebtedness, or any other Loan Document. Grantor irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

### 27.   NOTICE.

(a)     All notices, demands and other communications ("**notice**") under or concerning this Instrument shall be in writing. Each notice shall be addressed to the intended recipient at its address set forth in this Instrument, and shall be deemed given on the earliest to occur of (1) the date when the notice is received by the addressee; (2) the first Business Day after the notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested.  As used in this Section 27, the term "Business Day" means any day other than a Saturday, a Sunday or any other day on which financial institutions in Maryland are authorized to be closed.

(b)     Any party to this Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 27.  Each party agrees that it will not refuse or reject delivery of any notice given in accordance with this Section 27, that it will acknowledge, in writing, the receipt of any notice upon request by the other party and that any notice rejected or refused by it shall be deemed for purposes of this Section 27 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

### 28.   SALE OF NOTE; CHANGE IN SERVICER. The Note or a partial interest in the Note (together with the Guaranty, this Instrument and the other Loan Documents) may be sold one or more times without prior notice to Borrower or Grantor. A sale may result in a change of the Loan

21

Scanned with CamScanner

Servicer. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given notice of the change.

**29.    SUCCESSORS AND ASSIGNS BOUND.** This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and assigns of Lender and Grantor. However, a Transfer not permitted by Section 17 shall be an Event of Default.

**30.    JOINT AND SEVERAL LIABILITY.** If more than one person or entity signs this Instrument as Grantor, the obligations of such persons and entities shall be joint and several.

**31.    RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.**

(a)    The relationship between Lender and Grantor shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Grantor.

(b)    No creditor of any party to this Instrument and no other person (except Borrower) shall be a third party beneficiary of this Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (1) any arrangement (a "**Servicing Arrangement**") between the Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Grantor for the payment of the Indebtedness under the Guaranty, (2) Grantor shall not be a third party beneficiary of any Servicing Arrangement, and (3) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness under the Note or guaranteed by the Guaranty.

**32.    SEVERABILITY; AMENDMENTS**. The invalidity or unenforceability of any provision of this Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect. This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**33.    CONSTRUCTION.** The captions and headings of the sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument. Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument. All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument. Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Agreement includes the plural and use of the plural includes the singular. As used in this Instrument, the term "including" means "including, but not limited to."

**34.    LOAN SERVICING.** All actions regarding the servicing of the loan evidenced by the Note, including the collection of payments, the giving and receipt of notice, inspections of the Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such notice from Lender shall govern.

22

**35.    DISCLOSURE OF INFORMATION.** Lender may furnish information regarding Grantor or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of commercial mortgage loans. Grantor irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including any right of privacy.

**36.    SUBROGATION.** If, and to the extent that, the proceeds of the loan evidenced by the Note are used to pay, satisfy or discharge any obligation of Grantor for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a "**Prior Lien**"), such loan proceeds shall be deemed to have been advanced by Lender at Grantor's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

**37.    ACCELERATION; REMEDIES.** At any time during the existence of an Event of Default, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by Maryland law or provided in this Instrument or in any other Loan Document. Grantor acknowledges that the power of sale granted in this Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports.

If Lender invokes the power of sale, Lender shall mail or cause Trustee to mail written notice of sale to Grantor in the manner prescribed by Maryland law. Trustee shall give notice of sale and shall sell the Mortgaged Property according to Maryland law. Trustee may sell the Mortgaged Property at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone sale of all or any part of the Mortgaged Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Mortgaged Property at any sale.

Trustee shall deliver to the purchaser at the sale, within a reasonable time after the sale, a deed conveying the Mortgaged Property so sold without any express or implied covenant or warranty. The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements made in those recitals. Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including Trustee's fees, attorneys' fees and costs of title evidence; (b) to the Indebtedness in such order as Lender, in Lender's discretion, directs; and (c) the excess, if any, to the person or persons legally entitled to the excess.

Grantor hereby assents to the passage of a decree for the sale of the Mortgaged Property pursuant to Lender's exercise of its rights under this Section.

**38.    RELEASE.** Upon payment of the Indebtedness, Lender or Trustee shall release this Instrument. Grantor shall pay Lender's or Trustee's reasonable costs incurred in releasing this Instrument.

**39.    SUBSTITUTE TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee by an instrument recorded in the city or county in which this Instrument is recorded. Without conveyance of the Mortgaged Property, the successor trustee shall

23

Scanned with CamScanner

succeed to all the title, power and duties conferred upon the Trustee in this Instrument and by applicable law.

40.   WAIVER OF TRIAL BY JURY. GRANTOR AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS GUARANTOR AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

Balance of page left blank

24

**IN WITNESS WHEREOF**, Grantor has signed and delivered this Instrument under seal or has caused this Instrument to be signed and delivered by its duly authorized representative under seal.

WTINESS/ATTEST

Crear Estetica, LLC (BORROWER)

_____                  (SEAL)

By: _____

Its: _____

STATE OF_____ COUNTY/CITY OF_____ TO WIT:

I HEREBY CERTIFY, that on this____day of_____, 20__ before me, the undersigned, a Notary Public of the aforesaid State, personally appeared _____, and that he is known to me (or satisfactorily proven) to be the _____ authorized person of _____ whose name is subscribed to the within instrument, and, being authorized so to do, acknowledged that he executed the same on behalf of _____ for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____   NOTARY PUBLIC

My Commission Expires: _____

The undersigned, an attorney duly admitted to practice before the Maryland Court of Appeals, hereby certifies that this instrument has been prepared by or under the supervision of the undersigned.

_____

_____

25

Scanned with CamScanner

**EXHIBIT A**

26

Scanned with CamScanner

Lender's Licensure Exemption Affidavit

I hereby certify pursuant to Annotated Code of Maryland, Real Property Article, Section 3-104.1, that Wall Street Wealth Management, LLC is exempt from the licensure requirements of Financial Institutions Code Title 11, Subtitles 5 and 6.

Lender
**Wall Street Wealth Management, LLC**

By: _____

27

**Scanned with CamScanner**

# EXHIBIT J

**A. Settlement Statement**

U.S. Department of Housing and Urban Development
OMB Approval No. 2502-0265   FINAL

| B. Type of Loan | | | | |
|---|---|---|---|---|
| 1. ☐FHA | 2. ☐FrmHA | 3. ☐Conv. Unins. | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
| 4. ☐VA | 5. ☐Conv. Ins. | | 20-P-287 | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals. WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U. S. Code Section 1001 and Section 1010.

TitleExpress Settlement System
Printed 06/12/2020 at 11:10 WAM

| D. NAME OF BORROWER: | Crear Estetica, LLC |
| ADDRESS: | |
| E. NAME OF SELLER: | ABC Capital - Baltimore, LLC |
| ADDRESS: | |
| F. NAME OF LENDER: | Wall Street Wealth Street Management, LLC |
| ADDRESS: | |
| G. PROPERTY ADDRESS: | 1802 Hope Street, Baltimore, MD 21202 |
| H. SETTLEMENT AGENT: | Dulaney Title & Escrow, LLC |
| PLACE OF SETTLEMENT: | 809 Gleneagles Court, Suite 118, Towson, MD 21286 |
| I. SETTLEMENT DATE: | 06/12/2020 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract sales price | 31,500.00 | 401. Contract sales price | 31,500.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 4,585.00 | 403. | |
| 104. Rehab | 40,000.00 | 404. | |
| 105. 20/21 RP Tax estimate | 600.00 | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes 06/12/20 to 06/30/20 | 30.56 | 406. City/town taxes 06/12/20 to 06/30/20 | 30.56 |
| 109. Processing Fee | 499.00 | 409. | |
| 110. Processing Fee | 495.00 | 410. | |
| 111. HomeOwner Insurance & Fees | 880.00 | 411. | |
| 112. Settlement Fee | 1,110.44 | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 79,700.00 | **420. GROSS AMOUNT DUE TO SELLER** | 31,530.56 |
| **200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loans | 34,500.00 | 502. Settlement charges to seller (line 1400) | 10,825.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of First Mortgage Loan | |
| 205. | | 505. | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 34,500.00 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 10,825.00 |
| **300. CASH AT SETTLEMENT FROM OR TO BORROWER** | | **600. CASH AT SETTLEMENT TO OR FROM SELLER** | |
| 301. Gross amount due from borrower (line 120) | 79,700.00 | 601. Gross amount due to seller (line 420) | 31,530.56 |
| 302. Less amounts paid by/for borrower (line 220) | 34,500.00 | 602. Less reduction amount due seller (line 520) | 10,825.00 |
| **303. CASH FROM BORROWER** | 45,200.00 | **603. CASH TO SELLER** | 20,705.56 |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on line 401 above constitutes the Gross Proceeds of this transaction.

SELLER INSTRUCTIONS: If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide the settlement agent (Fed. Tax ID No: _____) with your correct taxpayer identification number. If you do not provide your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

TIN: _____/_____   SELLER(S) SIGNATURE(S): _____/_____

SELLER(S) NEW MAILING ADDRESS: _____

SELLER(S) PHONE NUMBERS: _____ (H) _____(W)

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

File Number: **20-P-287**

FINAL   PAGE 2

## SETTLEMENT STATEMENT

TitleExpress Settlement System  Printed 06/12/2020 at 11:10 WAM

| L. SETTLEMENT CHARGES | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price **$31,500.00** = | | | |
| Division of commission (line 700) as follows: | | | |
| 701. $ | to | | |
| 702. $ | to | | |
| 703. Commission paid at Settlement | | | |
| 704. Commission | to  ABC Capital - Miami, LLC | | 3,575.00 |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee          % | | | |
| 802. Loan Discount          % | | | |
| 803. Appraisal Fee | | | |
| 804. Credit Report | | | |
| 805. Lender's Inspection Fee | | | |
| 806. Lender Points | to  Wall Street Wealth Street Management, LLC | 1,725.00 | |
| 807. | | | |
| 808. | | | |
| 809. | | | |
| 810. | | | |
| 811. | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest  From | to          @$          /day | | |
| 902. Mortgage Insurance Premium for          to | | | |
| 903. Hazard Insurance Premium for          to | | | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | | |
| 1001. Hazard Insurance | mo. @ $          /mo | | |
| 1002. Mortgage Insurance | mo. @ $          /mo | | |
| 1003. City Property Taxes | mo. @ $     48.93 /mo | | |
| 1004. County Property Taxes | mo. @ $          /mo | | |
| 1005. Annual Assessments | mo. @ $          /mo | | |
| 1009. Aggregate Analysis Adjustment | | 0.00 | 0.00 |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or closing fee | to  Dulaney Title & Escrow, LLC | 275.00 | |
| 1102. Abstract or title search | to  Shawn Lynch | 250.00 | |
| 1103. Title examination | to  Dulaney Title & Escrow, LLC | 175.00 | |
| 1104. Title insurance binder | to  Dulaney Title & Escrow, LLC | 275.00 | |
| 1105. Document Preparation | to  Dulaney Title & Escrow, LLC | 275.00 | |
| 1106. Notary Fees | | | |
| 1107. Attorney's fees | | | |
|    (includes above items No: | ) | | |
| 1108. Title Insurance | to  Chicago Title Insurance Company | 300.00 | |
|    (includes above items No: | ) | | |
| 1109. Lender's Policy | | | |
| 1110. Owner's Policy | 31,500.00  - 300.00 | | |
| 1111. | | | |
| 1112. | | | |
| 1113. costs/mailings/judgments/trav | to  Dulaney Title & Escrow, LLC | 275.00 | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Fees Deed $  60.00 | ; Mortgage $          ; Release $ | 60.00 | |
| 1202. State Recordation Tax | Deed $ 345.00      ; Mortgage $ | 345.00 | |
| 1203. State Transfer Tax | Deed $ 157.50      ; Mortgage $ | 157.50 | |
| 1204. City Transfer Tax | Deed $ 472.50      ; Mortgage $ | 472.50 | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey | | | |
| 1302. Pest inspection | | | |
| 1303. Release Procure Prep & Record | to  Dulaney Title & Escrow, LLC | | 100.00 |
| 1304. Referal Fee | to  Miami Life Realty | | 4,290.00 |
| 1305. Renovation Fee | to  USA Rebuilders | | 2,860.00 |
| 1306. | | | |
| 1307. | | | |
| 1308. | | | |
| **1400. TOTAL SETTLEMENT CHARGES** | (enter on lines 103, Section J and 502, Section K) | 4,585.00 | 10,825.00 |

HUD CERTIFICATION OF BUYER AND SELLER

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement. I agree to further adjustments in the event of errors or omissions and indemnify and hold harmless Settlement Agent against such error or omissions.

Great Estates, LLC

ABC Capital - Baltimore, LLC

By: Michael Jarzyk, Authorized Agent

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE TITLE 18: U.S. CODE SECTION 1001 AND SECTION 1010.

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

By:

# EXHIBIT K

## REAL ESTATE CONTRACT OF SALE

THIS CONTRACT OF SALE dated May 18, 2020 between **CREAR ESTETICA LLC** (called "Buyer"), and **ABC CAPITAL BALTIMORE, LLC** (called "Seller").

1. The Property.  Seller sells to Buyer, and Buyer purchases from Seller the real property located in Baltimore City, Maryland, and known as **2638 Lauretta Ave, Baltimore, MD 21223.**

2. Purchase Price.  The purchase price for the Property is **Twenty Five Thousand Five Hundred** ($25,500.00) **Dollars**. The balance of the purchase price shall be paid at Settlement.

3. Time and Place of Settlement.  Unless the parties agree otherwise in writing, settlement shall take place on or before___June 5, 2020_____, at the offices of **Masters** (TITLE CO).

4. Financing Contingency. There are no financing contingencies for this transaction.

5. Title to the Property.  At settlement, upon payment as above provided of the unpaid purchase money, a deed for the property containing covenants of special warranty and further assurance shall be executed at Buyer's expense by Seller, which shall convey the property to Buyer.  The title conveyed to Buyer shall be good and merchantable, free of liens and encumbrances except use, occupancy and similar restrictions of public record which are generally applicable to properties in the immediate neighborhood or subdivision in which the property is located, easements which may be observed by an inspection of the property, and such utility and other easements as do not materially adversely affect the fair market value of the property.

6. Possession.   The Buyer shall be given possession of the property at settlement. The following work will be completed on the property within __120__ days of closing (see addendum B). (NO ADDENDUM)

7. Settlement Adjustments. Water charges, and community association charges, if any, shall be adjusted and apportioned as of the date of settlement.  All taxes, general or special, and all other public or governmental charges or assessments against the property which are or may be payable on an annual basis (including Metropolitan District or other benefit charges, assessments, liens or encumbrances for sewer, water, drainage, or other public improvements completed or commenced on or prior to the date hereof or subsequent thereto), are to be adjusted and apportioned as of the date of settlement and are



to be assumed and paid thereafter by Buyer, whether assessments have been levied or not as of the date of settlement except as otherwise required by law.  The cost of all recordation and transfer taxes required by law will be paid by the buyer. The cost of the title search and title insurance premiums shall be paid by Buyer.

7a. If Seller has identified in writing that the Property is subject to a lease, possession is to be delivered by deed, existing keys and assignment of existing leases for the Property, together with security deposits and interest, if any, at day and time of settlement. Seller will not enter into any new leases, nor extend existing leases, for the Property without the written consent of Buyer. Buyer will acknowledge existing lease(s) by initialing the lease(s) at the execution of this Agreement, unless otherwise stated in this Agreement.

8. Risk of Loss.  The property shall be held at the risk of Seller until settlement hereunder.  Upon the written request of Buyer, Seller shall immediately have all insurance policies on the property endorsed to protect all parties hereto, as their interest may appear, and shall continue the insurance in force during the life of this Contract.

9. Buyer's Default.  If Buyer defaults in Buyer's obligation to purchase the property, Seller shall have the right, at Seller's election, to retain all deposits paid hereunder as liquidated damages and not as a penalty, and upon such election the parties shall be released from all further liability hereunder at law and in equity.

10. Real Estate Commission.  Seller warrants to Buyer that it has not used the services of a real estate broker or agent in connection with this transaction. Seller agrees to defend, indemnify and hold the buyer harmless for any claim for real estate commissions arising by reason of Seller's breach of this warranty. The provisions of this paragraph shall survive settlement and the delivery of the deed to the property or the termination of this Contract.

11. Notice to Buyer Required by the Maryland Homeowners Association Act.  Attached as Addenda to this Contract are both the Notice and the Disclosure required by §11B-106 of the Real Property Article of the Annotated Code of Maryland.

12. Electronic Delivery.  The parties agree that this Contract offer shall be deemed validly executed and delivered by a party if a party executes this Contract and delivers a copy of the executed Contract to the other party by telefax, telecopier transmittal or e-mail.

13. Ground Rent.  If the property is subject to ground rent and the ground rent is not timely paid, the owner of the reversionary interest may bring an action of ejectment against the leasehold owner pursuant to Section 8-402.2 of the Real Property Article, Annotated Code of Maryland (as amended).

14. Miscellaneous Provisions.
(a) NOTICE TO BUYER: BUYER HAS THE RIGHT TO SELECT BUYER'S OWN TITLE INSURANCE COMPANY, TITLE LAWYER, SETTLEMENT COMPANY, ESCROW COMPANY, MORTGAGE LENDER, OR FINANCIAL INSTITUTION AS DEFINED IN THE FINANCIAL INSTITUTIONS ARTICLE, ANNOTATED CODE OF MARYLAND.



(b) This Contract contains the final and entire agreement between the parties and neither they nor their agents shall be bound by any terms, conditions or representations not herein written.

(c) Time is of the essence of this Contract.

(d) The liability of any party to this Contract shall be both joint and several.

(e) This Contract is binding on the parties and their personal representatives and assigns.

$\frac{JL}{R}$

**THE FOLLOWING ADDENDUMS ARE ATTACHED TO AND MADE PART OF THIS AGREEMENT:**

Signed by the hand of the parties.

WITNESS/ATTEST:

_Javier Luis Rossi_ _____        05/24/2020
                                                    01:21 AM GMT
                                                    _____ (SEAL)

                                    Buyer                          Date

_____        _____ (SEAL)

                                    Seller                         Date

**MARYLAND RESIDENTIAL PROPERTY DISCLAIMER STATEMENT**

Property Address: **2638 Lauretta Ave, Baltimore, MD 21223,**

The undersigned Seller of the Property described in this Contract makes no representations or warranties as to the condition of the real property or any improvements thereon, and Buyer will be receiving the property "AS IS", with all defects which may exist except as otherwise provided in this Contract.  Buyer acknowledges having carefully examined this Statement and further acknowledges that he has been informed of his rights and obligations under Section 10-702 of the Maryland Real Property Article.

IN WITNESS WHEREOF, each party hereto has executed and ensealed this Sale or caused it to be executed and ensealed on its behalf by its duly authorized representatives, the day and year first above written.

WITNESS/ATTEST:

_Javier Luis Rossi_ _____     05/24/2020
                                    01:21 AM GMT _____ (SEAL)
           Buyer                         Date

_____     _____ (SEAL)
           Seller                         Date

**Addendum to Agreement of Sale- Exhibit A**

<u>BUYER</u>: CREAR ESTETICA LLC

<u>SELLER</u>: ABC CAPITAL—BALTIMORE LLC

<u>WARRANTOR</u>: ABC CAPITAL—BALTIMORE LLC

<u>PROPERTY ADDRESS</u>: 2638 Lauretta Ave, Baltimore, MD 21223,


1. Property is warrantied for 24 months. Client will have NO maintenance at all for 24 months.
2. Roof is warrantied for 12 years added by a 3rd party roofing contractor.
3. Rents will be abated until identification number is provided.
4. Buyer acknowledges the tenant will have the right of first refusal to buy the property.
5. Rents are guaranteed by a third-party insurance company named the Guarantors and/or Rent Protect Membership for $1150 per month for 2 years. You are welcome to request your policy at any time.
6. ABC does not pay rent during construction delay from the city in the excess of 30 Days.
7. ABC has the rights to mitigate rent.
8. The client is responsible for all utilities at the property during construction. If ABC pays, they will be billed to the owner first billing rental statement.
9. Buyer will pay 10% for Property Management for Year One.
10. If ABC facilitates the purchase of a rental assurance policy for the client after year one, it will be at the cost of the client.
11. The Client will pay one month's rent for tenant placement during year one and all subsequent tenant placements.
12. Client indemnifies ABC of any claims regarding 3rd party products and services.
13. Client acknowledges they read and understand this contract. If they do not speak English, they have translated the documents and waive all claims against ABC for translation misunderstanding.
14. If Client or ABC terminates the property management agreement, all warranties provided by ABC and its affiliates are NULL and void.
15. If the buyer does not close on time at no fault of title not being clear, then buyer will pay $2000.00 USD penalty per week if closing is not done on time of closing.
16. If the client takes any type of warrantor offered by ABC. They acknowledge the expenses related to those warranties can be larger or smaller than the cost the warranties are offered.


*Javier Luis Rossi*   05/24/2020 01:21 AM GMT
_____
Buyer


_____
Seller

**AUTHORIZATION FOR TAXATION PETITION FOR REVIEW and/or NEW OWNER APPEAL OF REAL PROPERTY**

**Address: 2638 Lauretta Ave, Baltimore, MD 21223,**

I/We, __CREAR ESTETICA LLC__, Owner(s) of the above noted property, do hereby authorize ABC Management- Baltimore, LLC to file a Petition For Review and/or New Owner Appeal of Real Property on our behalf.



Javier Luis Rossi        05/24/2020
                         01:21 AM GMT

# ABC Management – Baltimore, LLC

**100 INTERNATIONAL DRIVE**
**Baltimore, MD**

---

# Property Management Contract

This Agreement is entered by and between ABC Management – Baltimore, LLC, hereinafter called "**AGENT**," and CREAR ESTETICA LLC, hereinafter called "**OWNER**."

**WITNESSETH** that, in order to induce the AGENT to enter into this agreement, OWNER hereby Represents and Warrants to AGENT that it is the OWNER of all the properties listed in Exhibit A (hereinafter "premises") as updated from time to time, that the premises have necessary Fire and Extended Coverage and Liability Insurance current, lead certificates if required, that the premises meet all required building and use codes, AND that the premises is registered both with the Municipality and with Maryland Department of Environment as required:

In consideration of these representations, warrants and the fees to be paid, AGENT agrees to act as management AGENT with respect to the property listed in Exhibit A, to use due diligence in the management of said premises upon the terms herein provided, and agrees to furnish the services of AGENT for the renting, leasing, operating and managing of said premises subject to and in accordance with the terms and provisions set forth below.

**I. AGENT'S COMPENSATION:**

    A. OWNER shall pay a monthly management fee shall and be charged as follows:

        For each premises or unit managed by AGENT, **ten percent (10%)** of the collected monthly rent, but not less than $50.00 for rented units, payable on the first day of each month.  If Owner waives any rent amount due Agent shall be entitled to the management fee as if the amount was collected.  The minimum amount is due even if the rent is collected at a later date.

    B. OWNER shall pay any late charge: judicial fine, penalty, or multiple damage; or interest collected from the tenant to the AGENT as an additional fee, as described in **Paragraph IV.B.**

C. OWNER shall grant the AGENT the right to Lease the premises, and shall pay to the AGENT a leasing fee of one hundred percent (100%) of the first month's rent if the premises is leased during the effective period of this Agreement.

## II. LEASING:

A. OWNER hereby authorizes AGENT to rent the premises for a minimum term of one year.

B. All utility charges, as appropriate, shall be paid by the tenant during tenant's occupancy. Water charges shall be paid by OWNER directly to Municipality and, where appropriate, shall be promptly presented by OWNER to AGENT for reimbursement from Tenant.

C. AGENT shall collect a security deposit from all tenants as directed by OWNER. The security deposit shall be maintained in the escrow account of OWNER.

## III. DISBURSEMENTS: AGENT shall pay, OUT OF OWNER'S FUNDS AVAILABLE, the following as they shall accrue and in the order here set out:

A. AGENT's compensation, as set forth in Paragraph I.

B. Such advertising and utility bills (including gas, electric, and water), necessary repairs and/or charges to maintain the property, and cleaning charges as shall accrue or be necessary to preserve the property during periods of vacancy or occupancy, or to put the property in a rentable condition after vacated; or expenses to regain possession and/or to attempt to collect delinquent rent subject to the provisions set forth below; or necessary professional fees; or governmental assessments.

C. Proceeds to OWNER. Tenancy revenues, refunds, adjustments, or other funds due OWNER shall be sent to the address provided by the OWNER on or before by the 15TH of the following month that the rent is collected (45 Days after the rent is due). If OWNER's account is negative AGENT may invoice that amount to OWNER. OWNER agrees to pay such invoice within 10 business days. If any of the invoice amount is outstanding for more than 3 days following said period of 10 business days such amount is subject to 5% interest penalty per month accrued on a daily basis.

D. **IT IS EXPRESSLY AGREED THAT NOTHING HEREIN CONTAINED SHALL BE CONSTRUED AS REQUIRING AGENT TO ADVANCE ANY OF ITS OWN MONIES FOR ANY PURPOSE WHATSOEVER.**

## IV. GENERAL PROVISIONS:

JL
R

**A. GRANT OF POWER:** Subject to the limitations set out herein, OWNER grants AGENT full power and authority to lease, let, rent and demise the premises, or any part thereof, in its own name as AGENT for OWNER. In order to effectuate same, AGENT may enter into such written contracts and/or leases as AGENT deems necessary, in its own name as AGENT for OWNER. Agent has the right to approve the rental amount for the initial lease and OWNER has the right to approve the rental amount for any subsequent new lease or renewal. AGENT may collect and receive all rents arising as a result of AGENT's management of the premises. AGENT may use such means as are ordinary and customary in collecting or attempting to collect any delinquent accounts. AGENT may, with OWNER approval evict any tenant who violates any term of the lease. OWNER hereby assigns to AGENT any and all delinquent rents which may accrue from any tenant for the purpose of crediting such rents to OWNER's operating account for required disbursement.

**B. COLLECTION OF RENT**

　　1. AGENT shall use such means as are ordinary and customary to collect or attempt to collect any rent from any tenant of the premises. In the event that legal action is necessary to obtain judgment for possession of the premises, delinquent rent, or damages upon other causes of action, AGENT is authorized to employ attorneys, to sue in its own name as AGENT for OWNER, and to expend the sum of up to six hundred dollars ($600.00) per premises or unit for each monthly billing cycle from OWNER's account for such purposes without OWNER's prior permission. If the legal expense will exceed this amount, the AGENT will obtain prior OWNER permission to proceed.  Additionally, AGENT will, when requested by OWNER, instigate action, legal or otherwise, for the collection of rents which is beyond the discretion heretofore allowed to AGENT, provided such action is considered reasonable by the AGENT.

　　2. **AGENT SHALL NOT BE HELD MONETARILY RESPONSIBLE FOR ITS INABILITY TO COLLECT RENTS. AGENT SHALL NOT BE HELD RESPONSIBLE FOR ANY EXPENSES INCURRED FOR LEGAL ACTION INVOLVED IN THE COLLECTION OF RENTS AND/OR THE EVICTION OF ANY TENANT AND/OR DAMAGES INCURRED TO THE PROPERTY**. All such expenses shall be paid by OWNER, reimbursable in the event AGENT is able to collect the rents, legal fees, or damages from the tenant.

　　3. If a late charge, judicial fine, penalty, or multiple damage, or interest is collected from the tenant, it shall be considered income to AGENT for its additional effort and time.

**C. MAINTENANCE**

1. AGENT shall have full authority to perform or to cause to be performed such maintenance of the property as is reasonable and necessary for the safety of the tenants and the preservation of the property at OWNER's expense.

2. AGENT may, at his sole discretion, install fire/smoke detectors, carbon monoxide detectors, and/or fire extinguishers on the property at OWNER's expense.

3. In the event maintenance, repairs, or construction are required to be performed to the property in excess of $_____500_____, AGENT will obtain prior OWNER permission to proceed.

**D. DISCRETIONARY AUTHORITY:**

1. OWNER expressly grants AGENT full power and authority to contract and pay for all repairs and cleaning costs, not exceeding the amount stipulated in paragraph IV.C.3. above, which in its discretion it deems necessary or advisable to maintain; or put the premises in a rentable condition; or to repair the same in the event of damage or destruction to the premises due to fire, windstorm, hail, flood, riot, civil commotion, tenant abuse, or other causes resulting in damage to the premises, all at OWNER's expense. Should the estimate or contemplated cost exceed funds on hand, OWNER shall promptly remit, upon AGENT's request, the necessary balance.

2. In an emergency, OWNER authorizes AGENT's expenditure in excess of funds on hand and above the amount stipulated in paragraph IV.C.3. above, without prior authorization. OWNER shall thereafter promptly remit, upon AGENT's request, the necessary balance.

3. Failure of OWNER to remit balances described in this subparagraph shall result in AGENT's reimbursement therefore from subsequent revenues ordinarily accruing and payable to OWNER.

**E. INSURANCE COVERAGE:** OWNER is obligated, at OWNER's expense, to keep the necessary Fire and Extended Coverage and Liability Insurance current and renewed. AGENT shall be shown as an additional insured under the liability section only.

**F. LIABILITY OF AGENT:** It is agreed that AGENT shall use reasonable and ordinary care in all acts assigned for performance by this Agreement. When any act is required of the AGENT, it shall be done in the ordinary course of AGENT's business.

1. Other than in cases of bad faith, fraud or willfull misconduct by AGENT or any of its representatives, OWNER shall save and hold AGENT harmless and indemnify AGENT from any and all claims, charges, debts, demands and lawsuits, which may arise in connection with the management of the premises, and from any liability from injuries suffered by any person entering or about the premises, including any property manager or other employee.

2. Other than in cases of bad faith, fraud or willfull misconduct by AGENT or any of its representatives, AGENT shall not be personally liable for any act it may do or omit to do hereunder as AGENT.

3. AGENT is hereby expressly authorized to comply with and obey any and all process, orders, judgment or decree, it receives of any court; where AGENT obeys or complies with any such process, order, judgment or decree, it shall not be liable to OWNER or any person, firm, or corporation by reason of such compliance, notwithstanding subsequent reversal or modification.

4. AGENT is hereby expressly authorized to comply with any laws, whether now in existence or hereinafter enacted, and whether federal, state, or local, relating to fair housing, rent control, discrimination, and health and welfare. AGENT is expressly authorized to comply with the rule or order of any governmental agency, insofar as such order in any manner affects the management of the premises or any duties of the AGENT hereunder.

## G. ACCOUNTING FOR FUNDS:

1. AGENT shall furnish OWNER a monthly accounting statement showing the receipts and expenditures with respect to the premises, plus OWNER's monthly proceeds.

2. AGENT shall furnish a final accounting upon the termination of this agreement within forty-five (45) days from the date of a written request of management termination, except as modified by this agreement.

## H. SECURITY AND DAMAGE DEPOSITS:

1. All security and damage deposits shall be accounted to owners account and maintained by OWNER. OWNER shall return to the tenant any legally required amounts when the tenant vacates the premises, consistent with Maryland law.

2. AGENT shall properly account for sums retained for the purpose of off-setting OWNER's expenses for unpaid rent, utilities, cleaning charges, or repairs.

3. In the event litigation shall occur concerning security deposits, AGENT may defend same in its own name as AGENT for OWNER, at OWNER's expense.

4. Should AGENT and OWNER disagree on the amount of security deposit to be refunded to the tenant, AGENT shall have no further obligation or liability whatsoever concerning the security deposit to any person or entity; and OWNER shall hold AGENT harmless and indemnify AGENT therefrom.

5. Should this Agreement initiate while an existing tenant's security deposit is in OWNERS possession, AGENT shall be given a full accounting of said deposit. AGENT shall have no obligation or liability whatsoever concerning the security deposit to any person or entity; the OWNER shall hold AGENT harmless and indemnify AGENT therefrom.

## I. ADDRESS OF OWNER: OWNER expressly agrees, within twenty (20) days of change, to advise AGENT, in writing, of any change of address. Any notice or accounting statement or other document required or desired to be given by AGENT to OWNER may be given by mailing to the address noted hereon, or the most recent address of OWNER

shown in the records of the AGENT; and notice so mailed shall be as effectual as if served upon such party in person at the time of depositing such notice in the mail.

**J. TERMINATION:** This agreement may be terminated by either party upon sixty (60) day's written notice. If so terminated, OWNER shall retake possession of the premises, subject to the rights of any tenant rightfully in possession. Other than an amount equal to any outstanding AGENT or third-party obligations then remaining, OWNER's proceeds shall be distributed by AGENT thirty (30) days after termination.  Each relevant portion of the proceeds not distributed at such time shall be distributed by AGENT to OWNER immediately following the satisfaction of the corresponding obligation.

**K. DEFICIT ACCOUNT:** In the event of AGENT's termination, should there be any outstanding and unpaid obligations, debts, or charges due AGENT, any amounts on account or received by AGENT on account or otherwise due OWNER shall be applied first to satisfy those obligations and then disbursed to OWNER. OWNER waives all protest and defenses against AGENT for such lawful disbursements. AGENT's lien rights against the subject property shall not be waived by this provision.

**L. PARTIAL WAIVE OR ACQUIESCENCE NO BAR:** AGENT's or OWNER's waiver, forbearance, or
acquiescence of any of its rights or remedies, in whole or in part, shall not serve to waive, bar, or
compromise any contemporaneous or subsequent right or remedy.

**M. ATTORNEY FEES AND COSTS:** The unsuccessful party in litigation to enforce the terms and conditions of this Agreement shall pay the reasonable attorney fees and costs of the successful party.

**N. WHOLE AGREEMENT:** This writing, as amended in writing from time to time, embodies the entire agreement between the parties and is not based upon any other representation whatsoever, expressed or implied, except as herein contained. The Agreement cannot be modified except in writing and agreed to by the parties.

**V. EFFECTIVE DATE:** Management by AGENT shall be effective as of date executed herein**.** This agreement shall automatically be renewed for additional one year periods from the end date stated as its ending date unless written notice of its non-renewal is given in accordance with IV-J above.

**VII. ITEMS OF MUTUAL AGREEMENT:**
1. OWNER ( ) does / ( ) does not authorize AGENT to have the furnace HVAC system serviced twice each year;
2. OWNER ( ) does / ( ) does not authorize AGENT to have the sprinkler system drained in the winter and re-pressurized in the Spring of each year;

JL
R

3. Pets ( ) shall - ( ) shall not be allowed, and/or limited as
follows:_____. A pet
deposit of $_____ shall be collected of which $_____ shall be considered
non-refundable.

4. OWNER ( ) does / ( ) does not permit smoking.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands this _____ day of
_____.

AGENT / ABC Management – Baltimore, LLC
By: _____
Authorized Signature

_____
Printed Name

By:_____
Name:
Title: Managing Member

OWNER:_*Javier Luis Rossi*_  05/24/2020 01:21 AM GMT _____
Social Security No. or Federal I.D. No. _____
OWNER:_____
Social Security No. or Federal I.D. No. _____

## Attachment A
## Premises

<u>Name of Property</u>          <u>Address of Property</u>

2638 Lauretta Ave, Baltimore, MD 21223, USA

**WITNESSETH** that, in order to induce the AGENT to enter into this agreement, OWNER hereby Represents and Warrants to AGENT that he/she/they is/are the OWNER(s) of all the properties listed in Exhibit A (hereinafter "premises") as updated from time to time, that the premises have necessary Fire and Extended Coverage and Liability Insurance current, lead certificates if required, that the premises meet all required building and use codes, AND that the premises is registered both with the Municipality and with Maryland Department of Environment as required.

 

Javier Luis Rossi          05/24/2020
01:21 AM GMT

# EXHIBIT L

$45,000.00

2638 Lauretta Ave, Baltimore, Maryland 21223
DATE

## PROMISSORY NOTE

FOR VALUE RECEIVED, the undersigned, Crear Estetica, LLC, (the "Borrower") promises to pay to the order of Wall Street Wealth Management, LLC or any subsequent holder of this Note (the "Lender"), during Lender's regular business hours at Lender's offices at 1714 Memphis St, Suite C-8, Philadelphia, PA 19125, or at such other place as Lender may from time to time designate to Borrower in writing, the sum of Forty Five Thousand DOLLARS ($45,000.00) (the "Loan"), together with interest on the unpaid principal balance outstanding from time to time at the rate or rates hereafter specified and any and all other sums which may be owing to Lender by Borrower pursuant to this Note. Payments of all sums due under this Note shall be paid in lawful money of the United States of America which shall be legal tender in payment of all debts and dues. The following additional terms shall apply to this Note.

1.    Interest. The principal amount outstanding from time to time hereunder shall bear interest at a fixed rate of NINE PERCENT (9%) per annum. Interest shall be calculated on the basis of a year of three hundred sixty (360) days applied to the actual days on which there exists an unpaid balance under this Note.

2.    Repayment.

(a) Commencing on July 1, 2020 and continuing on the first day of each month thereafter, Borrower shall make payments of interest at the rate provided above in the monthly amount of $337.50; provided, however, that unless sooner paid, the entire amount of the unpaid principal amount, together with all accrued and unpaid interest thereon and all other sums due under this Note that remain unpaid shall be repaid within FIVE YEARS which is the final and absolute due date of this Note (the "Note Maturity Date").

(b) The Borrower acknowledges and agrees that the payments of interest during the term of this Note are insufficient to pay the entire principal amount by the Maturity Date, and therefore, unless sooner paid, this Note contemplates a balloon payment of principal on the Maturity Date.

3.    Default Interest Rate. Upon an Event of Default (hereinafter defined), Lender may, in Lender's sole discretion, raise the rate of interest accruing on the unpaid principal balance to fifteen percent (15%) per annum, independent of whether Lender elects to accelerate the unpaid principal balance as a result of such default. Such default interest rate shall continue, in Lender's sole discretion, until all defaults are cured.

4.    Repayment Extension. If any payment of principal or interest shall be due on a Saturday, Sunday or any other day on which banking institutions in the State of Maryland are required or permitted to be closed, such payment shall be made on the next succeeding business day and such extension of time shall be included in computing interest under this Note.

353503.1
7/18/2006

5.    <u>Late Payment Charge</u>.  Borrower shall pay a late payment charge of five percent (5%) of the amount then due if any payment due under this Note is not received by Lender within five (5) days after its due date.  The late payment charge shall be payable to Lender on demand.  A similar late charge may be imposed for each successive 30-day period during which all or any portion of such payment remains delinquent.  Such late charge shall be in addition to, and not in lieu of, any other right or remedy Lender may have, including the right to receive principal and interest and to reimbursement of costs and expenses.

6.    <u>Application of Payments</u>.  All payments made under this Note may, in Lender's sole discretion, be applied first to late payment charges or other sums owed to Lender, next to accrued and unpaid interest, and the balance to the repayment of principal, or in such other order or proportion as Lender, in its sole discretion, may elect from time to time.

7.    <u>Prepayment</u>.  This Note may be prepaid in whole or in part at any time without premium or penalty, provided, however, that each such payment shall be accompanied by payment of all unpaid penalties and premiums, if any, which are due plus all accrued and unpaid interest due as of the date of such prepayment.

8.    <u>Events of Default; Acceleration</u>.  The following shall each constitute an "Event of Default" under this Note: (a) a default by Borrower to make any payment of any sum under this Note within five (5) days after such payment is first due and payable; or (b) a failure to timely comply with any other obligation set forth in this Note or (c) an event of default in any other document delivered in connection with the securing and funding of this Note (collectively, the "Loan Documents").  The terms, covenants, conditions, provisions, stipulations, and agreements contained in the Loan Documents are hereby made a part hereof to the same extent and with the same effect as if fully set forth herein.  Upon the occurrence of an Event of Default, Lender, in Lender's sole discretion and without notice or demand, may declare the entire unpaid principal balance of this Note, together with all accrued interest and all other sums due under this Note to be immediately due and payable and may exercise any and all rights and remedies available to Lender hereunder, under applicable law and under any of the Loan Documents.  This Note is given pursuant to the aforesaid Loan Documents, and reference is hereby made to the Loan Documents for further and additional rights of Lender to declare the entire unpaid principal balance plus all accrued interest and all other sums due under this Note to be immediately due and payable.  Any failure by Lender to exercise this right of acceleration shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

9.    <u>Expenses of Collection</u>.  Borrower agrees to pay to Lender and reimburse Lender upon demand for any and all losses, costs and expenses, including all reasonable attorney's fees and court costs, if any, incurred by Lender in connection with the enforcement or collection of this Note, whether or not any action has been commenced by Lender to enforce or collect this Note.

10.    <u>Security</u>.  This Note is secured by a Deed of Trust, Assignment of Rents and Security Agreement of even date herewith (the "Deed of Trust"), from Borrower, as grantor, to the trustees named therein, for the benefit of Lender.  The Deed of Trust encumbers the real property and improvements thereon, more fully described in the Deed of Trust.

– 2 –

Scanned with CamScanner

11. <u>Confession of Judgment</u>. Upon the occurrence of any Event of Default as provided hereinabove, Borrower authorizes any attorney admitted to practice before any court of record in the United States to appear on behalf of Borrower in any court having jurisdiction in one or more proceedings, or before any clerk thereof or prothonotary or other court official, and to CONFESS JUDGMENT AGAINST BORROWER, WITHOUT PRIOR NOTICE OR OPPORTUNITY OF BORROWER FOR PRIOR HEARING, in favor of the holder of this Note for the full amount due on this Note (including principal, accrued interest and any and all other sums due under this Note that remain unpaid) plus court costs, expenses and attorneys fees of fifteen percent (15%) of the total amount then due hereunder. Notwithstanding the amount of any such judgment, Lender agrees by accepting this Note not to enforce a judgment for legal fees against Borrower in an amount in excess of the fees and expenses actually charged to Lender for services rendered by, and for actual expenses incurred by, its counsel in connection with such confession of judgment and the collection of all amounts owed by Borrower to Lender. Borrower waives the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon Borrower any right or privilege of exemption, summons and other process, all errors and rights of appeal, homestead rights, stay of execution or stay of supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment. The authority and power to appear for and enter judgment against Borrower shall not be exhausted by one or more exercises thereof, or by any imperfect exercise thereof, and shall not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions, from time to time, in the same or different jurisdictions, as often as the holder shall deem necessary or advisable, for all of which this Note shall be sufficient authority.

12. <u>Interest Rate After Judgment</u>. If judgment is entered against Borrower on this Note, the amount of the judgment entered (which may include principal, interest, fees, and costs) shall bear interest at the higher: (a) the above described default interest rate, or (b) the legal rate of interest then applicable to judgments in the jurisdiction in which the judgment was entered, to be determined on the date of the entry of the judgment, until the judgment is paid in full.

13. <u>Certain Waivers By Borrower</u>. Borrower waives demand, presentment, notice of dishonor, protest, protest and demand, notice of protest, and notice of non-payment of this Note. Lender, without compromising, impairing, modifying, diminishing, or in any way releasing or discharging Borrower from Borrower's obligations hereunder and without notifying or obtaining the prior approval of Borrower at any time or from time to time, may: (a) grant extensions of time for payment or performance by Borrower or any other party to the Loan Documents; (b) release, substitute, exchange, impair, surrender, dispose of, or add any collateral which is security for this Note; (c) release in whole or in part Borrower or any other party to the Loan Documents; or (d) modify, change, renew, extend, or amend, in any respect, Lender's agreements with Borrower or any document, instrument, or writing, embodying or reflecting the same.

14. <u>Commercial Loan</u>. Borrower acknowledges and warrants that the debt evidenced by this Note is a "commercial loan" within the meaning of Title 12 of the Commercial Law Article of the Annotated Code of Maryland (2000 Rep. Vol.).

15. <u>Non-Waiver By Lender</u>. The rights and remedies of Lender under this Note and under the Loan Documents shall be cumulative and concurrent and may be pursued singularly, successively or together at the sole discretion of Lender, and may be exercised as often as occasion

- 3 -

Scanned with CamScanner

therefor shall occur, and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of the same or any other right or remedy. By accepting full or partial payment after the due date of any amount of principal or of interest on this Note, Lender shall not be deemed to have waived the right either to require prompt payment when due and payable of all other amounts of principal or of interest on this Note or to exercise any remedies available to it in order to collect all such other amounts due and payable under this Note.

No delay in the exercise of or failure to exercise, any right, remedy, or power accruing upon any default or failure of Borrower in the performance of any obligation under this Note shall impair any such right, remedy or power or shall be construed to be a waiver thereof, but any such right, remedy, or power may be exercised from time to time and as often as may be deemed by Lender expedient. If Borrower should default in the performance of any obligation under this Note, and such default should thereafter be waived by Lender, such waiver shall be limited to the particular default so waived.

16. _Evidence of Indebtedness_. This Note is given and accepted as evidence of indebtedness only, and not in payment or satisfaction of any indebtedness or obligation. The books and records of Lender will be sufficient evidence of advances made and payments received hereunder, except in the case of manifest error.

17. _Time of the Essence_. Time is of the essence under this Note.

18. _Estoppel Certificate_. Borrower agrees to furnish to the holder of this Note at any time and from time to time within fifteen (15) days after a written request from the holder of this Note, a written Estoppel Certificate duly executed and acknowledged setting forth the amount then due under this Note and whether any claim, offset or defense then exists under this Note.

19. _Notices_. Any notice or demand required or permitted by or in connection with this Note shall be given by either service of process or by certified mail or receipted overnight delivery service addressed to the Borrower at its principal place of business . Notice by certified mail shall be deemed received on the third day after the date sent and notice by overnight delivery shall be deemed received on the day following the date sent. Notwithstanding anything to the contrary, all notices and demands for payment from Lender actually received in writing by Borrower shall be considered to be effective upon the receipt thereof by Borrower regardless of the procedure or method utilized to accomplish delivery thereof to Borrower. Notice to any one person constituting Borrower shall constitute notice to all such persons.

20. _Choice of Law; Consent to Venue and Jurisdiction_. This Note shall be governed, construed and interpreted strictly in accordance with the laws of the State of Maryland. Borrower consents to the jurisdiction and venue the courts of Maryland and to the jurisdiction and venue of the United States District Court for the District of Maryland in any action or judicial proceeding brought to enforce, construe or interpret this Note. Borrower agrees to stipulate in any future proceeding that this Note is to be considered for all purposes to have been executed and delivered within the geographical boundaries of the State of Maryland, even if it was, in fact, executed and delivered elsewhere.

21. _Points._ Lender is requiring that Borrower pay, in addition to Lender's out of pocket costs of closing this transaction, a loan fee equal to ten (10) percent of the loan amount.

- 4 -

Said loan fee is being paid at funding of the Loan. (If the values in this paragraph are left blank then the values equal zero (0).)

22. <u>Actions Against Lender</u>. Any action brought by Borrower against Lender which is based, directly or indirectly or in whole or in part, on this Note or any matter in or related to this Note or any of the Loan Documents, including but not limited to the making of the loan or the administration or collection thereof, shall be brought only in the courts of the State of Maryland. Borrower may not file a counterclaim against Lender in a suit brought by Lender against Borrower in a state other than the State of Maryland unless, under the rules of procedure of the court in which Lender brought the action, the counterclaim is mandatory and will be considered waived unless filed as a counterclaim in the action instituted by Lender. All costs and expenses, including all attorneys fees, incurred by Lender in successfully defending any such action or counterclaim brought by Borrower against Lender shall be paid by Borrower to Lender.

23. <u>Waiver of Jury Trial</u>. Borrower agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by Borrower or Lender or any successor or assign of Borrower or Lender on or with respect to this Note or any of the Loan Documents or which in any way relates, directly or indirectly, to the obligations of Borrower to Lender under this Note or any of the Loan Documents, or the dealings of the parties with respect thereto, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY. BORROWER HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY in any such suit, action, or proceeding. Borrower acknowledges and agrees that this waiver is knowingly, intelligently, and voluntarily made by Borrower, that this provision is a specific and material aspect of the agreement between the parties and that Lender would not enter into the transaction with Borrower if this provision were not part of their agreement. Borrower acknowledges that neither Lender nor any person acting on behalf of Lender has made any misrepresentations of fact to induce this waiver of trial by jury. Borrower further acknowledges that Borrower has been represented (or has had the opportunity to be represented) in the signing of this Note and in the making of this waiver by independent legal counsel selected of Borrower's own free will and that Borrower has had the opportunity to discuss this waiver with counsel.

24. <u>Miscellaneous</u>. Neither this Note nor any term hereof may be terminated, amended, supplemented, waived, released or modified orally, but only by an instrument in writing signed by the party against which the enforcement of the termination, amendment, supplement, waiver, release, or modification is sought. The Lender may, without notice to or consent of the Borrower, sell, assign, pledge or transfer this Note or sell, assign, transfer or grant participations in all or any part of the obligations evidenced by this Note to others at any time and from time to time, and the Lender may divulge to any potential assignee, transferee or participant all information, reports, financial statements and documents obtained in connection with this Note and any other Loan Documents or otherwise. No amendment, modification, waiver, or release of this Note shall be established by conduct, custom, or course of dealing. Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders. The headings used in this Note are for convenience only and are not to be interpreted as a part of this Note. This Note and the Loan Documents constitute the entire agreement between the parties with respect to their subject matter and supercede all prior letters, representations or agreements, oral or written, with respect thereto.

- 5 -

25.          IN WITNESS WHEREOF, Borrower has executed this Note specifically intending this Note to constitute an instrument under seal.

*Signature on next page*

- 6 –

Scanned with CamScanner

*Signature page to _____DATE_____ Promissory Note*

WITNESS/ATTEST:                    BORROWER

_____        _____ (SEAL)
                               By:
                               Its:


**STATE OF** _____, **CITY/COUNTY OF** _____, **TO WIT:**

       I HEREBY CERTIFY, that on this __TH day of _____, before me, the undersigned, a Notary Public of the aforesaid State, personally appeared _____, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within Note, and, being authorized so to do, acknowledged that he executed the same as authorized person on behalf of _____ for the purposes therein contained.

       IN WITNESS MY Hand and Notarial Seal.

                                     _____
                                     NOTARY PUBLIC

My Commission Expires: _____

– 7 –

Scanned with CamScanner

# REAL ESTATE MORTGAGE

Securing the real property known as: **2638 Lauretta Ave, Baltimore, MD 21223**

# DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT (the "**Instrument**") is dated as of the_____ day of_____, 20__ by **Crear Estetica, LLC** a Florida limited liability company, as grantor (together with successors and assigns, "**Grantor**"), for the benefit of <u>Wall Street Wealth Management, LLC</u>, as beneficiary ("**Lender**").

Grantor, in consideration of the Indebtedness, and the trust created by this Instrument, irrevocably grants, conveys and assigns to Trustee, in trust, with power of sale, the Mortgaged Property described in Exhibit A attached to this Instrument, and authorizes Trustee to sell the Mortgaged Property upon default by any lawful means, as provided in this Instrument, and assents to the passage of a decree for the sale of the Mortgaged Property; provided, however, that prior to the occurrence of an Event of Default, Grantor shall be entitled to possession of the Mortgaged Property.

TO SECURE TO LENDER the repayment of the Indebtedness evidenced by the Note (the "**Note**") payable to Lender, dated as of the date of this Instrument, in the principal amount of **Forty Five Thousand DOLLARS ($45,000.00)**, executed by Grantor (also sometimes referred to herein as the "**Borrower**"), and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in the Loan Documents.

Grantor represents and warrants that Grantor is lawfully seized of the Mortgaged Property and has the right, power and authority to grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered. Grantor covenants that Grantor will warrant and defend specially the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Instrument and insuring Lender's interest in the Mortgaged Property.

**Covenants.** Grantor and Lender covenant and agree as follows:

1.     **DEFINITIONS.** The following terms, when used in this Instrument (including when used in the above recitals), shall have the following meanings:

(a)     "**Borrower**" means all persons or entities identified as "Borrower" in the first page of this Instrument, together with their successors and assigns. If Borrower and Grantor are the same person, sentences in this instrument which refer to Borrower and to Grantor shall be read as referring to that one person.

(b)     **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(c)     **"Event of Default"** means the occurrence of any event listed in Section 18.

(d)     **"Fixtures"** means all property which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

(e)     **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

(f)     **"Grantor"** means all persons or entities identified as "Grantor" in the first paragraph of this Instrument, together with their successors and assigns.

(g)     **"Guaranty"** means the Guaranty, if any, executed on even date herewith in connection with the making of the Note, and all schedules, riders, allonges and addenda, as such Guaranty may be amended from time to time.

(h)     **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(i)     **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials and apply to Grantor or to the Mortgaged Property. Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, *et seq.*, and their state analogs.

2

Scanned with CamScanner

(j)    **"Improvements"** means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(k)    **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under, the Note, the Guaranty, this Instrument or any other Loan Document, including late charges, default interest, and advances as provided in Section 8 or elsewhere including this Instrument to protect the security of this Instrument.

(l)    **"Key Principal"** means the natural person(s) or entity identified as such or Exhibit B attached to this Instrument, and any person or entity who becomes a Key Principal after the date of this Instrument and is identified as such in an amendment or supplement to this Instrument.

(m)    **"Land"** means the land described in Exhibit A.

(n)    **"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Grantor is a cooperative housing corporation), and all modifications, extensions or renewals.

(o)    **"Lender"** means the entity identified as "Lender" in the first paragraph of this Instrument and its successors and assigns, or any subsequent holder of the Note.

(p)    **"Loan Documents"** means the Note, the Guaranty, this Instrument, all guaranties, all indemnity agreements, O&M Programs, and any other documents now or in the future executed by Borrower, Grantor, Key Principal, any guarantor or any other person in connection with the loan evidenced by the Note, as such documents may be amended from time to time.

(q)    **"Loan Servicer"** means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, the Guaranty, this Instrument and any other Loan Document, and otherwise to service the loan evidenced by the Note for the benefit of Lender. Unless Grantor receives notice to the contrary, the Loan Servicer is the entity identified as "Lender" in the first paragraph of this Instrument.

(r)    **"Mortgaged Property"** means all of Grantor's present and future right, title and interest in and to all of the following:

> (1)    the Land;
>
> (2)    the Improvements;
>
> (3)    the Fixtures;
>
> (4)    the Personalty;
>
> (5)    all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the

3

Scanned with CamScanner

Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6) all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Grantor obtained the insurance pursuant to Lender's requirement;

(7) all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8) all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Grantor now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9) all proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds;

(10) all Rents and Leases;

(11) all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the loan secured by this Instrument and, if Grantor is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12) all tenant security deposits which have not been forfeited by any tenant under any Lease; and

(13) all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property.

(s) "**Note**" means the Note described on page 1 of this Instrument.

(t) "**O&M Program**" is defined in Section 14(a).

(u) "**Personalty**" means all equipment, inventory, general intangibles which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, including furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the

4

Scanned with CamScanner

Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

(v)     "**Property Jurisdiction**" is defined in Section 26(a).

(w)     "**Rents**" means all rents, revenues and other income of the Land or the Improvements, whether now due, past due, or to become due, and deposits forfeited by tenants.

(x)     "**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

(y)     "**Transfer**" means (A) a sale, assignment, transfer or other disposition (whether voluntary, involuntary or by operation of law); (B) the granting, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law); (C) the issuance or other creation of an ownership interest in a legal entity, including a partnership interest, interest in a limited liability company or corporate stock; (D) the withdrawal, retirement, removal or involuntary resignation of a partner in a partnership or a member or manager in a limited liability company; or (E) the merger, dissolution, liquidation, or consolidation of a legal entity. "Transfer" does not include (i) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under this Instrument or (ii) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the United States Bankruptcy Code. For purposes of defining the term "Transfer," the term "partnership" shall mean a general partnership, a limited partnership, a joint venture and a limited liability partnership, and the term "partner" shall mean a general partner, a limited partner and a joint venturer.

2.     **UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.** This Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash and non-cash proceeds thereof (collectively, "**UCC Collateral**"), and Grantor hereby grants to Lender a security interest in the UCC Collateral. Grantor hereby authorizes Lender to file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest and Grantor agrees, if Lender so requests, to execute and deliver to Lender such financing statements, continuation statements and amendments. Grantor shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require. Without the prior written consent of Lender, Grantor shall not create or permit to exist any other lien or security interest in any of the UCC Collateral. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture.

3.     **ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

5

Scanned with CamScanner

(a) As part of the consideration for the Indebtedness, Grantor absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Grantor to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Grantor. Promptly upon request by Lender, Grantor agrees to execute and deliver such further assignments as Lender may from time to time require. Grantor and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the "Mortgaged Property," as that term is defined in Section 1(r). However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under applicable law, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of the Grantor that in this circumstance this Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Instrument.

(b) After the occurrence of an Event of Default, Grantor authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender, and Grantor shall, upon Grantor's receipt of any Rents from any sources, pay the total amount of such receipts to the Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Grantor a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Loan Documents and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums, tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Grantor free and clear of, and released from, Lender's rights with respect to Rents under this Instrument. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Grantor's license to collect Rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Grantor shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Grantor hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender, no tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Grantor any amounts which are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Grantor shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c) Grantor represents and warrants to Lender that Grantor has not executed any prior assignment of Rents (other than an assignment of Rents securing indebtedness that will be paid off and discharged with the proceeds of the loan evidenced by the Note), that Grantor has not performed, and Grantor covenants and agrees that it will not perform, any acts and has not executed, and shall not execute, any instrument which would prevent Lender from exercising its rights under this Section 3, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents. Grantor shall not collect or accept payment of any Rents more than two months prior tothe due dates of such Rents.

(d) If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Grantor and even in the absence of waste, enter upon



Scanned with CamScanner

and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to this Section 3, protecting the Mortgaged Property or the security of this Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable. Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Grantor's solvency and without the necessity of giving prior notice (oral or written) to Borrower or Grantor, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Grantor, by its execution of this Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property. Immediately upon appointment of a receiver or immediately upon the Lender's entering upon and taking possession and control of the Mortgaged Property, Grantor shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents. In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and Grantor and their representatives from the Mortgaged Property. Grantor acknowledges and agrees that the exercise by Lender of any of the rights conferred under this Section 3 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

(e)     If Lender enters the Mortgaged Property, Lender shall be liable to account only to Grantor and only for those Rents actually received. Lender shall not be liable to Borrower, Grantor, anyone claiming under or through Grantor or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under this Section 3, and Grantor hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)     If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 8.

(g)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Instrument.

(h)     Grantor shall, promptly upon Lender's request, deliver to Lender an executed copy of each Lease then in effect. All Leases for residential dwelling units shall be on forms approved by Lender, shall be for initial terms of at least six months and not more than two years, and shall not include options to purchase. If customary in the applicable market, residential Leases with terms of less than six months may be permitted with Lender's prior written consent.

(i)     Grantor shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

7

**Scanned with CamScanner**

4.     **PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS.** Upon default by Borrower under the Note, Grantor shall pay the Indebtedness when due in accordance with the terms of the Note and the other Loan Documents and shall perform, observe and comply with all other provisions of the Note and the other Loan Documents.

5.     **APPLICATION OF PAYMENTS.** If at any time Lender receives, from Borrower, Grantor or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Neither Lender's acceptance of an amount which is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Grantor's obligations under this Instrument and the Note shall remain unchanged.

6.     **COMPLIANCE WITH LAWS.** Grantor shall comply with all laws, ordinances, regulations and requirements of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements and covenants pertaining to health and safety, construction of improvements on the Mortgaged Property, zoning and land use, and Leases. Grantor also shall comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits. Grantor shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 6. Grantor shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property. Grantor represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

7.     **USE OF PROPERTY.** Unless required by applicable law, Grantor shall not (a) except for any change in use approved by Lender, allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Instrument was executed, (b) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property, or (c) establish any condominium or cooperative regime with respect to the Mortgaged Property.

8.     **PROTECTION OF LENDER'S SECURITY.**

(a)     If Grantor fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Grantor and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 15, and (4) payment of amounts which Grantor has failed to pay under Sections 11 and 13.

(b)     Any amounts disbursed by Lender under this Section 8, or under any other provision of this Instrument that treats such disbursement as being made under this Section 8, shall be added to,

8

Scanned with CamScanner

and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the "**Default Rate**", as defined in the Note.

(c)     Nothing in this Section 8 shall require Lender to incur any expense or take any action.

**9.     INSPECTION.** Lender, its agents, representatives, and designees may make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during normal business hours, or at any other reasonable time.

## 10.     BOOKS AND RECORDS; FINANCIAL REPORTING.

(a)     Grantor shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property. The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)     If requested by Lender, Grantor shall furnish to Lender all of the following:

(1)     within 120 days after the end of each fiscal year of Grantor, a statement of income and expenses for Grantor's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Grantor relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Grantor relating to the Mortgaged Property as of the end of that fiscal year;

(2)     within 120 days after the end of each fiscal year of Grantor, and at any other time upon Lender's request, a rent schedule for the Mortgaged Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3)     within 120 days after the end of each fiscal year of Grantor, and at any other time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4)     within 120 days after the end of each fiscal year of Grantor, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Grantor and the interest held by each, if Grantor is a corporation, all officers and directors of Grantor, and if Grantor is a limited liability company, all managers who are not members;

(5)     upon Lender's request, a monthly property management report for the Mortgaged Property, showing the number of inquiries made and rental applications

9

Scanned with CamScanner

received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender; and

(6)     upon Lender's request, a balance sheet, a statement of income and expenses for Grantor and a statement of changes in financial position of Grantor for Grantor's most recent fiscal year; and

(7)     if required by Lender, a statement of income and expense for the Mortgaged Property for the prior month or quarter.

(c)     Each of the statements, schedules and reports required by Section 10(b) shall be certified to be complete and accurate by an individual having authority to bind Grantor, and shall be in such form and contain such detail as Lender may reasonably require. Lender also may require that any statements, schedules or reports be audited at Grantor's expense by independent certified public accountants acceptable to Lender.

(d)     If Grantor fails to provide in a timely manner the statements, schedules and reports required by Section 10(b), Lender shall have the right to have Grantor's books and records audited, at Grantor's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness as provided in Section 8.

(e)     If an Event of Default has occurred and is continuing, Grantor shall deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation.

(f)     Grantor authorizes Lender to obtain a credit report on Grantor at any time.

(g)     If an Event of Default has occurred and Lender has not previously required Grantor to furnish a quarterly statement of income and expense for the Mortgaged Property, Lender may require Grantor to furnish such a statement within 45 days after the end of each fiscal quarter of Grantor following such Event of Default.

## 11.     TAXES; OPERATING EXPENSES.

(a)     Subject to the provisions of Section 11(c) and Section 11(d), Grantor shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)     Subject to the provisions of Section 11(c), Grantor shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)     Grantor, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Grantor notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Grantor deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Grantor furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which

10

Scanned with CamScanner

may include the delivery to Lender of the reserves established by Grantor to pay the contested Imposition.

**12.** **LIENS; ENCUMBRANCES.** Grantor acknowledges that, to the extent provided in Section 17, the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance (a "**Lien**") on the Mortgaged Property (other than the lien of this Instrument) or on certain ownership interests in Grantor, whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Instrument, is a "**Transfer**" which constitutes an Event of Default.

**13.** **PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.** Grantor (1) shall not commit waste or permit impairment or deterioration of the Mortgaged Property, (2) shall not abandon the Mortgaged Property, (3) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (4) shall keep the Mortgaged Property in good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, and (5) shall give notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument. Grantor shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Personalty.

**14.** **ENVIRONMENTAL HAZARDS.**

(a) Except for matters covered by a written program of operations and maintenance approved in writing by Lender (an "**O&M Program**") or matters described in Section 14(b), Grantor shall not cause or permit any of the following:

(1) the presence, use, generation, release, treatment, processing, storage (including storage in above ground and underground storage tanks), handling, or disposal of any Hazardous Materials on or under the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property;

(2) the transportation of any Hazardous Materials to, from, or across the Mortgaged Property;

(3) any occurrence or condition on the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(4) any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Grantor that is adjacent to the Mortgaged Property.

The matters described in clauses (1) through (4) above are referred to collectively in this Section 14 as "**Prohibited Activities or Conditions**".

(b) Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) pre-packaged supplies, cleaning materials and petroleum products

11

Scanned with CamScanner

customarily used in the operation and maintenance of comparable commercial properties, and (2) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(c)     Grantor shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions.

(d)     Grantor represents and warrants to Lender that, except as previously disclosed by Grantor to Lender in writing:

(1)     Grantor has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)     to the best of Grantor's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)     except to the extent previously disclosed by Grantor to Lender in writing, the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Grantor's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past. If there is an underground storage tank located on the Property which has been previously disclosed by Grantor to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)     Grantor has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials. Without limiting the generality of the foregoing, Grantor has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)     no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with the terms of any Environmental Permit;

(6)     there are no actions, suits, claims or proceedings pending or, to the best of Grantor's knowledge after reasonable and diligent inquiry, threatened that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7)     Grantor has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property.

12

The representations and warranties in this Section 14 shall be continuing representations and warranties that shall be deemed to be made by Grantor throughout the term of the loan evidenced by the Note, until the Indebtedness has been paid in full.

(e)     Grantor shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)     Grantor's discovery of any Prohibited Activity or Condition;

(2)     Grantor's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Grantor that is adjacent to the Mortgaged Property; and

(3)     any representation or warranty in this Section 14 becomes untrue after the date of this Agreement.

Any such notice given by Grantor shall not relieve Grantor of, or result in a waiver of, any obligation under this Instrument, the Note, or any other Loan Document.

(f)     Grantor shall pay promptly the costs of any environmental inspections, tests or audits ("**Environmental Inspections**") required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any Transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) which Grantor fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 8. The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to Grantor or any other party such results or any other information obtained by Lender in connection with its Environmental Inspections. Lender hereby reserves the right, and Grantor hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property. Grantor consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections. Grantor acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale. Grantor agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Grantor hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(g)     If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("**Remedial Work**") is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials Law, Grantor shall, by the earlier of (1) the applicable deadline required by Hazardous Materials Law or (2)

13

Scanned with CamScanner

30 days after notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law. If Grantor fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Grantor shall reimburse Lender on demand for the cost of doing so. Any reimbursement due from Grantor to Lender shall become part of the Indebtedness as provided in Section 8.

(h)      Grantor shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(i)      Grantor shall indemnify, hold harmless and defend (i) Lender, (ii) any prior owner or holder of the Note, (iii) the Loan Servicer, (iv) any prior Loan Servicer, (v) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (vi) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, the "**Indemnitees**") from and against all proceedings, claims, damages, judgments, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(1)      any breach of any representation or warranty of Grantor in this Section 14;

(2)      any failure by Grantor to perform any of its obligations under this Section 14;

(3)      the existence or alleged existence of any Prohibited Activity or Condition;

(4)      the presence or alleged presence of Hazardous Materials on or under the Mortgaged Property or any property of Grantor that is adjacent to the Mortgaged Property; and

(5)      the actual or alleged violation of any Hazardous Materials Law.

(j)      Counsel selected by Grantor to defend Indemnitees shall be subject to the approval of those Indemnitees. However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at the Grantor's expense.

(k)      Grantor shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (a "**Claim**"), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(l)      The provisions of this Section 14 shall be in addition to any and all other obligations and liabilities that Grantor may have under applicable law or under other Loan Documents. If Grantor consists of more than one person or entity, the obligation of those persons or entities to indemnify the Indemnitees under this Section 14 shall be joint and several. The obligation of Grantor to indemnify the Indemnitees under this Section 14 shall survive any repayment or discharge of the Indebtedness,

14

any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Instrument.

### 15.    PROPERTY AND LIABILITY INSURANCE.

(a)     Grantor shall keep the Improvements insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, and business income coverage. Lender's insurance requirements may change from time to time throughout the term of the Indebtedness. If any of the Improvements is located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, and if flood insurance is available in that area, Grantor shall insure such Improvements against loss by flood.

(b)     All policies of property damage insurance shall include a non-contributing, non-reporting mortgage and loss payee clause in favor of, and in a form approved by, Lender. Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 15(a). Grantor shall promptly deliver to Lender a copy of all renewal and other notices received by Grantor with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Grantor shall deliver to Lender the original (or a duplicate original) of a renewal policy in form satisfactory to Lender.

(c)     Grantor shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require.

(d)     Grantor shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Instrument requires Grantor to maintain.

(e)     In the event of loss, Grantor shall give immediate written notice to the insurance carrier and to Lender. Grantor hereby authorizes and appoints Lender as attorney-in-fact for Grantor to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 19 shall require Lender to incur any expense or take any action. Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Grantor for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender (the "**Restoration**"), or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar commercial properties.

(f)     Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating

15

Scanned with CamScanner

to the Mortgaged Property; (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty; and (5) upon Lender's request, Grantor provides Lender evidence of the availability during and after the Restoration of the insurance required to be maintained by Grantor pursuant to this Section 15.

(g)     If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, Lender shall automatically succeed to all rights of Grantor in and to any insurance policies and unearned insurance premiums and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

## 16.    CONDEMNATION.

(a)     Grantor shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect (a "**Condemnation**"). Grantor shall appear in and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by Lender in writing. Grantor authorizes and appoints Lender as attorney-in-fact for Grantor to commence, appear in and prosecute, in Lender's or Grantor's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 16 shall require Lender to incur any expense or take any action. Grantor hereby transfers and assigns to Lender all right, title and interest of Grantor in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b)     Lender may apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to the restoration or repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Grantor.  Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness shall not extend or postpone the due date of any monthly installments referred to in the Note or Guaranty, Section 4 of this Instrument, or change the amount of such installments. Grantor agrees to execute such further evidence of assignment of any awards or proceeds as Lender may require.

## 17.    TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN GRANTOR.

(a)     The occurrence of any of the following events shall constitute an Event of Default under this Instrument:

(1)     a Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property;

(2)     a Transfer of a Controlling Interest in Grantor;

(3)     a Transfer of a Controlling Interest in any entity which owns, directly or indirectly through one or more intermediate entities, a Controlling Interest in Grantor;

16

Scanned with CamScanner

(4) a Transfer of all or any part of a Key Principal's ownership interests in Grantor, or in any other entity which owns, directly or indirectly through one or more intermediate entities, other than a transfer of an interest that is (i) insignificant, (ii) non-governing interest and (iii) does not effectively shift control of the Grantor;

(5) if Key Principal is an entity, (A) a Transfer of a Controlling Interest in Key Principal, or (B) a Transfer of a Controlling Interest in any entity which owns, directly or indirectly through one or more intermediate entities, a Controlling Interest in Key Principal;

(6) if Grantor or Key Principal is a trust, the termination or revocation of such trust; and

(7) a conversion of Grantor from one type of legal entity into another type of legal entity, whether or not there is a Transfer.

Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default in order to exercise any of its remedies with respect to an Event of Default under this Section 17.

(b)     The occurrence of any of the following events shall not constitute an Event of Default under this Instrument, notwithstanding any provision of Section 17(a) to the contrary:

(1) a Transfer to which Lender has consented;

(2) a Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person;

(3) the grant of a leasehold interest in all or any portion of the Improvements not containing an option to purchase for a term of three years or less (including renewals) if the Improvements are residential, and for a term of ten years (five years if to an affiliate of Grantor) or less (including renewals) if the Improvements are not residential;

(4) a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality, which are free of liens, encumbrances and security interests other than those created by the Loan Documents or consented to by Lender;

(5) the grant of an easement, if before the grant Lender determines that the easement will not materially affect the operation or value of the Mortgaged Property or Lender's interest in the Mortgaged Property, and Grantor pays to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's or Grantor's request; and

(6) the creation of a tax lien or a mechanic's, materialman's or judgment lien against the Mortgaged Property which is bonded off, released of record or otherwise remedied to Lender's satisfaction within 30 days of the date of creation.

17

Scanned with CamScanner

(c)     For purposes of this Section, the following terms shall have the meanings set forth
below:

    (1)     **"Initial Owners"** means, with respect to Grantor or any other entity, the
persons or entities who on the date of the Note own in the aggregate 100% of
the ownership interests in Grantor or that entity.

    (2)     A Transfer of a **"Controlling Interest"** shall mean, with respect to any entity,
the following:

        (i)     if such entity is a general partnership or a joint venture, a Transfer of any
general partnership interest or joint venture interest which would cause
the Initial Owners to own less than 51% of all general partnership or joint
venture interests in such entity;

        (ii)    if such entity is a limited partnership, a Transfer of any general
partnership interest;

        (iii)   if such entity is a limited liability company or a limited liability
partnership, a Transfer of any membership or other ownership interest
which would cause the Initial Owners to own less than 51% of all
membership or other ownership interests in such entity;

        (iv)    if such entity is a corporation (other than a Publicly-Held Corporation)
with only one class of voting stock, a Transfer of any voting stock which
would cause the Initial Owners to own less than 51% of voting stock in
such corporation;

        (v)     if such entity is a corporation (other than a Publicly-Held Corporation)
with more than one class of voting stock, a Transfer of any voting stock
which would cause the Initial Owners to own less than a sufficient
number of shares of voting stock having the power to elect the majority
of directors of such corporation;

        (vi)    if such entity is a trust, the removal, appointment or substitution of a
trustee of such trust other than (A) in the case of a land trust, or (B) if
the trustee of such trust after such removal, appointment or substitution
is a trustee identified in the trust agreement approved by Lender

        (vii)   for any entity, a change in the terms of the governing agreement(s)
which has the practical effect of shifting control of the entity from
either of the Key Principals.

    (3)     **"Publicly-Held Corporation"** shall mean a corporation the outstanding voting
stock of which is registered under Section 12(b) or 12(g) of the Securities and
Exchange Act of 1934, as amended.

**18.     EVENTS OF DEFAULT.** The occurrence of any one or more of the following shall
constitute an Event of Default under this Instrument:

18

(a)     any failure by Borrower or Grantor to pay or deposit when due any amount required by the Note, the Guaranty, this Instrument or any other Loan Document;

(b)     any failure by Grantor to maintain the insurance coverage required by Section 15;

(c)     fraud or material misrepresentation or material omission by Grantor or any of its officers, directors, trustees, general partners or managers, Key Principal or any guarantor in connection with (A) the application for or creation of the Indebtedness, (B) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (C) any request for Lender's consent to any proposed action;

(d)     any Event of Default under Section 17;

(e)     the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property;

(f)     any failure by Grantor to perform any of its obligations under this Instrument (other than those specified in Sections 18(a) through (e)), as and when required, which continues for a period of 30 days after notice of such failure by Lender to Grantor, but no such notice or grace period shall apply in the case of any such failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Instrument, result in harm to Lender, impairment of the Note or this Instrument or any other security given under any other Loan Documents;

(g)     any failure by Borrower or Grantor to perform any of its obligations as and when required under any Loan Document other than this Instrument which continues beyond the applicable cure period, if any, specified in that Loan Document; and

(h)     any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable.

**19.     REMEDIES CUMULATIVE.** Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

**20.     FORBEARANCE.**

(a)     Lender may (but shall not be obligated to) agree with Grantor, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, any guarantor or other third party obligor, to take any of the following actions:  extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Instrument, the Guaranty, the Note, or any other Loan Document; release anyone liable for the payment of any amounts under this Instrument, the Guaranty, the Note, or any other Loan Document; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Instrument, the Guaranty, the Note, or any other Loan Document.

19

Scanned with CamScanner

(b)    Any forbearance by Lender in exercising any right or remedy under the Guaranty, the Note, this Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any awards or proceeds under Sections 19 and 20 shall not operate to cure or waive any Event of Default.

21.    **LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower or Grantor is interpreted so that any charge provided for in any Loan Document, whether considered separately or together with other charges levied in connection with any other Loan Document, violates that law, and Borrower or Grantor is entitled to the benefit of that law, that charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower or Grantor has been violated, all Indebtedness which constitutes interest, as well as all other charges levied in connection with the Indebtedness which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

22.    **WAIVER OF STATUTE OF LIMITATIONS.** Grantor hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce the Note or any Loan Document.

23.    **WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Grantor and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

24.    **FURTHER ASSURANCES.** Grantor shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Note.

25.    **ESTOPPEL CERTIFICATE.** Within 10 days after a request from Lender, Grantor shall deliver to Lender a written statement, signed and acknowledged by Grantor, certifying to Lender or any person designated by Lender, as of the date of such statement, (i) that the Loan Documents are

20

unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications); (ii) the unpaid principal balance of the Note and the Guaranty; (iii) the date to which interest under the Note and Guaranty has been paid; (iv) that neither Grantor nor Borrower is in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Instrument, the Note, or any of the other Loan Documents (or, if the Grantor is in default, describing such default in reasonable detail); (v) whether or not there are then existing any setoffs or defenses known to Grantor against the enforcement of any right or remedy of Lender under the Loan Documents; and (vi) any additional facts requested by Lender.

## 26.   GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.

(a)   To the extent required by Maryland law, this Instrument shall be governed by the laws of the jurisdiction in which the Land is located (the "**Property Jurisdiction**"), but shall otherwise be governed, together with the Guaranty and all other Loan Documents, by the laws of the State of Maryland.

(b)   Except to the extent required exercise foreclosure and related rights with respect to the Land and other collateral located outside of Maryland, Grantor agrees that any controversy arising under or in relation to the Guaranty, this Instrument, or any other Loan Document shall be litigated exclusively in Maryland. The state and federal courts and authorities with jurisdiction in Maryland shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Guaranty, this Instrument, any security for the Indebtedness, or any other Loan Document. Grantor irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

## 27.   NOTICE.

(a)   All notices, demands and other communications ("**notice**") under or concerning this Instrument shall be in writing. Each notice shall be addressed to the intended recipient at its address set forth in this Instrument, and shall be deemed given on the earliest to occur of (1) the date when the notice is received by the addressee; (2) the first Business Day after the notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested. As used in this Section 27, the term "Business Day" means any day other than a Saturday, a Sunday or any other day on which financial institutions in Maryland are authorized to be closed.

(b)   Any party to this Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 27. Each party agrees that it will not refuse or reject delivery of any notice given in accordance with this Section 27, that it will acknowledge, in writing, the receipt of any notice upon request by the other party and that any notice rejected or refused by it shall be deemed for purposes of this Section 27 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

## 28.   SALE OF NOTE; CHANGE IN SERVICER. The Note or a partial interest in the Note (together with the Guaranty, this Instrument and the other Loan Documents) may be sold one or more times without prior notice to Borrower or Grantor. A sale may result in a change of the Loan

21

Scanned with CamScanner

Servicer. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given notice of the change.

29.     **SUCCESSORS AND ASSIGNS BOUND.** This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and assigns of Lender and Grantor. However, a Transfer not permitted by Section 17 shall be an Event of Default.

30.     **JOINT AND SEVERAL LIABILITY.** If more than one person or entity signs this Instrument as Grantor, the obligations of such persons and entities shall be joint and several.

31.     **RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.**

(a)     The relationship between Lender and Grantor shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Grantor.

(b)     No creditor of any party to this Instrument and no other person (except Borrower) shall be a third party beneficiary of this Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (1) any arrangement (a "**Servicing Arrangement**") between the Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Grantor for the payment of the Indebtedness under the Guaranty, (2) Grantor shall not be a third party beneficiary of any Servicing Arrangement, and (3) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness under the Note or guaranteed by the Guaranty.

32.     **SEVERABILITY; AMENDMENTS.** The invalidity or unenforceability of any provision of this Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect. This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

33.     **CONSTRUCTION.** The captions and headings of the sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument. Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument. All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument. Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Agreement includes the plural and use of the plural includes the singular. As used in this Instrument, the term "including" means "including, but not limited to."

34.     **LOAN SERVICING.** All actions regarding the servicing of the loan evidenced by the Note, including the collection of payments, the giving and receipt of notice, inspections of the Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such notice from Lender shall govern.

22

35. **DISCLOSURE OF INFORMATION.** Lender may furnish information regarding Grantor or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of commercial mortgage loans. Grantor irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including any right of privacy.

36. **SUBROGATION.** If, and to the extent that, the proceeds of the loan evidenced by the Note are used to pay, satisfy or discharge any obligation of Grantor for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a "Prior Lien"), such loan proceeds shall be deemed to have been advanced by Lender at Grantor's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

37. **ACCELERATION; REMEDIES.** At any time during the existence of an Event of Default, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by Maryland law or provided in this Instrument or in any other Loan Document. Grantor acknowledges that the power of sale granted in this Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports.

If Lender invokes the power of sale, Lender shall mail or cause Trustee to mail written notice of sale to Grantor in the manner prescribed by Maryland law. Trustee shall give notice of sale and shall sell the Mortgaged Property according to Maryland law. Trustee may sell the Mortgaged Property at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone sale of all or any part of the Mortgaged Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Mortgaged Property at any sale.

Trustee shall deliver to the purchaser at the sale, within a reasonable time after the sale, a deed conveying the Mortgaged Property so sold without any express or implied covenant or warranty. The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements made in those recitals. Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including Trustee's fees, attorneys' fees and costs of title evidence; (b) to the Indebtedness in such order as Lender, in Lender's discretion, directs; and (c) the excess, if any, to the person or persons legally entitled to the excess.

Grantor hereby assents to the passage of a decree for the sale of the Mortgaged Property pursuant to Lender's exercise of its rights under this Section.

38. **RELEASE.** Upon payment of the Indebtedness, Lender or Trustee shall release this Instrument. Grantor shall pay Lender's or Trustee's reasonable costs incurred in releasing this Instrument.

39. **SUBSTITUTE TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee by an instrument recorded in the city or county in which this Instrument is recorded. Without conveyance of the Mortgaged Property, the successor trustee shall

23

Scanned with CamScanner

succeed to all the title, power and duties conferred upon the Trustee in this Instrument and by applicable law.

**40.     WAIVER OF TRIAL BY JURY. GRANTOR AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS GUARANTOR AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

Balance of page left blank

24

Scanned with CamScanner

**IN WITNESS WHEREOF**, Grantor has signed and delivered this Instrument under seal or has caused this Instrument to be signed and delivered by its duly authorized representative under seal.

WTINESS/ATTEST

Crear Estetica, LLC (BORROWER)

_____

By: _____ (SEAL)

Its: _____

STATE OF_____COUNTY/CITY OF_____TO WIT:

I HEREBY CERTIFY, that on this____day of_____, 20__ before me, the undersigned, a Notary Public of the aforesaid State, personally appeared _____, and that he is known to me (or satisfactorily proven) to be the authorized person of _____ whose name is subscribed to the within instrument, and, being authorized so to do, acknowledged that he executed the same on behalf of _____ for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____

My Commission Expires: _____        NOTARY PUBLIC

The undersigned, an attorney duly admitted to practice before the Maryland Court of Appeals, hereby certifies that this instrument has been prepared by or under the supervision of the undersigned.

_____

_____

25

Scanned with CamScanner

# EXHIBIT M

| A. **Settlement Statement** | U.S. Department of Housing and Urban Development | | OMB No. 2502-0265 |
|---|---|---|---|

**B. Type of Loan**

| 1. ☐ FHA  2. ☐ FmHA  3. ☐ Conv Unins | 6. File Number | 7. Loan Number | 8. Mortgage Ins Case Number |
|---|---|---|---|
| 4. ☐ VA  5. ☐ Conv Ins.  6. ☐ Seller Finance | 2029472A | | |
| 7. ☒ Cash Sale. | | | |

C. Note:   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower | E. Name & Address of Seller | F. Name & Address of Lender |
|---|---|---|
| Crear Estetica, LLC a Florida Limited Liability Company | ABC Management - Baltimore, LLC 518 S. Conkling Street 4th Floor Baltimore, MD  21224 | CASH DEAL |
| , | , | , |

| G. Property Location | H. Settlement Agent Name |
|---|---|
| 2638 Lauretta Avenue Baltimore, MD 21223 | Castle Title, LLC 1447 York Road, #606 Lutherville, MD  21093  Tax ID: 20-5347540 Underwritten By: Old Republic |

| Place of Settlement | I. Settlement Date |
|---|---|
| Castle Title, LLC 1447 York Road Suite 606 Lutherville, MD  21093 | 7/3/2020 Fund: 7/3/2020 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101.  Contract Sales Price | $25,500.00 | 401.  Contract Sales Price | $25,500.00 |
| 102.  Personal Property | | 402.  Personal Property | |
| 103.  Settlement Charges to borrower | $76,296.68 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106.  County Property taxes    07/03/20 to 06/30/21 | $248.63 | 406.  County Property taxes    07/03/20 to 06/30/21 | $248.63 |
| 107.  Water/Sewer | | 407.  Water/Sewer | |
| 108.  Prorated Ground Rent | | 408.  Prorated Ground Rent | |
| 109.  Prorated Rent | | 409.  Prorated Rent | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| **120. Gross Amount Due From Borrower** | $102,045.31 | **420.  Gross Amount Due to Seller** | $25,748.63 |
| **200. Amounts Paid By Or in Behalf Of Borrower** | | **500. Reductions in Amount Due to Seller** | |
| 201.  Deposit or earnest money | | 501.  Excess Deposit | |
| 202.  Principal amount of new loan(s) | | 502.  Settlement Charges to Seller (line 1400) | $14,407.50 |
| 203.  Existing loan(s) taken subject to | | 503.  Existing Loan(s) Taken Subject to | |
| 204.  Loan Amount 2nd Lien | | 504.  Payoff of first mortgage loan       to | |
| 205. | | 505.  Payoff of second mortgage loan     to | |
| 206.  Loan Amount From Wall Street Wealth Mng | $45,000.00 | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210.  County Property taxes | | 510.  County Property taxes | |
| 211.  Water/Sewer    05/07/20 to 07/03/20 | $120.31 | 511.  Water/Sewer    05/07/20 to 07/03/20 | $120.31 |
| 212.  Prorated Ground Rent | | 512.  Prorated Ground Rent | |
| 213.  Prorated Rent | | 513.  Prorated Rent | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | $45,120.31 | **520. Total Reduction Amount Due Seller** | $14,527.81 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | $102,045.31 | 601. Gross Amount due to seller (line 420) | $25,748.63 |
| 302. Less amounts paid by/for borrower (line 220) | $45,120.31 | 602. Less reductions in amt. due seller (line 520) | $14,527.81 |
| **303. Cash From Borrower** | $56,925.00 | **603. Cash To Seller** | $11,220.82 |

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following:  • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services;  • Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate;  • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement. These disclosures are mandatory.

Section 4(a) of RESPA mandates that HUD develop and prescribe this standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller. These are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.

The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

The information requested does not lend itself to confidentiality.

JLR

File No. 2029472A

## L. Settlement Charges

| | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| **700.** Total Sales/Broker's Commission based on price | $25,500.00 | @ % = $4,675.00 | | |
| Division of Commission (line 700) as follows: | | | | |
| 701. $4,675.00 | to | ABC Capital Miami | | |
| 702. | to | | | |
| 703. Commission Paid at Settlement | | | $0.00 | $4,675.00 |
| 704. Referral Fee | to | Miami Life Realty | | $5,610.00 |
| **800. Items Payable in Connection with Loan** | | | | |
| 801. Loan Origination Fee     % | to | Wall Street Wealth Management, LLC | $2,250.00 | |
| 802. Loan Discount             % | to | | | |
| 803. Appraisal Fee | to | | | |
| 804. Credit Report | to | | | |
| 805. Lender's Inspection Fee | to | | | |
| 806. Mortgage Application | to | | | |
| 807. Broker Fee | to | | | |
| 808. Tax Service Fee | to | | | |
| 809. Flood Certification | to | | | |
| 810. YSP | to | | | |
| 811. Service Release Premium | to | | | |
| **900. Items Required by Lender To Be Paid in Advance** | | | | |
| 901. Interest from   7/3/2020   to   8/1/2020 @ $0/day | | | | |
| 902. Mortgage Ins Premium for  months | to | | | |
| 903. Hazard Ins Premium for  years | to | Stateside APM | $880.00 | |
| **1000. Reserves Deposited With Lender** | | | | |
| 1001. Hazard Insurance | months @ | $73.33 per month | | |
| 1002. Mortgage insurance | months @ | per month | $0.00 | |
| 1003. Property Tax | months @ | per month | | |
| 1004. Water/Sewer | months @ | per month | | |
| 1005. Prorated Ground Rent | months @ | per month | | |
| 1006. Prorated Rent | months @ | per month | | |
| 1007. | months @ | per month | | |
| 1008. | months @ | per month | | |
| 1011. Aggregate Adjustment | | | | |
| **1100. Title Charges** | | | | |
| 1101. Settlement or closing fee | to | Castle Title, LLC | $300.00 | |
| 1102. Abstract or title search | to | Mortiles, LLC | $171.00 | |
| 1103. Title examination | to | Castle Title, LLC | $595.00 | |
| 1104. Title insurance binder | to | Castle Title, LLC | | |
| 1105. Judgment report | to | Castle Title, LLC | $95.00 | |
| 1106. Doc Prep | to | Castle Title, LLC | $95.00 | |
| 1107. Attorney's fees | to | | | |
| (includes above items numbers: | | ) | | |
| 1108. Title insurance | to | Old Republic National Title Insurance Company | $175.00 | |
| (includes above items numbers: | | ) | | |
| 1109. Lender's coverage | $0.00/$0.00 | | | |
| 1110. Owner's coverage | $25,500.00/$175.00 | | | |
| 1111. Hand recording fee | to | MP Recordings, LLC | $40.00 | |
| 1112. Prepare/Track/Record Release | to | Castle Title, LLC | | |
| 1113. Lien Sheet x2 | to | Director of Finance | $110.00 | |
| **1200. Government Recording and Transfer Charges** | | | | |
| 1201. Recording Fees | Deed $60.00 ; Mortgage $115.00 ; Rel | to Circuit Court for Baltimore City | $175.00 | |
| 1202. City/county tax/stamps | Deed $255.00 ; Mortgage | to Director of Finance | $127.50 | $127.50 |
| 1203. State tax/stamps | Deed $127.50 ; Mortgage | to Director of Finance | $63.75 | $63.75 |
| 1204. MD CTY TRANSFER TAX | to | Circuit Court for Baltimore City | $191.25 | $191.25 |
| 1205. Conveyance Fee | to | | | |
| **1300. Additional Settlement Charges** | | | | |
| 1301. Rehab | to | ABC Capital Baltimore | $68,000.00 | |
| 1302. Renovation Fee | to | USA Rebuilders | | $3,740.00 |
| 1303. Processing Fee | to | ABC Capital Miami | $499.00 | |
| 1304. Processing Fee | to | Miami Life Realty | $495.00 | |
| 1305. Covid-19 City Billing Escrow | to | ESCROW | $500.00 | |
| 1306. Per Agreement | to | | $1,534.18 | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | $76,296.68 | $14,407.50 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement.

*JLR*

File No. 2029472A

Crear Estetica, LLC a Florida Limited Liability Company      ABC Management - Baltimore, LLC

*Javier Luis Rossi*   06/30/2020
10:49 PM GMT

By                              By Jason Welsh

SETTLEMENT AGENT CERTIFICATION

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.

_____  7/3/2020

Settlement Agent             Date

**Warning:** It is a crime to knowingly make false statements to the United States on this or any other similar form.  Penalties upon conviction can include a fine and imprisonment.  For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Previous Editions are Obsolete      Page 2      form **HUD-1** (3/86)
Handbook 4305.2

File No. 2022-0220

Crear Estetica, LLC a Florida Limited Liability Company

ABC Management - Baltimore, LLC

By _____

By Jason Welsh

## SETTLEMENT AGENT CERTIFICATION

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.

_____       7/3/2020
Settlement Agent                        Date

**Warning:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Previous Editions are Obsolete

Page 2

form **HUD-1** (3/86)
Handbook 4305.2

# EXHIBIT N



# A. Settlement Statement (HUD-1)

OMB Approval No. 2502-0265

## B. Type of Loan

| | |
|---|---|
| 1. ☐ FHA   2. ☐ RHS   3. ☐ Conv. Unins.   4. ☐ VA   5. ☐ Conv. Ins. | 6. File Number: M20-7831-TG-B   7. Loan Number: 0000   8. Mortgage Insurance Case Number: |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agents are shown. Items marked "(p.o.c)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: | E. Name & Address of Seller: | F. Name & Address of Lender: |
|---|---|---|
| Katherine Victory Properties LLC 1714 Memphis St, Suite C-8, Philadelphia 19125 | ABC Capital-Baltimore, LLC 100 International Drive, 23rd Floor, Baltimore, MD 21202 | Cash |

| G. Property Location: | H. Settlement Agent: | I. Settlement Date: 02/24/2020 |
|---|---|---|
| 5343 Maple Avenue Baltimore, MD 21215 | Masters Title & Escrow 10411 Motor City Drive #690, Bethesda, MD 20817 | Disbursement Date: 02/24/2020 |
| | Place of Settlement: 10411 Motor City Drive #690, Bethesda, MD 20817 | TitleExpress |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract sales price | 42,000.00 | 401. Contract sales price | 42,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 54,263.91 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes           to | | 406. City/town taxes           to | |
| 107. County taxes              to | | 407. County taxes              to | |
| 108. Assessments               to | | 408. Assessments               to | |
| 109. | | 409. | |
| 110. City/Town Taxes | 361.09 | 410. City/Town Taxes | 361.09 |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due from Borrower** | 96,625.00 | **420. Gross Amount Due to Seller** | 42,361.09 |
| **200. Amounts Paid by or in Behalf of Borrower** | | **500. Reductions In Amount Due to Seller** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 26,742.50 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes           to | | 510. City/town taxes           to | |
| 211. County taxes              to | | 511. County taxes              to | |
| 212. Assessments               to | | 512. Assessments               to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid by/for Borrower** | 0.00 | **520. Total Reduction Amount Due Seller** | 26,742.50 |
| **300. Cash at Settlement from/to Borrower** | | **600. Cash at Settlement to/from Seller** | |
| 301. Gross amount due from borrower (line 120) | 96,625.00 | 601. Gross amount due to seller (line 420) | 42,361.09 |
| 302. Less amounts paid by/for borrower (line 220) | 0.00 | 602. Less reductions in amount due seller (line 520) | 26,742.50 |
| 303. Cash ☒ From ☐ To Borrower | 96,625.00 | 603. Cash ☒ To ☐ From Seller | 15,618.59 |

The Public Reporting Burden for this collection of information is estimated at 35 minutes per response for collecting, reviewing, and reporting the data. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. No confidentiality is assured; this disclosure is mandatory. This is designed to provide the parties to a RESPA covered transaction with information during the settlement process.

**L. Settlement Charges**

| | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| **700.** | **Total Real Estate Broker Fees** | $ 4,537.50 | | |
| | Division of commission (line 700) as follows: | | | |
| 701. | $0.00 | to | | |
| 702. | $4,537.50 | to  ABC Capital Miami | | |
| 703. | Commission paid at settlement | | | 4,537.50 |
| **800.** | **Items Payable in Connection with Loan** | | | |
| 801. | Our origination charge  (Includes Origination Point 0.000% or $0.00) | $ | (from GFE #1) | |
| 802. | Your credit or charge (points) for the specific interest rate chosen | $ | (from GFE #2) | |
| 803. | Your adjusted origination charges | | (from GFE A) | |
| 804. | Processing Fee | to ABC Capital Miami | 499.00 | |
| 805. | Homeowners Insurance and Fees | to Stateside APM | 780.00 | |
| 806. | Processing Fee | to Miami Life Realty | 495.00 | |
| 807. | MD - Registration | to | | |
| 808. | MD - Lead Cert | to | (from GFE #3) | |
| **900.** | **Items Required by Lender to be Paid in Advance** | | | |
| 901. | Daily interest charges from | from 02/24/2020 to 03/01/2020 @ $0.00/day | (from GFE #10) | |
| 902. | Mortgage insurance premium | months to | (from GFE #3) | |
| 903. | Homeowner's insurance | months to | (from GFE #11) | |
| 904. | | months to | (from GFE #11) | |
| **1000.** | **Reserves Deposited with Lender** | | | |
| 1001. | Initial deposit for your escrow account | | (from GFE #9) | |
| 1002. | Homeowner's insurance | months @ $        /month | | |
| 1003. | Mortgage insurance | months @ $        /month | | |
| 1004. | Property taxes | months @ $  0.00/month $ | | |
| 1005. | | months @ $        /month | | |
| 1006. | Assessments | months @ $  0.00/month $ | | |
| 1007. | Aggregate Adjustment | $ | | |
| **1100.** | **Title Charges** | | | |
| 1101. | Title services and lender's title insurance | $ | (from GFE #4) | |
| 1102. | Settlement or closing fee | to | $ | |
| 1103. | Owner's title insurance - First American Title Insurance Company | $ | (from GFE #5)  470.40 | |
| 1104. | Lender's title insurance - First American Title Insurance Company | $ | | |
| 1105. | Lender's title policy limit $0.00  Lender's Policy | | | |
| 1106. | Owner's title policy limit $97,500.00  Owner's Policy | | | |
| 1107. | Agent's portion of the total title insurance premium | $376.32 | | |
| | to Masters Title & Escrow | | | |
| 1108. | Underwriter's portion of the total title insurance premium | $94.08 | | |
| | to First American Title Insurance Company | | | |
| 1109. | Settlement Fee | to Masters Title & Escrow | 450.00 | |
| 1110. | Title Abstract | to Masters Title & Escrow | 260.00 | |
| 1111. | Document Preparation | to Masters Title & Escrow | 185.00 | |
| 1112. | Attorney Fee | to Masters Title & Escrow | 395.00 | |
| 1113. | Lien Certification | to Masters Title & Escrow | 58.00 | |
| 1114. | Wire/Curior Fee | to Masters Title & Escrow | 70.00 | |
| **1200.** | **Government Recording and Transfer Charges** | | | |
| 1201. | Government recording charges | $ | (from GFE #7)  60.00 | |
| 1202. | Deed $60.00 | Mortgage $          Release $ | | |
| 1203. | Transfer taxes | $ | (from GFE #8)  630.00 | |
| 1204. | State Recordation Tax | Deed $420.00        Mortgage $ | | 210.00 |
| 1205. | State Transfer Tax | Deed $210.00        Mortgage $ | | 105.00 |
| 1206. | City Transfer Tax | Deed $630.00        Mortgage $ | | 315.00 |
| **1300.** | **Additional Settlement Charges** | | | |
| 1301. | Required services that you can shop for | | (from GFE #6) | |
| 1302. | Reimbursement of previous Maintenance | to ABC Management - Baltimore, LLC | 48,750.00 | |
| 1303. | Per Agreement | to 477 International Realty | | 10,000.00 |
| 1304. | Property Taxes | to Director of Finance | $1,200.00 P.O.C.(S*) | |
| 1305. | Per Agreement | to Premier Rentals Philadelphia LLC | | 2,500.00 |
| 1306. | Referral Fee | to Miami Life Realty | | 5,445.00 |
| 1307. | Renovation Fee | to USA Rebuilders | | 3,630.00 |
| 1308. | Closing Fee | to ABC Management - Baltimore, LLC | 1,161.51 | |
| **1400.** | **Total Settlement Charges**   (enter on lines 103, Section J and 502, Section K) | | 54,263.91 | 26,742.50 |

*Paid outside of closing by (B)orrower, (S)eller, (L)ender, (I)nvestor, Bro(K)er. **Credit by lender shown on page 1. ***Credit by seller shown on page 1.

**Signature Page**

### HUD CERTIFICATION OF BUYER AND SELLER

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

**Buyers**

VICTORY PROPERTIES LLC

**Sellers**

ABC CAPITAL-BALTIMORE, LLC

**Settlement Agent**

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

SETTLEMENT AGENT                    DATE   2/24/20

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE TITLE 18: U.S. CODE SECTION 1001 AND SECTION 1010.

Previous editions are obsolete          Page 3 of 3          HUD-1

Signature Page

## HUD CERTIFICATION OF BUYER AND SELLER

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Buyers

KATHERINE VICTORY PROPERTIES LLC

*Leonel Pinto*                    03/18/2020
                                  03:23 PM GMT

,

Sellers

ABC CAPITAL-BALTIMORE, LLC

Angela Buonopane, duly authorized agent

Settlement Agent

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

SETTLEMENT AGENT

DATE   2/24/20